UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| SUTURE EXPRESS, INC. | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CARDINAL HEALTH, INC., | : |
| CARDINAL HEALTH 200, LLC, OWENS & | : |
| MINOR, INC. and OWENS & MINOR | : |
| DISTRIBUTION, INC. | : |
| | : |
| Defendants. | |

2:12-cv-02760-RDR-KGS

**JURY TRIAL DEMANDED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FIRST AMENDED COMPLAINT

### Nature of the Action

1.     This is an antitrust and unfair competition case directed at anti-competitive practices in the distribution of medical and surgical ("Med-Surg") supplies to acute care providers.

2.     Acute care providers are generally hospitals and integrated delivery networks of hospitals.  Acute care providers make a significant share of their purchases from broad-based Med-Surg distributors.  These distributors maintain distribution centers throughout the country.

3.     Defendants Cardinal Health, Inc. ("Cardinal Health") and Cardinal Health 200, LLC ("CH200") (collectively "Cardinal"), and Defendants Owens & Minor, Inc. ("O&M, Inc.") and Owens & Minor Distribution, Inc. ("O&M Distribution") (collectively "O&M", and together with Cardinal "Defendants") are broad-based national

Med-Surg distributors.  Cardinal and O&M purchase products from manufacturers, warehouse the products in distribution centers around the country, and then sell and deliver the products in smaller quantities to hospitals and other acute care providers. According to 2011 sales numbers contained in analysts' reports by William Blair & Company and Robert W. Baird & Company, Cardinal and O&M control in excess of 70 percent of the Med-Surg supply to hospitals and other acute care providers.

4.      Plaintiff, Suture Express, Inc. ("Suture Express"), is a national Med-Surg supplies distributor to acute care providers specializing in two Med-Surg product categories – sutures and endomechanical products.  By specializing, Suture Express is able to offer its customers superior service, lower distribution fees, faster and more efficient delivery and a more comprehensive product line within its specialty.

5.      Cardinal and O&M have over the past several years engaged in systematic anti-competitive conduct to undermine Suture Express' attempt to expand its customer base.

6.      Exploiting their dominance in the distribution of Med-Surg supplies generally, Defendants Cardinal and O&M have coerced acute care providers not to purchase sutures and endomechanical products from Suture Express.  Defendants accomplish this by, among other things, charging penalty distribution fees to acute care providers that do not purchase requisite levels of sutures and endomechanical products from Defendants.  On information and belief, Defendants also cause acute care providers not to purchase sutures and endomechanical products from Suture Express by pricing medical and surgical product bundles so that pricing is below cost.

2

7.      By their actions, Cardinal and O&M suppress competition, extend their market power and fortify barriers to entry for the distribution of sutures and endomechanical products.

8.      Defendants' anti-competitive practices clearly target Suture Express.  As a result, Suture Express has lost a significant number of existing and potential customers. Were it not for Defendants' actions, Suture Express' revenues and profits would be substantially greater than they are today.

9.      By making it impossible for Suture Express to compete on its merits, Defendants' practices have also harmed acute care providers.  Hospitals are effectively denied access to Suture Express, raising their costs and compromising their ability to provide economic health care.

10.     Suture Express brings this civil action against Defendants for equitable relief and damages for violating federal and state antitrust laws.

## The Parties

11.     Plaintiff Suture Express, a corporation organized and existing under the laws of the state of Kansas, with its principal place of business at 11020 King Street, Suite 400, Overland Park, Kansas 66210, is the leading dedicated suture and endomechanical products distributor in the United States.

12.     Defendant Cardinal Health, a corporation organized and existing under the laws of Ohio, with its principal place of business at 7000 Cardinal Place, Dublin, Ohio 43017, is a broad-based healthcare services company.  Its medical segment, at issue in

this case, distributes Med-Surg supplies to hospitals and other acute care providers across the United States and Canada, including in this district.

13.     Cardinal Health is an independent corporation without a parent.  It is publicly traded on the New York Stock Exchange (Symbol: "CAH") and has a market capitalization of more than $13.5 billion, annual revenue of more than $107 billion, of which $9.6 billion is generated by its medical segment, and net earnings exceeding $1 billion.

14.     Defendant CH200 is a Delaware limited liability company which is owned 100% by Allegiance Corporation, a Delaware corporation.  Allegiance Corporation is 100% owned by Cardinal Health.  CH200 has a principal place of business at 1430 Waukegan Road, McGaw Park, Illinois 60085.  CH200 distributes Med-Surg supplies to hospitals and other acute care providers across the United States and Canada, including in this district.

15.     Defendant O&M, Inc., a corporation organized and existing under the laws of Virginia, with its principal place of business at 9120 Lockwood Boulevard, Mechanicsville, Virginia 23116, is a broad-based distributor of Med-Surg supplies, serving hospitals and other acute care providers throughout the United States, including in this district.

16.     O&M, Inc. is an independent corporation without a parent.  It is publicly traded on the New York Stock Exchange (Symbol: "OMI").  O&M has a market capitalization of more than $1.82 billion, annual revenue of more than $8.6 billion, and net earnings exceeding $110 million.

17.     Defendant O&M Distribution, a corporation organized and existing under the laws of Virginia, with its principal place of business at 9120 Lockwood Boulevard, Mechanicsville, Virginia 23116, is a wholly-owned a subsidiary of O&M, Inc.  O&M Distribution distributes Med-Surg supplies to hospitals and other acute care providers across the United States and Canada, including in this district.

### Jurisdiction and Venue

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to redress and prevent injuries caused by Cardinal's and O&M's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 3.  This action also states claims under state law arising from the same and related conduct, for which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and diversity jurisdiction pursuant to 28 U.S.C. § 1332.

19.     The Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Kan. Stat. Ann. § 60-308.

20.     Defendant Cardinal, directly or by its agents, may be found in and transacts business in this district, 15 U.S.C. § 22.  The claims stated herein arise in part from Cardinal transacting business in this state, entering into an express contract with a resident of this state to be performed in part in this state and causing injury by acts or omissions to persons within this state.  Kan. Stat. Ann. §§ 60-308(b)(1)(a), (e), (g).

21.     Defendant O&M, directly or by its agents, may be found in and transacts business in this district.  15 U.S.C. § 22.  The claims stated herein arise in part from O&M transacting business in this state, entering into an express contract with a resident of this state to be performed in part in this state, and causing injury by acts or omissions to persons within this state.  Kan. Stat. Ann. §§ 60-308(b)(1)(a), (e), (g).

22.     Venue is proper in this district under 15 U.S.C. § 22, 28 U.S.C. § 1391, and Kan. Stat. Ann. § 60-604, because Plaintiff resides in this district and Defendants maintain registered offices, have agents, transact business and are found in this district. Certain of the unlawful acts alleged herein were performed and had effects within this district.

## **Factual Background**

## **Medical and Surgical Supply Markets**

23.     Broad-based distributors of Med-Surg supplies, like Cardinal and O&M, acquire Med-Surg products at discount prices by purchasing in bulk directly from manufacturers.  They then store, inventory and distribute these products through a network of distribution centers across the country.

24.     The overwhelming majority of acute care providers cannot cost-effectively procure the many items they need by negotiating directly with hundreds of separate individual manufacturers.  Broad-based Med-Surg distributors therefore are in a unique position to deliver key supplies to acute care providers.

25.     The dollar volume of distribution of Med-Surg products to domestic acute care providers is approximately $22 billion annually.  *See* Health Industry Distributors

Association ("HIDA") 2012 Acute Care Market Report.  The domestic distribution of Med-Surg products to acute care providers constitutes a relevant market.  *See, e.g.*, Thomas Weisel Partners, "Owens & Minor, Inc.:  Largest Pure-Play Distributor in Acute Care Market; Impressive Product Strategy; Initiating With an Overweight Rating," March 31, 2010 (discussing O&M's and Cardinal's shares in the acute care hospital market); William Blair & Company, August 5, 2011, Equity Research on Cardinal Health, Inc. (discussing Cardinal's market share position).

26.     The domestic distribution to acute care providers of each product category within the broader market of Med-Surg products constitutes a relevant market or submarket.  The different product categories are not similar in use to or reasonably interchangeable with other product categories.  For example, sutures are not similar to or reasonably interchangeable with  needles and syringes.  Suture Express competes with Defendants in the markets for the domestic distribution of sutures and endomechanical products.

27.     The overwhelming majority of the revenue generated by Med-Surg product distributors is comprised of sales of high-volume, single-use, disposable items that hospitals and other acute care providers consume in large quantities.  These product categories are often referred to as the Med-Surg basket.

28.     According to the 2012 HIDA Acute Care Market Report, over 88 percent of the volume sold by Med-Surg product distributors comes from thirty product categories in the Med-Surg basket.  The HIDA report describes these product categories as parenteral; kits, packs and trays-custom; wound staples and sutures; respiratory;

gloves; woven and nonwoven goods; wound staples and endosurgery; needles and syringes; skin care products; patient care products-medical; wound care; microbiology reagents/supplies; adhesives, bandages, dressings and sponges; surgical instruments and devices; kits, packs and strays-systems; kits, packs and trays-standard; solutions nutritional; sterilization; incontinence products; electrosurgical; specimen collection kits and supplies; urological; point-of-care testing (POCT) reagents/supplies; metal/plastic/paper products; patient restraints and supports; electromedical; clinical chemistry reagents/supplies; pressure monitoring; housekeeping; and diagnostic and therapeutic catheters.

29.     Defendants O&M and Cardinal are the largest national distributors of Med-Surg products to acute care providers.  O&M has an estimated 39 percent share of the acute care Med-Surg distribution market, while Cardinal has an estimated 33 percent market share.  *See* J.P. Morgan "Healthcare Technology & Distribution" May 2012. Defendants' shares are approximately the same in the acute care markets for domestic distribution of sutures and endomechanical products.

**Purchases of Medical and Surgical Supplies by Acute Care Providers**

30.     The United States healthcare network is comprised of approximately 4,800 acute care providers that are in the market for Med-Surg supplies.

31.     When making medical and surgical supply purchases, acute care providers often choose to take advantage of contract pricing that has been negotiated by group purchasing organizations ("GPOs"), regional purchasing cooperatives ("RPCs") or other multi-hospital systems.  In principle, these contracting organizations negotiate with

distributors better terms than single hospitals or providers could negotiate on their own. Member acute care providers then have the opportunity to negotiate contracts with distributors that incorporate these terms.

32.    GPO and RPC model contracts generally extend for approximately three years.  Individual hospital distribution contracts typically extend for the remaining term of the GPO or RPC agreement.

### The Sutures and Endo Product Lines

33.    Two of the product categories in the Med-Surg basket are sutures and endomechanical products.  Sutures are medical devices that are used to hold body tissues together after injury or surgery.  They are the most commonly used means of wound closure.

34.    Endomechanical and endosurgical (or "endo") products are devices used in minimally invasive surgeries, also known as "laparoscopic" or "keyhole" surgeries.

35.    According to HIDA data, sutures and endo products (which in HIDA are included in the "Wound Staples & Sutures" and "Wound Staples & Endosurgery" categories) together make up approximately 10% of the Med-Surg supplies distributed in the United States to hospitals and other acute care providers, worth over $2 billion annually.  *See* HIDA 2012 Acute Care Market Report.

36.    Acute care providers' requirements for sutures and endo products differ from their requirements for other products in the Med-Surg basket.  This is primarily because there are thousands of varieties of sutures and endo products tailored and

designed for the vast spectrum of potential medical or surgical applications (*e.g.*, type of wound, depth of wound, type of surgery).

37.     There is also a vast spectrum of user/surgeon preference (*e.g.*, different doctors often prefer different types of sutures to perform the exact same procedure, even within the same hospital or medical group).

38.     Broad-based distributors like Defendants traditionally only stock sutures and endo products that are the most often used (the "core" products).  As in many industries, "core" products are determined by the frequency with which a product is purchased.  For example, a product that is purchased more than six times per month (on average) may qualify as a "core" product and a product that is purchased only twice a year may be defined as a "non-core" product.

### Suture Express Enters the Sutures and Endo Distribution Business

39.     Suture Express launched its business in 1998.  Since its inception, Suture Express has focused its sales primarily on sutures and endomechanical products, having perceived a market need for enhanced distribution of these categories of products.

40.     The company now stocks approximately 6,000 SKUs of sutures and other wound closure products, as well as endomechanical and endosurgical supplies, and distributes to approximately 900 hospitals and other acute care providers across the United States.  The company offers both core and non-core sutures and endo products.

41.     Suture Express offers a compelling alternative for the purchase of sutures and endo products by hospitals and other acute care providers.  Suture Express sets itself apart from broad-based distributors of Med-Surg supplies by offering: (1) superior

delivery service, utilizing FedEx overnight-shipping to deliver next-day to any location in the United States from a secure, central fulfillment facility; (2) higher order fill rates; (3) lower distribution fees; (4) the largest selection of sutures and endo products, both core and non-core; and (5) no additional handling or restocking fees.

42.     From the time of its launch in 1998 through 2008, Suture Express experienced significant growth in revenues and profitability by meeting the demand for enhanced distribution of sutures and endo products.  During these years, customers recognized the superior service and robust product offerings of Suture Express and rewarded it with their business.

### Defendants' Anti-Competitive Conduct

43.     Defendants responded to the success of Suture Express by adopting a series of anti-competitive practices designed to leverage their power in the distribution of products in the Med-Surg basket to coerce customers into foregoing purchases of sutures and endo products from Suture Express.  On information and belief, Defendants initiated these practices in 2008.

44.     Among other things, Defendants unlawfully tie the sale to acute care providers of sutures and endo products to the sale of other products in the Med-Surg basket.  Defendants provide in their contracts that, if an acute care organization wants to purchase distributors' products in the Med-Surg basket excluding sutures and endo, the customer must also purchase sutures and endo products from this distributor; otherwise, Defendants charge the hospital or other acute care organization a penalty in the form of a prohibitive distribution fee applicable to the entire Med-Surg basket.  For example,

Defendants divide purchase requirements between Med-Surg products excluding sutures and endo, and sutures and endo products.  If the acute care provider does not purchase 90 percent or more of its sutures and endo needs from Defendants, it must pay a penalty on its entire Med-Surg spend.  That penalty can range from 1 percent to 5 percent.

45.     As an illustration of this coercive scheme, assume a hospital purchases $10 million in Med-Surg products, including $1 million of sutures and endo products. The hospital contracts with either Defendant to meet their overall Med-Surg needs, but the contract includes a specific provision imposing a 5 percent penalty fee on all purchases if the hospital elects to purchase its sutures and endo products from Suture Express.  Therefore, if the hospital were to purchase its $1 million in sutures and endo from Suture Express, Defendant would impose on the hospital a penalty of 5 percent, or $450,000, on its remaining $9 million of Med-Surg purchases.

46.     The prohibitive penalty described above coerces acute care organizations that require Defendants' Med-Surg products to also purchase Defendants' sutures and endo products.  These acute care providers are effectively prevented from dealing with Suture Express, notwithstanding Suture Express' superior service, lower distribution fees and comprehensive product selection.

47.     On information and belief, Defendants also employ the alternative tactic of repackaging distribution penalty programs as purported discount programs. Defendants offer a bundle of Med-Surg products, including sutures and endo products, for a so-called discounted distribution fee and eliminate the discount when sutures and endo are not included in the basket.  There is a substantial gap between the distribution

fee when sutures and endo are included and when they are not – much as there is a gap when defendant distributors impose the distribution penalty described earlier.

48.     On information and belief, the allocation of this whole basket "discount" to sutures and endo products brings the price of the Defendants' sutures and endo offerings below cost.  If, for example, the overall Med-Surg spend by a hospital is $10 million, its spend on sutures and endo would be approximately 10 percent, or $1 million. If there is a 5 percent discount for purchasing the whole Med-Surg basket of products, then the discount amount attributable to all products except sutures and endo (that is, $9 million of products) is $450,000.

49.     On information and belief, Defendants earn gross margins ranging from 6 percent to 9.5 percent for sutures and endo products (i.e., Cost of Goods Sold is 90.5 percent to 94 percent of Sales).  Additional costs generally range from 2 to 7 percent.  On this basis, Defendants' costs for sutures and endo products are approximately 92.5 percent to nearly 100 percent or more of Sales.  Thus, under these ranges the 5 percent discount results in pricing below Cardinal's and O&M's costs.  In the example above, allocating the $450,000 discount to Defendants' $1 million sales of sutures and endo products results in net sales of $550,000, which is substantially below the estimated $925,000 to $1 million cost of those products.  This predatory pricing enhances Defendants' market power, raises barriers to entry and impedes the ability of Suture Express to compete.

50.     These exclusionary practices clearly are directed at Suture Express. Sutures and endo are the only product categories in the entire Med-Surg basket subject to

Defendants' illegal tying and bundling arrangements.  Further, Suture Express is the only significant specialty distributor of sutures and endo products.

51.     Notably, the exclusionary practices directed at Suture Express and employed by Cardinal and by O&M are strikingly similar.

52.     The Defendants' lock-step implementation of nearly identical penalty programs defies each distributor's independent economic interests.  One would expect, for example, in response to Cardinal's imposition of contractual penalties on acute care providers who seek to purchase from Suture Express, that O&M – acting independently – would seek these customers' business by offering Med-Surg products without the penalty.  Instead, O&M imposes a similar regime of contractual penalties and bundling that does not challenge Cardinal.  In short, O&M and Cardinal present a united front against acute care providers' dealing with Suture Express.

53.     There are no legitimate business justifications for Defendants' anti-competitive practices.  Any purported legitimate business justifications are mere pretexts.

**The Anti-Competitive Effects of Defendants' Illegal Conduct**

54.     Due to the fact that many hospitals and other acute care providers have high-dollar-volume needs for the larger basket of Med-Surg products, they cannot as a practical matter put themselves in a position to pay the exorbitant distribution fees that are only avoided if they commit to purchase all or most of their sutures and endo products from Cardinal and O&M.

55.     Moreover, given the ongoing pressure in healthcare for cost containment, a penalty distribution fee of even 1 percent on Med-Surg products purchased is a significant economic factor that effectively coerces consumer choice in these markets.

56.     As a result, numerous hospitals and other acute care providers that would prefer to purchase sutures and endo products from Suture Express are prohibited from doing so; they have no viable economic option other than to purchase those products from Cardinal or O&M.

57.     As a direct and proximate result of Cardinal and O&M's anti-competitive and exclusionary conduct, Suture Express has been injured in its business and property, entitling it to treble damages in an amount in excess of $200 million.  Cardinal and O&M's conduct has affected and, unless enjoined, will continue to injure and reduce competition in the sutures and endo products distribution markets.

58.     These effects include, without limitation: (a) reduction or elimination of consumer choice among competing sutures and endo products distributors; (b) increased costs and reduced service to acute care providers for distribution of sutures and endo products; (c) foreclosure of access to the sutures and endo products distribution market; (d) increased barriers to entry in the sutures and endo products distribution market; (e) chilling innovation within the Med-Surg supplies distribution market more generally; and (f) loss of competition among distributors to the acute care market.

## CLAIMS FOR RELIEF

## COUNT I

### Sherman Act § 1: Illegal Tying of Suture and Endo Products

(Against Cardinal and O&M Each Individually)

59.     Suture Express incorporates paragraphs 1 through 58 by reference.

60.     Defendants have tied products in their Med-Surg baskets excluding sutures and endo products (tying products) to the purchase of sutures and endo products (tied products) by threatening exorbitant penalties for the distribution of the tying products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  These penalties can only be avoided by also purchasing the tied products from Defendants.  Defendants condition the availability of their tying products on the buyer's purchase of their tied products to the exclusion of Suture Express' sutures and endo products.

61.     Sutures and endo products represent distinct product categories within the standard basket of Med-Surg products sold by Defendants, which generally includes some thirty product categories, including, for example, needles and syringes, surgical kits, specimen collection kits, skin care products and gloves.

62.     Defendants each possess appreciable power in the market for the distribution and sale of supplies in the Med-Surg basket exclusive of sutures and endo products.

63.     Defendants leverage this market power to coerce buyers to purchase Defendants' sutures and endo products rather than Suture Express' products.

64.     The tying arrangements described affect a substantial volume of commerce in the relevant Med-Surg, sutures and endo markets, suppress sales of Suture Express' products and diminish Suture Express' current and future sales opportunities.

Count II

Sherman Act § 2: Unlawful Monopolization

(Against Cardinal and O&M Each Individually)

65.     Suture Express incorporates paragraphs 1 through 64 by reference.

66.     On information and belief, each Defendants' conduct constitutes the intentional and unlawful maintenance of monopoly power in the relevant markets for the domestic distribution to acute care providers of sutures and endo products, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

67.     In the alternative, each Defendants' conduct is an attempt by each to monopolize these markets in violation of 15 U.S.C. § 2.  Defendants have acted with specific intent to attempt to monopolize the relevant markets for the domestic distribution to acute care providers of sutures and endo products, and each has sufficient market power to create a dangerous probability of success of monopolizing these markets.

68.     Defendants have excluded, or attempted to exclude, competition in these markets by engaging in predatory and anti-competitive conduct, including, as described above, the tying of sutures and endo products to the other products in the Med-Surg basket and by bundling Med-Surg products in a manner that provides sutures and endo products to customers at prices below any appropriate measure of their cost.

17

69.     Defendants' anti-competitive practices have injured competition and consumers in the relevant sutures and endo markets, suppressed sales of Suture Express' products and diminished Suture Express' current and future sales opportunities.

## Count III

### Sherman Act § 1: Conspiracy to Restrain Trade

70.     Suture Express incorporates paragraphs 1 through 69 by reference.

71.     On information and belief, Defendants have conspired to restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by offering nearly identical terms that prevent customers from being able to purchase sutures and endo products from Suture Express.  This conduct defies each defendant's own independent economic interest.

72.     Defendants' anti-competitive practices have injured competition and consumers in the relevant sutures and endo markets, suppressed sales of Suture Express' products and diminished Suture Express' current and future sales opportunities.

## Count IV

### Sherman Act § 2: Conspiracy to Monopolize

73.     Suture Express incorporates paragraphs 1 through 72 by reference.

74.     On information and belief, Defendants have conspired to intentionally and unlawfully maintain monopoly power in the relevant sutures and endo markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

75.     Defendants, in concert, have excluded, or attempted to exclude, competition in these markets by engaging in predatory and anti-competitive conduct,

including as described above, the tying of sutures and endo products to the other products in the Med-Surg basket and by bundling Med-Surg products in a manner that provides sutures and endo products to customers at prices below any appropriate measure of their cost. Each Defendant has crafted and implemented these anti-competitive schemes in a manner nearly identical to one another despite the fact that the schemes are directly contrary to each of their own independent economic interests.

76. Defendants' anti-competitive practices affect a substantial volume of commerce in the relevant sutures and endo markets, and have injured competition and consumers in these markets, suppressed sales of Suture Express' products and diminished Suture Express' current and future sales opportunities.

Count V

Clayton Act § 3: Exclusive Dealing

(Against Cardinal and O&M Each Individually)

77. Suture Express incorporates paragraphs 1 through 76 by reference.

78. As detailed above, Defendants have made sales of Med-Surg products, including sutures and endo products, and have set the prices and distribution fees charged on those sales, based on the condition, agreement or understanding that the purchaser will not deal in Suture Express' sutures and endo products.

79. Defendants' exclusive dealing violates Section 3 of the Clayton Act because it has foreclosed Suture Express from substantial portions of the markets for the

distribution of sutures and endo products, has substantially lessened competition in these markets, and tends to create a monopoly.

80.     Suture Express has been damaged by the loss of sales and profits resulting from buyers' unwillingness and inability to resist Defendants' exclusive dealing arrangements.

Count VI

Violation of Kan. Stat., Chapter 50

81.     Suture Express incorporates paragraphs 1 through 80 by reference.

82.     Defendants' anti-competitive tying and bundling practices, as well as their agreement or arrangement to implement these practices, were undertaken with a view to prevent full and free competition in the transportation or sale of articles imported into Kansas.

83.     In the alternative, Defendants' anti-competitive tying and bundling practices tend to prevent full and free competition in the transportation or sale of articles imported into Kansas.

84.     Defendants' practices violate Kan. Stat. Ann. Sections 50-101 et. seq.

Count VII

Unjust Enrichment

85.     Suture Express incorporates paragraphs 1 through 84 by reference.

86.     Defendants' anti-competitive conduct reduced Suture Express's presence in the sutures and endo markets.

87.     Defendants benefited from Suture Express's reduced presence in those markets.

88.     Defendants appreciate the fact that their market share is greater in the sutures and endo markets as a consequence of Suture Express's reduced presence.

89.     This greater market share was achieved as a consequence of Defendants' own anti-competitive activities.

90.     Defendants were therefore unjustly enriched in violation of Kansas common law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Suture Express respectfully prays that this Court enter judgment on its behalf and against Defendants and award as follows:

a.     An Order directing the termination of the alleged anti-competitive conduct and injunctive relief that restores Suture Express to the same position it occupied prior to Cardinal's and O&M's unlawful exclusionary conduct;

b.     Treble damages (including, without limitation, lost profits), in an amount in excess of $200 million, to be determined at trial;

c.     Suture Express's costs of suit herein, including without limitation its attorneys' fees actually incurred;

d.     Punitive damages; and

e.     Such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Suture Express respectfully requests trial by jury in this action.

## REQUEST FOR PLACE OF TRIAL

Suture Express respectfully requests the place of trial as Kansas City, Kansas.

Respectfully submitted,

POLSINELLI SHUGHART PC

By: /s/ Jennifer Gille Bacon
    GREGORY M. BENTZ (USD KS 70358)
    JENNIFER GILLE BACON (USD KS 70279)
    CATHY J. DEAN (USD KS 70143)
    Twelve Wyandotte Plaza
    120 W. 12th Street
    Kansas City, MO 64105
    (816) 421-3355
    Fax No. (816) 374-0509

DEBEVOISE & PLIMPTON LLP

Daniel M. Abuhoff (admitted *Pro Hac Vice*)
Michael S. Schaper (admitted *Pro Hac Vice*)
Julie M. Calderon Rizzo (admitted *Pro Hac Vice*)
919 Third Avenue
New York, New York 10022
(212) 909-6000
Fax No. (212) 521-7788

*Attorneys for Plaintiff Suture Express*