# EXHIBIT A

market share from 3.68 percent in 1944 to 7 percent in 1948, the DOJ asserted that the full line practice "tends to exclude the dealer as [an] outlet for competitive goods"[1324] and challenged the practice under both the Sherman and Clayton Acts. The district court rejected the government's challenge, stating that "a mutual arrangement between the farm machinery manufacturer and its dealers that it is for the best interest of both for the latter to handle a full line of the manufacturer's output, without any competitive restriction imposed upon the dealer, is not violative of any law."[1325]

Practices involving "bundling" or "packaging" of products are sometimes challenged as de facto tying arrangements under Section 1 on the theory that they may make it economically unviable for customers to purchase one product without also purchasing others from the same supplier.[1326]

b. EXCLUSIVE DEALING ARRANGEMENTS

Exclusive dealing describes a set of practices that have the effect of inducing a buyer to purchase most or all products or services for a period of time from one supplier.[1327] The arrangement may take the form of an agreement forbidding the buyer from purchasing from the supplier's competitors,[1328] a requirements contract committing the buyer to purchase all (or a substantial portion) of its total requirements of specific goods or services only from the supplier,[1329] a pricing policy that creates a substantial disincentive to purchase from competitors,[1330] or an agreement to purchase all of a supplier's output.[1331] A supplier may enter an

---

1324. *Id.* at 867.
1325. *Id.*
1326. *See, e.g.*, Ramallo Bros. Printing v. El Dia, Inc., 392 F. Supp. 2d 118, 133-35 (D.P.R. 2005) (granting summary judgment on tying claim based on packaged discounts); Ortho Diagnostics v. Abbott Labs., 920 F. Supp. 455, 471, 474 (S.D.N.Y. 1996) (granting summary judgment on § 1 claim based on bundling of pharmaceutical products; *see also* LePage's Inc. v. 3M Co., 324 F.3d 141, 155 (3d Cir. 2003) (en banc) (observing, in the context of evaluating a monopolization claim, that a package discount is a form of tying that can have an anticompetitive effect if it creates a strong incentive to forgo purchases from competing sellers). Supplier bundling or packaging is also sometimes challenged as alleged monopolization under § 2 of the Sherman Act. These claims are discussed in part C.2.e of Chapter 2.
1327. *See, e.g.*, Omega Envtl. v. Gilbarco, Inc., 127 F.3d 1157, 1162-65 (9th Cir. 1997); Roy B. Taylor Sales v. Hollymatic Corp., 28 F.3d 1379, 1384 (5th Cir. 1994). A requirement that a buyer sell goods of competing manufacturers only from separate facilities, however, has been found not to be an exclusive dealing arrangement. *See* Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp., 814 F.2d 90, 96-97 (2d Cir. 1987) (competing manufacturers' products from separate showrooms); Kellam Energy v. Duncan, 668 F. Supp. 861, 883-84 (D. Del. 1987). Exclusive dealing also occurs when a technology license prevents the licensee from licensing, selling, distributing, or using competing technologies. INTELLECTUAL PROPERTY GUIDELINES §§ 4.1.2, 5.4. Exclusive dealing should be distinguished from exclusive distributorships. In an exclusive distributorship, the restraint operates only on the seller, but in an exclusive dealing arrangement, the restraint is on the buyer. *See* part D.1.b(3) of this chapter.
1328. *See, e.g., Omega*, 127 F.3d at 1162; Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1234 (8th Cir. 1987).
1329. *See, e.g.*, Taggart v. Rutledge, 657 F. Supp. 1420, 1443-45 (D. Mont. 1987), *aff'd mem.*, 852 F.2d 1290 (9th Cir. 1988).
1330. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1162-63 (8th Cir. 2000); Avery Dennison Corp. v. ACCO Brands, 2000 U.S. Dist. LEXIS 3938, at *59-60 (C.D. Cal. 2000).
1331. *See* Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 509 (2d Cir. 2004) (exclusive agreement between the only significant supplier of an essential component of a drug product and a

exclusive dealing arrangement with a distributor, retailer, or end user. Some exclusive-dealing agreements are directed upstream, such as an agreement between a manufacturer and an input supplier or an agreement imposed by a distributor that limits the supplier's ability to work with other distributors.

Like tying arrangements, exclusive dealing arrangements may raise competitive concerns if they have the potential to foreclose competitors of the supplier from marketing their products to that buyer for the period of time involved. Exclusive dealing is explicitly prohibited by Section 3 of the Clayton Act when the effect of the arrangement may be substantially to lessen competition or tend to create a monopoly.[1332] It is also subject to challenge under Section 1 of the Sherman Act,[1333] Section 5 of the FTC Act,[1334] and as conduct evidencing a violation of Section 2 of the Sherman Act.[1335] Section 3 is limited to arrangements involving "goods, wares, merchandise, machinery, supplies, or other commodities,"[1336] and therefore cannot support a challenge involving services or intangibles.[1337] Section 3 also requires that there be a "sale." Accordingly, exclusive dealing transactions that do not involve sales, such as consignments, cannot be challenged under that statute.[1338]

The Supreme Court historically has treated exclusive dealing arrangements more leniently than tying arrangements. Recognizing that these arrangements may have procompetitive effects and may be motivated by goals that are not anticompetitive,[1339] the Court has never treated exclusive dealing arrangements as per se unlawful. In *Standard Oil Co. v. United States (Standard Stations)*,[1340] for example, the Court discussed potential benefits of exclusive dealing arrangements:

> In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations,

---

generic manufacturer "had the potential to freeze [other generic manufacturers] out of the ... market"). *But see* Paddock Publ'ns v. Chi. Tribune Co., 103 F.3d 42, 44 (7th Cir. 1996) (no injury to competition where other sources of supply available).
1332. 15 U.S.C. § 14.
1333. *See, e.g.*, *Microsoft*, 253 F.3d at 34.
1334. *See, e.g.*, Luria Bros. & Co. v. FTC, 389 F.2d 847, 861 (3d Cir. 1968).
1335. *See Geneva*, 386 F.3d at 504-05 (exclusive supply agreement could have enabled defendant to monopolize market for a key input); United States v. Dentsply Int'l, 399 F.3d 181, 191 (3d Cir. 2005) (exclusive dealing contracts enabled defendant to preserve monopoly power); Fraser v. Major League Soccer, 284 F.3d 47, 61 (1st Cir. 2002).
1336. 15 U.S.C. § 14.
1337. Cases describing the scope of "commodities" subject to § 3 are discussed *supra* at notes 1069-1074 and the accompanying text.
1338. *See, e.g.*, FTC v. Curtis Publ'g Co., 260 U.S. 568, 581 (1923) (§ 3 inapplicable to consignments); CDC Techs. v. IDEXX Labs., 186 F.3d 74, 78-79 (2d Cir. 1999) (§ 3 inapplicable to transactions with distributors who provided only "qualified leads").
1339. *See, e.g.*, Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 329, 334 (1961); *Jefferson Parish*, 466 U.S. at 44-47 (O'Connor, J., concurring); *accord* Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 373 F.3d 57, 62 (1st Cir. 2004); *Omega*, 127 F.3d at 1162; *Roy B. Taylor*, 28 F.3d at 1384; U.S. Healthcare v. Healthsource, Inc., 986 F.2d 589, 594 (1st Cir. 1993); *Ryko Mfg.*, 823 F.2d at 1234 n.17; Interface Grp. v. Mass. Port Auth., 816 F.2d 9, 11-12 (1st Cir. 1987); Roland Mach. Co. v. Dresser Indus., 749 F.2d 380, 394-96 (7th Cir. 1984); Smith v. N. Mich. Hosps., 703 F.2d 942, 953 (6th Cir. 1983).
1340. 337 U.S. 293 (1949).

and—of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified—offer the possibility of a predictable market. They may be useful, moreover, to a seller trying to establish a foothold against the counterattacks of entrenched competitors. Since these advantages of requirements contracts may be sufficient to account for their use, the coverage by such contracts of a substantial amount of business affords a weaker basis for the inference that competition may be lessened than would similar coverage by tying clauses, especially where use of the latter is combined with market control of the tying device.[1341]

In the *Standard Stations* decision, the Court adopted what came to be known as the "quantitative substantiality" test. This test measured whether the foreclosure of competition was substantial by focusing almost entirely on the percentage of the relevant market foreclosed to competing suppliers by virtue of the exclusive dealing arrangement. The Court stated that Section 3 did not require a full-scale rule of reason inquiry "of the same broad scope as was adumbrated . . . in *Chicago Board of Trade*"[1342] and held that the substantial lessening of competition requirement of Section 3 "is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected."[1343] The Court reasoned that "serious difficulties" would attend any attempt to undertake a more searching judicial inquiry into the economic effects of such arrangements[1344] and found that the foreclosure of 6.7 percent of the relevant market was substantial.[1345] This foreclosure occurred in an industry where other major oil companies employed exclusive dealing contracts similar to those before the Court. The Court emphasized that, in the aggregate, these arrangements foreclosed 65 percent of the market.[1346]

The Supreme Court took a different course twelve years later in *Tampa Electric Co. v. Nashville Coal Co.*,[1347] where it employed what has been characterized as the "qualitative substantiality" test in finding that a foreclosure of $128 million of coal sales covered by a utility's twenty-year requirements contract was insufficient to render the contract illegal. Although the arrangement foreclosed just 0.77 percent of the relevant market, the Court did not rest its decision only on the fact that such a percentage was insubstantial. The Court also emphasized the need "to weigh the probable effect of the contract on the relevant area of effective competition . . . and

---

1341. *Id.* at 306-07 (citations and footnotes omitted); *see also Tampa Elec. Co.*, 365 U.S. at 329, 334 (exclusive dealing arrangement may be of economic advantage to both buyers and sellers); *Stop & Shop Supermarket*, 373 F.3d at 62 (exclusive dealing may have procompetitive benefits and is not a per se violation); *Ryko Mfg.*, 823 F.2d at 1234 n.17 (exclusive dealing promotes interbrand competition by concentrating a distributor's efforts on promoting one line of products and by preventing free riding).

342. 337 U.S. at 313.

343. *Id.* at 314.

344. *Id.* at 308.

345. *Id.* at 309.

346. *Id.* at 309, 314. Subsequently, in *Tampa Electric*, the Court emphasized the "industry-wide practice of relying upon exclusive contracts" that existed in *Standard Stations*. 365 U.S. at 334; *see also Stop & Shop Supermarket*, 373 F.3d at 66 (analysis of effect on plaintiff must take account of foreclosure engendered by challenged agreement "and other existing foreclosures" in the market). *But see* Dickson v. Microsoft Corp., 309 F.3d 193, 210 (4th Cir. 2002) (effects of Microsoft's exclusionary agreements with original equipment manufacturers had to be evaluated separately).

347. 365 U.S. 320 (1961).

the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein."[1348] After assessing the "particularized considerations of the parties' operations," including the public interest in assuring public utilities a steady and ample supply of fuel, the Court upheld the agreement.[1349] In determining whether exclusive dealing arrangements "significantly limited" the opportunities for competing sellers to "enter into or remain on the market,"[1350] the Court in *Tampa Electric* required a more detailed analysis of the market and the particular circumstances in which an exclusive dealing arrangement was employed than it had in *Standard Stations*.[1351]

In *Jefferson Parish Hospital District No. 2 v. Hyde*,[1352] the Supreme Court addressed a five-year exclusive contract between a hospital and a firm of anesthesiologists. Although the majority opinion in *Jefferson Parish* analyzed the contract as a tying arrangement, the concurring opinion of four justices analyzed it as exclusive dealing:

> In determining whether an exclusive-dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question—the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.[1353]

The concurring justices concluded, without engaging in a detailed analysis of the market, that the exclusive contract (which foreclosed 30 percent of the market) was not an unreasonable restraint of trade because there was no likelihood that it would unreasonably enhance the market position of the hospital or permit the anesthesiology firm to acquire power relative to other anesthesiologists.[1354]

Until the early 1980s, the *Tampa Electric* approach was not the controlling standard under Section 5 of the FTC Act because Section 5 had been construed to reach exclusive dealing arrangements that did not violate Section 3 of the Clayton Act. In one early decision, the FTC indicated that it would consider all relevant factors and undertake an economic analysis before concluding that an arrangement

---

1348. 365 U.S. at 329. Potential for anticompetitive effects may arise if the excluding supplier can hinder rivals that might otherwise constrain its competitive behavior; the effects are felt through reduced competition and may ultimately result in higher prices or reduced output to consumers. *Stop & Shop Supermarket*, 373 F.3d at 66.
1349. *Id.* at 334-35. The Court did not address the issue of whether a less than total requirements contract was reached by § 3 of the Clayton Act. *Id.* at 329-30.
1350. *Id.* at 328.
1351. Since *Tampa Electric*, lower courts have applied a similar approach. *See, e.g.*, Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 508 (2d Cir. 2004); Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 373 F.3d 57, 66 (1st Cir. 2004); Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655, 661 (8th Cir. 2000); CDC Techs. v. IDEXX Labs., 186 F.3d 74, 80 (2d Cir. 1999); Omega Envtl. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997); Thompson Everett, Inc. v. Nat'l Cable Adver., 57 F.3d 1317, 1326 (4th Cir. 1995) (short-term exclusive contracts upheld where plaintiff failed to advance evidence of substantial anticompetitive effect); Roy B. Taylor Sales v. Hollymatic Corp., 28 F.3d 1379, 1383 (5th Cir. 1994); (adverse market effect must affect competition not competitors).
1352. 466 U.S. 2 (1984).
1353. *Id.* at 45.
1354. *Id.* at 46.

Case 2:12-cv-02760-RDR-KGS   Document 43-1   Filed 04/19/13   Page 6 of 12

b.  INDIRECT/CIRCUMSTANTIAL EVIDENCE OF MONOPOLY POWER

*(1)  Market Share as an Indicator of Monopoly Power*

In *United States v. Aluminum Co. of America*,[22] Judge Learned Hand, writing for the Second Circuit after certification of the case from the Supreme Court, opined that controlling 90 percent of supply "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not."[23]

Consistent with the *Alcoa* decision, courts generally have regarded the alleged monopolist's market share as a very important factor in determining the existence of monopoly power. Thus, in *United States v. E.I. duPont de Nemours & Co.*,[24] the Supreme Court unanimously stated that control of 75 percent of a relevant market consisting of cellophane wrapping materials would have constituted monopoly power.[25] The Court held, however, that there had been no monopolization because the properly defined relevant market consisted of all flexible wrapping materials, of which duPont's share was less than 20 percent.[26] Subsequently, in *United States v. Grinnell Corp.*,[27] the defendants accounted for 87 percent of the accredited central station security service business.[28] The Court noted "[t]he existence of such [monopoly] power ordinarily may be inferred from the predominant share of the market."[29] In *Eastman Kodak Co. v. Image Technical Services*,[30] the Supreme Court held that a factfinder could infer monopoly power from an 80 percent market share.[31]

Many lower courts continue to regard market share as the starting point in assessing monopoly power,[32] while others consider market share and entry barriers

---

evidence of market power includes definition of relevant market and showing defendant has dominant share of that market, significant barriers to entry exist, and existing competitors lack ability to increase output in short run); *see also* Lockheed Martin Corp. v. Boeing Co., 390 F. Supp. 2d 1073, 1079 (M.D. Fla. 2005) (explaining that changes to structure of relevant market, such as reallocation of contracts, may indicate whether exercise of monopoly power is impossible, but noting that alleged monopolist's drop in market share, due to its own misconduct, will not be factor in determining whether or not it had monopoly power).

22. 148 F.2d 416 (2d Cir. 1945). The case was certified to the Second Circuit pursuant to the 1944 amendment to 15 U.S.C. § 29 due to the absence of a quorum of six Supreme Court Justices eligible to participate in the consideration of the case. *Id.* at 421.
23. *Id.* at 424.
24. 351 U.S. 377 (1956).
25. *Id.* at 379, 391.
26. *Id.* at 402-04.
27. 384 U.S. 563 (1966).
28. *Id.* at 567.
29. *Id.* at 571; *see also* Int'l Boxing Club v. United States, 358 U.S. 242, 249 (1959) (observing that "[t]he power of the combine to exclude competitors in the championship field is graphically shown by their promotion of 25 out of 27 fights in all divisions, a total of 93% during the two-and-a-half-year period ending with the filing of the amended complaint").
30. 504 U.S. 451 (1992).
31. *Id.* at 481.
32. *See, e.g.*, Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 315 (3d Cir. 2007) (holding that monopoly power was sufficiently alleged where plaintiff alleged that defendant had a "dominant" market share as well as the power to extract supracompetitive prices and that the market had entry barriers); Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 500 (2d Cir. 2004) ("Although market share is not functionally equivalent to monopoly power, it is nevertheless highly relevant to the determination of monopoly power."); Bailey v. Allgas, Inc., 284 F.3d 1237, 1246 (11th Cir.

simultaneously.[33] A market share in excess of 70 percent generally establishes a prima facie case of monopoly power,[34] at least with evidence of substantial barriers to entry[35] and evidence that existing competitors could not expand output.[36] In contrast, courts virtually never find monopoly power when market share is less than about 50

---

2002) ("The most direct method of establishing monopoly power is through economic proof, namely, demand and supply curves. Because demand is difficult to establish with accuracy, evidence of a seller's market share may provide the most convenient circumstantial measure of monopoly power."); Goldwasser v. Ameritech Corp., 222 F.3d 390, 397 (7th Cir. 2000) ("the conventional way of proving power [is] by showing a given share of a properly defined relevant market," but noting that this approach can present "vexing problems"); Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, 185 F.3d 606, 623 (6th Cir. 1999) ("market share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share").

33. See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 450-51 (4th Cir. 2011) (noting district court was correct to assume monopoly power on motion to dismiss where antitrust plaintiff pled, among other things, that defendant "has long dominated" the market, "numerous" barriers to entry exist, supply is low, and defendant has market share over 70%); Confederated Tribes of Siletz Indians v. Weyerhaeuser Co., 411 F.3d 1030, 1043 (9th Cir. 2005) ("Market share alone, however, does not raise an inference of a dangerous possibility of market power if there are low entry barriers or other evidence of a defendant's inability to control prices or competitors.") (citation omitted), vacated on other grounds sub nom. Weyerhaeuser Co. v. Ross-Simmons Hardware Lumber Co., 549 U.S. 312 (2007); United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001) ("Under [the] structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."); Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) (circumstantial evidence of monopoly power includes market share and barriers to entry).

34. See, e.g., Spirit Airlines v. Nw. Airlines, 431 F.3d 917, 935-36 (6th Cir. 2005) (reasonable finder of fact could find monopoly power based on market shares from 70% to 89%); Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 783 n.2 (6th Cir. 2002) (share of 74% to 77% shows monopoly power); Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."); Morgenstern v. Wilson, 29 F.3d 1291, 1296 n.3 (8th Cir. 1994) (80% market share sufficient); Weiss v. York Hosp., 745 F.2d 786, 827 (3d Cir. 1984) (market share in excess of 80% sufficient); Byars v. Bluff City News Co., 683 F.2d 981, 982-83 (6th Cir. 1982) (90% market share sufficient); LG Elecs. v. Asko Appliances, 2010 U.S. Dist. LEXIS 31571, at *13 (D. Del. 2010) (allegation that defendant enjoys 50-75% market share was sufficient to state a monopolization claim); In re Educ. Testing Serv., 429 F. Supp. 2d 752, 756 (E.D. La. 2005) ("The case law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of market power.").

35. See, e.g., Microsoft, 253 F.3d at 51 (affirming district court's finding of monopoly power where Microsoft's market share was at least 80% and the "applications barrier to entry" hindered new entrants into market); see also Tops Mkts. v. Quality Mkts., 142 F.3d 90, 98-99 (2d Cir. 1998) (finding no monopoly power despite share of 72% or more because undisputed facts showed low barriers to entry); Crossroads Cogeneration Corp. v. Orange & Rockland Util., 159 F.3d 129, 141 (3d Cir. 1998) ("merely stat[ing] that defendant is the sole provider of electricity" would not suffice; such claims require "something more, which may include 'the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand'") (citation omitted).

36. See, e.g., Townshend v. Rockwell Int'l Corp., 2000 U.S. Dist. LEXIS 5070, at *36 (N.D. Cal. 2000) (failure to allege that competitors could not expand output defeated claim); cf. R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 368, 390-91 (M.D.N.C. 2002) (incumbent competitor's current market share of 51% was not sufficient to establish market power because of substantial excess capacity in market, willingness of at least some customers to shift purchases among brands, and recent history of new entry), aff'd on other grounds, 67 F. App'x 810 (4th Cir. 2003) (declining to affirm finding that defendant lacked market power).

percent.[37] The greatest uncertainty exists when market shares are between 50 percent and 70 percent.[38] Courts generally look only to a single defendant's market share for evidence of its monopoly power, rejecting plaintiffs' attempts to aggregate the market share of one defendant with that of another (or with a nonparty) to reach a share high enough to show monopoly power.[39]

---

37. *See, e.g.*, Bailey v. Allgas, Inc., 284 F.3d 1237, 1250 (11th Cir. 2002) (holding in the context of Robinson-Patman Act claim that market share of less than 50% was insufficient to establish single-firm monopoly power as a matter of law); AD/SAT v. Associated Press, 181 F.3d 216, 229 (2d Cir. 1999) ("a 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power"); *Morgenstern*, 29 F.3d at 1296 n.3 (30% market share insufficient); United Airlines v. Austin Travel Corp., 867 F.2d 737, 742 (2d Cir. 1989) (31% market share insufficient); Dimmitt Agri Indus. v. CPC Int'l, 679 F.2d 516, 529-31 (5th Cir. 1982) (market shares in range of 16% to 25% insufficient); Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, 311 F. Supp. 2d 1048, 1098 (D. Colo. 2004) (granting summary judgment for defendant whose 50.48% share of the rock concert market was "impressive" but "not monopolistic"); Masco Contractor Servs. E. v. Beals, 279 F. Supp. 2d 699, 707 (E.D. Va. 2003) (counterclaim under § 2 failed in part because at least 25% of the market was not controlled by plaintiff and there were multiple competitors in the market); *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 396-97. *But see* Valley Liquors v. Renfield Imps., 822 F.2d 656, 667 (7th Cir. 1987) (absent "special market conditions or other compelling evidence of market power, the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%"); Hayden Publ'g Co. v. Cox Broad. Corp., 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("a party may have monopoly power in a particular market even though its market share is less than 50%"); Broadway Delivery Corp. v. UPS, 651 F.2d 122, 130 (2d Cir. 1981) (jury instruction precluding finding of monopoly power with market share less than 50% is erroneous); *In re* Payment Card Interchange Fee & Merchant Disc. Antitrust Litig., 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008) (denying motion to dismiss despite defendant's alleged 30% market share, stating "[j]ust as a defendant's large market share, without more, cannot support a finding of monopoly power, a low market share by itself cannot necessarily defeat such a finding" particularly in light of other factual allegations of monopoly power).
38. Cases holding such market shares insufficient to evidence market power include: PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 109 (2d Cir. 2002) (64% market share insufficient to show monopoly power absent additional evidence of power to exclude competition or control prices); Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share."); U.S. Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 1000 (11th Cir. 1993) ("We have discovered no cases in which a court found the existence of actual monopoly established by a bare majority share of the market."); Spanish Broad. Sys. v. Clear Channel Commc'ns, 242 F. Supp. 2d 1350, 1362 (S.D. Fla. 2003) ("When the plaintiff pleads less than a majority share of the relevant market, the plaintiff must show additional factors."), *aff'd*, 376 F.3d 1065 (11th Cir. 2004); *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 394 (granting summary judgment because defendant's "51.3% market share falls far below the generally accepted 70% to 75% minimum share necessary to support a finding of monopoly power").
39. *See, e.g.*, Smith Wholesale Co. v. Philip Morris USA, Inc., 219 F. App'x 398, 409 (6th Cir. 2007) (affirming summary judgment for defendant; holding that market power under § 2 of the Sherman Act is a single seller's ability to raise prices and restrict output); City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d 20, 42, 46 (D.D.C. 2007) (dismissing claims for failure to allege monopoly power, where plaintiffs alleged only that five defendants together had a 70% market share but did not allege that any one of them individually acted to monopolize or attempt to monopolize); Arista Records v. Lime Group, 532 F. Supp. 2d 556 (S.D.N.Y. 2007) (dismissing counterclaims for reliance on shared monopoly theory of liability).

*(2) Other Indirect/Circumstantial Evidence Relevant to Existence of Monopoly Power*

Market share is not the only indirect factor considered in determining whether monopoly power exists.[40] Other factors may be determinative. Most significantly, the absence of meaningful barriers to entry may indicate a defendant lacks monopoly power.[41]

(a) Barriers to Entry

Barriers to entry have been defined as either a cost that would have to be borne by an entrant that was not and is not borne by the incumbent or any condition that is likely to inhibit other firms from entering the market on a substantial scale in response to an increase in the incumbent's prices.[42] Where barriers to entry are

---

40. *See, e.g.*, United States v. Dentsply Int'l, 399 F.3d 181, 187 (3d Cir. 2005) ("Other germane factors include the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand."); Allen-Myland, Inc. v. IBM, 33 F.3d 194, 209 (3d Cir. 1994) ("Market share, of course, is only one type of evidence that may prove the defendant has ... market power."); Ball Mem'l Hosp. v. Mut. Hosp. Ins., 784 F.2d 1325, 1336 (7th Cir. 1986) ("Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them."); Coal Exps. Ass'n v. United States, 745 F.2d 76, 91 (D.C. Cir. 1984) ("the ability of a firm to price discriminate is an indicator of significant monopoly power").

41. *See, e.g.*, Confederated Tribes of Siletz Indians v. Weyerhaeuser Co., 411 F.3d 1030, 1044 (9th Cir. 2005) ("Entry barriers that justify a finding of market power must 'be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting.'") (footnote omitted), *vacated on other grounds sub nom.* Weyerhaeuser Co. v. Ross-Simmons Hardware Lumber Co., 549 U.S. 312 (2007); Inter-County Title v. Data Trace Info. Servs., 105 F. App'x 136, 139 (9th Cir. 2004) (failure to supply evidence of barrier to entry fatal to § 2 claim); Epicenter Recognition, Inc. v. Jostens, Inc., 81 F. App'x 910, 911 (9th Cir. 2003) (even where defendant had 80% market share it did not have monopoly power where only barrier to entry was customers' own inertia); United States v. Microsoft Corp., 253 F.3d 34, 54 (D.C. Cir. 2001) (in a case with 80%-95% market share, "because of the possibility of competition from new entrants, looking to market share alone can be misleading") (citation omitted); W. Parcel Express v. UPS, 190 F.3d 974, 977 (9th Cir. 1999) (quoting United States v. Syufy Enters., 903 F.2d 659, 664 (9th Cir. 1990)) ("'A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.'"); Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich, 108 F.3d 1147, 1154 (9th Cir. 1997) ("Even if Harcourt has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion."); Safeway Inc. v. Abbott Labs., 761 F. Supp. 2d 874, 889 (N.D. Cal. 2011) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors."); Rochester Drug Co-op., Inc. v. Braintree Labs., 712 F. Supp. 2d 308, 315 (D. Del. 2010) ("To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market.").

42. *See, e.g.*, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 591 n.15 (1986); *Weyerhaeuser*, 411 F.3d at 1044 (high capital costs that new sawmill entrants faced and limited availability of sawlogs were barriers to entry justifying inference of monopoly power); Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group, 93 F. App'x 1, 8 (5th Cir. 2004) (long-term processing contracts created a barrier to entry by causing a "lack of sufficient gas volume to offset the capital expense of a new plant," which "illustrated [the defendant's] power to control prices or exclude competition"); *Microsoft*, 253 F.3d at 51 (entry barriers "are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the

significant, courts are more likely to find monopoly power.[43] In contrast, where entry is easy, courts have been reluctant to find monopoly power regardless of the market share because the threat of potentially imminent entry should prevent the defendant from raising prices to monopoly levels[44] or the fact of entry should make any exercise of monopoly power short lived.[45] In evaluating barriers to entry, courts consider evidence regarding the frequency, magnitude, and success of entry.[46]

---

competitive level"); *W. Parcel Express*, 190 F.3d at 975 (entry barriers are "'additional long-run costs that were not incurred by incumbent firms, but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns'"; court further noted that to justify a finding that defendant had power to control prices for § 2 purposes, "entry barriers must be . . . capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting"); *see also Microsoft*, 253 F.3d at 38 ("[w]hether costs borne by all market participants should be considered entry barriers is the subject of much debate").

43. *See, e.g., Allen-Myland*, 33 F.3d at 209-10 (reversing finding of no monopoly power, in part because of rejection of finding that entry barriers were low); Energex Lighting Indus. v. N. Am. Philips Lighting Corp., 656 F. Supp. 914, 921 (S.D.N.Y. 1987) ("court must consider the strength of the competition, the probable development of the industry, consumer demand, and the percentage of market share"; where defendant's pricing practices may have been responsible for halving number of competitors in market, defendant may have monopoly power despite having only 25% market share).

44. *See, e.g.*, Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1208 (9th Cir. 1997) ("Even a 100% monopolist may not exploit its monopoly power in a market without entry barriers."); Handicomp, Inc. v. U.S. Golf Ass'n, 2000 WL 426245, at *3-4 (3d Cir. 2000) (72% market share insufficient where plaintiff unable to prove substantial barriers to entry because of ease of software programming); Advo, Inc. v. Phila. Newspapers, 51 F.3d 1191, 1200 (3d Cir. 1995); Roy B. Taylor Sales v. Hollymatic Corp., 28 F.3d 1379, 1388 (5th Cir. 1994); Emigra Group v. Fragomen, Del Rey, Bernsen & Loewy, L.L.P., 612 F. Supp. 2d 330, 362 (S.D.N.Y. 2009) (noting that "[m]arket power can persist only when entry barriers—market circumstances, governments, or the defendants—block rivals' entry or expansion"); Fabrication Enters. v. Hygenic Corp., 848 F. Supp. 1156, 1160 (S.D.N.Y. 1994) (100% market share does not imply monopoly power where barriers to entry are low), *rev'd on other grounds*, 64 F.3d 53 (2d Cir. 1995); *cf.* United States v. Baker Hughes Inc., 908 F.2d 981, 988 (D.C. Cir. 1990) (observing, in Clayton Act case, that "the threat of entry can stimulate competition . . . regardless of whether entry ever occurs").

45. *See, e.g.*, Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1439 (9th Cir. 1995) ("[W]ith easy entry, a predator charging supracompetitive prices will quickly lose market share (as well as any chance of reaping monopoly profits) as new rivals enter market and undercut its high price."); Cyntegra, Inc. v. Idexx Labs, 520 F. Supp. 2d 1199, 1208-09 (C.D. Cal. 2007) (holding plaintiff must prove barriers to entry to establish market power and granting summary judgment for defendant where no evidence of barriers to entry and defendant offered evidence of recent entry by two new suppliers).

46. *See, e.g.*, Tops Mkts. v. Quality Mkts., 142 F.3d 90, 99 (2d Cir. 1998) (no monopoly power despite 70% market share in light of successful entry of competitor); *Syufy Enters.*, 903 F.2d at 665-67 (fact that entrants reduced incumbent's market share from 100% to 75% in four years shows entry is easy); United States v. AMR Corp., 140 F. Supp. 2d 1141, 1209-10 (D. Kan. 2001) (no monopoly power over airline hub routes when no other hub had more low-cost carriers, five new low-cost carriers had started service at hub in prior three years, there were no physical barriers to entry, and defendant's share at hub was decreasing), *aff'd*, 335 F.3d 1109 (10th Cir. 2003). *But cf. Rebel Oil Co.*, 51 F.3d at 1440 ("The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers. If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power."); *Allen-Myland*, 33 F.3d at 210 (rejecting district court's inference that presence of several competitors demonstrated ease of entry, noting that there may have been no recent entry).

recent cases suggest that, after *Spectrum Sports*, proof of some dangerous probability of success is required to establish a conspiracy to monopolize.[686] But other post-*Spectrum Sports* cases continue to hold that no dangerous probability of success is required in conspiracy cases.[687]

## G. Shared Monopoly

The "shared monopoly" or "joint monopolization" theory—under which a group of firms that collectively possess monopoly power can be found liable for joint monopolization—generally has been rejected by the courts. In *American Tobacco Co. v. United States*,[688] the Supreme Court upheld a conviction of competitors for conspiring to monopolize, but the question of whether conspiracy to monopolize jointly violated Section 2 was not presented or considered. Lower courts consistently have rejected the shared monopoly theory in the absence of any allegation of a conspiracy to monopolize, not permitting Section 2 to be invoked as a tool to challenge oligopolies engaged in parallel but noncollusive conduct.[689] Even where

---

conspiracy to monopolize must be ... *somehow* rationally directed to the exclusion of competitors") (emphasis in original).

686. Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 256 F. Supp. 2d 249, 283 (D.N.J. 2003); Urdinaran v. Aarons, 115 F. Supp. 2d 484, 491 (D.N.J. 2000); Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc., 940 F. Supp. 1026, 1038 (E.D. Tex. 1996) (no claim for conspiracy to monopolize unless defendants collectively possess a 50% or greater market share); *see also* V. & L. Cicione, Inc. v. Schmidt & Sons, 403 F. Supp. 643, 651 (E.D. Pa. 1975) ("proof of a dangerous probability of success of the monopoly in a relevant market is essential to prove either an attempt or a conspiracy to monopolize"), *aff'd*, 565 F.2d 154 (3d Cir. 1977).

687. Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1154-56 (9th Cir. 2003) (dangerous probability does not have to be shown if specific intent is otherwise established); *In re Se. Milk Antitrust Litig.*, 2010 U.S. Dist. LEXIS 94158, at *65 (citing Int'l Distribution Ctrs. v. Walsh Trucking Co., 812 F.2d 786, 795-96 n.8 (2d Cir. 1987) ("Nor, in a conspiracy claim, does an antitrust plaintiff need to show defendants' dangerous probability of success as would be the case if an attempted monopolization claim were brought."); Rome Ambulatory Surgical Ctr. v. Rome Mem'l Hosp., 349 F. Supp. 2d 389, 420 (N.D.N.Y. 2004) ("Unlike the elements required to establish an attempt to monopolize, proof of a conspiracy to monopolize does not require a dangerous probability of success."); Wagner v. Magellan Health Servs., 121 F. Supp. 2d 673, 680 (N.D. Ill. 2000) ("market power is not an element of a conspiracy to monopolize claim under section 2"); *5300 Columbia Pike Corp.*, 891 F. Supp. at 1175 ("The plaintiffs need not prove that the defendants succeeded or even came close to obtaining monopoly power or excluding any competitors."). *See generally* Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1024 n.10 (10th Cir. 2002) (noting "split among the circuits as to whether proof of the relevant market is required to prove a conspiracy to monopolize claim" and collecting cases).

688. 328 U.S. 781 (1946).

689. *In re* Delta/AirTran Baggage Fee Antitrust Litig., 733 F. Supp. 2d 1348, 1367 (N.D. Ga. 2010) ("The fact that a separate offense (a conspiracy claim) exists under the statute for concerted action pertaining to monopolization suggests that any joint monopoly theory must be brought pursuant to that subsection of the statute rather than pursuant to the 'attempted monopolization' prong."); Flash Elecs. v. Universal Music & Video Distrib. Corp., 312 F. Supp. 2d 379, 396-97 (E.D.N.Y. 2004) ("The idea of a 'shared monopoly' giving rise to Section 2 liability repeatedly has been received with skepticism by courts who have squarely addressed the issue.") (collecting cases); *Carpet Group Int'l*, 256 F. Supp. 2d at 285 (reaffirming that a "shared monopoly" theory does not suffice to support a monopolization or attempted monopolization claim under § 2); ID Sec. Sys. Can. v. Checkpoint Sys., 249 F. Supp. 2d 622, 649-50 (E.D. Pa. 2003) (§ 2 applies to the conduct of single firms only and does not extend to firms engaged in tacit collusion); *In re* Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 782 F. Supp. 481, 486 (C.D. Cal. 1991) ("sharing by numerous competitors of monopoly power" does not violate § 2) (quotations omitted).

competitors allegedly have conspired to monopolize the market, the traditional view has been that the offense of monopolization requires that a single firm possess monopoly power.[690] But some older decisions appear to be more amenable to considering this claim where a relatively few firms achieve monopoly-like results.[691]

---

690. RxUSA Wholesale v. Alcon Labs., 391 Fed. Appx. 59, 61 (2d Cir. 2010) (characterizing plaintiff's shared monopoly claim as a recapitulation of its failed § 1 arguments); Midwest Gas Servs. v. Ind. Gas Co., 317 F.3d 703, 713 (7th Cir. 2003) (ruling that under § 2 only one firm can be a monopolist); H.L. Hayden Co. v. Siemens Med. Sys., 879 F.2d 1005, 1018 (2d Cir. 1989) (holding that "market shares of [defendants] could not be aggregated to establish an attempt to monopolize"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 2010 U.S. Dist. LEXIS 85844, at *56-57 n.15 ("to the extent that a shared monopoly theory for an attempted monopolization claim is a viable legal doctrine in this circuit, the Court finds that the facts presented in this case do not warrant its application"); Precision CPAP, Inc. v. Jackson Hosp., 2010 U.S. Dist. LEXIS 20336, at *43 (M.D. Ala. 2010) (rejecting "any claim of violation of [§] 2 of the Sherman Act predicated on a theory of shared monopoly"); City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d 20, 42 (D.D.C. 2007) (dismissing claims of monopolization, attempted monopolization, and conspiracy to monopolize where plaintiffs averred that defendants together had market share of 70%, holding that claim of monopolization must be supported by allegations of market domination by each defendant, and that allegations that a group of defendants together possess market power do not satisfy § 2); Klickads, Inc. v. Real Estate Bd. of N.Y., 2007 U.S. Dist. LEXIS 57305, at *24-26 (S.D.N.Y. 2007) (acknowledging possibility identified by some district courts that shared monopoly theory might be viable where competitors seek to allocate market or form single entity to possess illegal market power but holding that plaintiff had not pointed to any evidence that could satisfy even such a permissive theory); Arista Records v. Lime Grp., 532 F. Supp. 2d 556, 579-80 (S.D.N.Y. 2007) (dismissing § 2 claims premised on shared monopoly theory) (citing *H.L. Hayden Co.*, 879 F.2d at 1005); *In re* Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 700-02 (E.D. Pa. 2007) (rejecting "concerted monopolization" theory aggregating monopoly power of individual defendants); *Santana Prods.*, 249 F. Supp. 2d at 519 (shared monopoly claim is not cognizable under § 2 because a monopoly requires complete domination by a single entity); Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 256-57 (S.D.N.Y. 1995) (rejecting theory); *Phoenix Elec. Co.*, 861 F. Supp. at 1514 (rejecting theory and reasoning that if shared monopoly cannot support an actual monopolization claim, then conspiracy to achieve shared monopoly cannot be an unlawful conspiracy to monopolize); *but cf.* Allen v. Dairy Farmers of Am., 748 F. Supp. 2d 323 (D. Vt. 2010) (accepting plaintiff's § 2 claim predicated on an agency theory despite defendant's assertion that plaintiff's claim was actually based on a shared monopoly theory).

691. *See, e.g.*, JTC Petroleum Co. v. Piasa Motor Fuels, 190 F.3d 775, 780 (7th Cir. 1999) (oligopolistic interdependence may be actionable under § 2 where an agreement is proven); Morgenstern v. Wilson, 29 F.3d 1291, 1295 n.2 (8th Cir. 1994) (observing that it is unresolved whether a claim of monopolization may be predicated on "combining the market power of multiple defendants" and, if so, whether such a claim would also require agreement among them, i.e., conspiracy to monopolize); Harkins Amusement Enters. v. Gen. Cinema Corp., 850 F.2d 477, 490 (9th Cir. 1988) (stating that no court had adopted the theory, although some commentators support it); Intellective, Inc. v. Mass. Mut. Life Ins. Co., 190 F. Supp. 2d 600, 614 (S.D.N.Y 2002) (denying motion to dismiss where plaintiff alleged that defendants collectively posed a dangerous probability of achieving monopoly power); DeLoach v. Philip Morris Cos., 2001 U.S. Dist. LEXIS 16909, at *47-54 (M.D.N.C. 2001) (denying motion to dismiss a collusive oligopoly claim where defendants allegedly controlled 96% of the market); **Santana Prods. v. Sylvester & Assocs.**, 121 F. Supp. 2d 729, 737-38 (E.D.N.Y. 1999) (joint division of markets, coupled with exclusion of competitors, could state § 2 claim); *Stewart Glass & Mirror*, 940 F. Supp. at 1038 ("[w]hen two or more persons agree to monopolize, they have committed the offense of joint monopolization provided that they have jointly acquired monopoly power").