# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

SUTURE EXPRESS, INC.,        )
                                     )
          Plaintiff,       )
                                     )
    v.                         )     **Case No. 12-2760-RDR**
                                     )
**CARDINAL HEALTH 200, LLC, and**  )
**OWENS & MINOR DISTRIBUTION, INC.,**  )
                                     )
          Defendants.     )

## MEMORANDUM AND ORDER

This is an antitrust action raising federal and state law claims. This case is before the court upon the motions to dismiss for failure to state a claim (Doc. Nos. 23 and 27) filed by defendant Owens & Minor Distribution, Inc. and defendant Cardinal Health 200, LLC.[1] Thus, the question for the court is whether plausible antitrust law violations and state law claims are described in plaintiff's first amended complaint. The court finds that: the first amended complaint does not allege per se antitrust violations or monopolization violations; plaintiff's claims of conspiratorial agreement are not specifically supported by factual allegations; and plaintiff's unjust enrichment claim does not properly allege a benefit conferred by plaintiff upon defendant. The court further finds that plaintiff's claims that defendants,

---

[1] Two other defendants named in the first amended complaint, Cardinal Health, Inc. and Owens & Minor, Inc. have been voluntarily dismissed without prejudice. Doc. No. 42. This action makes moot a portion of the motion to dismiss filed as Doc. No. 23 and makes the motion to dismiss filed as Doc. No. 25 entirely moot.

acting individually, violated § 1 of the Sherman Act and § 3 of the Clayton Act are plausible under rule of reason analysis and that analogous claims under K.S.A. 50-112 should also survive.[2]

I. PLAINTIFF'S FIRST AMENDED COMPLAINT (Doc. No. 19).

Plaintiff alleges federal and state antitrust law violations and makes a claim of unjust enrichment relating to the distribution and sale of "med-surg" supplies to acute care providers. "Med-surg" supplies are medical and surgical single-use items such as sutures, needles, syringes, gloves, surgical instruments and catheters. There are thirty product categories in the "med-surg basket" commonly sold to acute care providers. Plaintiff alleges that defendants Owens & Minor Distribution, Inc. ("O&M") and Cardinal Health 200, LLC ("Cardinal") are broad-based distributors who purchase and distribute the full gamut of products in the med-surg basket. The complaint alleges that there are approximately 4,800 acute care providers that commonly purchase med-surg supplies through group purchasing organizations, regional purchasing cooperatives or other multi-hospital systems. Defendant O&M is alleged to have 39% of this market. Defendant Cardinal is alleged to have 33% of this market.

---

[2] The court shall also rule as follows upon motions connected to the motions to dismiss. The unopposed motion to amend the memorandum in support of the motion to dismiss filed by defendant Owen & Minor Distribution, Inc. (Doc. No. 45) and that defendant's request for judicial notice (Doc. No. 29) shall be granted. The motion for oral argument filed by defendants Cardinal Health 200, LLC and Owens & Minor Distribution, Inc. (Doc. No. 48), which is also unopposed, shall be denied.

Plaintiff has limited its business to a portion of the med-surg basket – the sale and distribution of sutures and endomechanical products. Endomechanical ("endo") products are devices used in minimally invasive surgeries, like laparoscopic surgery. Sutures and endo products are alleged to make up 10% of med-surg supplies distributed in the United States to acute care providers. Plaintiff asserts that it provides a greater variety of suture and endo products than the more broad-based distributors who concentrate on so-called "core" products, which are the most popular or widely-used sutures and endo products. Plaintiff alleges that it is the only significant distributor of specialty or non-core sutures and endo products. For this and other reasons, plaintiff contends that its business thrived from the beginning in 1998 through 2008. Plaintiff alleges that it distributes to approximately 900 of the nation's 4,800 acute care providers and that it offers both core and non-core sutures and endo products.

Plaintiff states that in 2008 defendants attempted to leverage their power in the distribution of a fuller array of med-surg products to coerce customers from buying plaintiff's sutures and endo products. Plaintiff asserts that contracts were constructed which unlawfully tied the sale of sutures and endo products to the sale of other products in the med-surg basket. Under these contracts if an acute care provider did not purchase 90% or more of its sutures and endo products from a defendant, then it would pay a

penalty on the entire med-surg basket purchased from that defendant. The penalty was allegedly so substantial that it effectively prevented acute care providers from dealing with plaintiff, thus foreclosing the opportunity for acute care providers to enjoy plaintiff's alleged superior service, lower distribution fees and comprehensive product selection. According to plaintiff, this penalty was also packaged as a "discount program" where providers were not eligible for a discounted distribution fee if they did not purchase their sutures and endo products from a defendant. Plaintiff further contends that the amount of the "discount" was such as to bring the price of defendants' sutures and endo products below cost and, thus, constituted predatory pricing which enhanced defendants' market power, raised barriers to entry and impeded the ability of plaintiff to compete.

Plaintiff asserts that defendants' exclusionary practices are strikingly similar and that the "lock-step implementation of nearly identical penalty programs defies each [defendant's] economic interests." Doc. No. 19, ¶ 52.

Plaintiff contends that in order to avoid paying extra for the med-surg products hospitals needed as part of the med-surg basket, acute care providers declined to purchase sutures and endo products from plaintiff and instead purchased them from defendants. Plaintiff alleges that its business has been injured and that

4

consumers have been injured in the following manner:  less consumer choice among competing suture and endo product distributors; increased costs and reduced service; reduced access and barriers to entry to the sutures and endo products distribution market; chilled innovation within the med-surg supplies distribution market; and loss of competition among distributors to the acute care market.

Seven counts are listed in the complaint:  a violation of § 1 of the Sherman Act alleging illegal tying (Count 1); a violation of § 2 of the Sherman Act alleging unlawful monopolization or attempted monopolization of the markets for the domestic distribution of sutures and endo products to acute care providers (Count 2); a violation of § 1 of the Sherman Act alleging conspiracy to restrain trade (Count 3); a violation of § 2 of the Sherman Act alleging conspiracy to monopolize (Count 4); a violation of § 3 of the Clayton Act alleging exclusive dealing (Count 5); a violation of K.S.A. 50-101 et. seq. alleging anti-competitive tying and bundling (Count 6); and unjust enrichment (Count 7).

II.  STANDARDS GOVERNING DEFENDANTS' MOTIONS TO DISMISS

FED.R.CIV.P. 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court has stated that a complaint must provide a defendant with "fair notice" of the claims against it and the grounds for relief. See Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007).  Pursuant to FED.R.CIV.P. 12(b)(6), a court may dismiss a complaint when it does not contain enough facts to state a claim to relief that is plausible on its face.  Id. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (internal citations and parentheticals omitted).  The Court observed in Twombly that, "proceeding to antitrust discovery can be expensive."  Id. at 558 (applying the pleading standard to Sherman Act claims).  Thus, a court should "'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'"  Id. (quoting Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n.17 (1983)).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff.  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) cert. denied, 548 U.S. 1148 (2010).  In addition, a court may consider documents attached to the complaint or incorporated by reference.  Id.

III.  COUNT ONE AND GLOBAL DEFENSES.

In this section of the court's order, the court shall address defendants' arguments against Count One and some of the arguments defendants have asserted broadly against all of the counts in the first amended complaint.  The court shall address defendants' statute of limitations arguments in a separate section of this opinion.

Count One alleges that each defendant individually engaged in illegal tying contracts in violation of § 1 of the Sherman Act. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Any "restraint of trade" is not prohibited by § 1 of the Sherman Act, only "unreasonable restraints of trade."  Law v. NCAA, 134 F.3d 1010, 1016 (10th Cir.) cert. denied, 525 U.S. 822 (1998).

"Generally, a tying arrangement, is illegal under § 1 of the Sherman Act if it can be shown that: (1) two separate products or

services are involved; (2) the sale or agreement to sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected." <u>Sports Racing Services, Inc. v. Sports Car Club of America, Inc.</u>, 131 F.3d 874, 886 (10th Cir. 1997).

Whether an alleged restraint of trade is unreasonable depends upon a "rule of reason" or a "per se" analysis. A "rule of reason" analysis, the most commonly used method, requires weighing all of the circumstances of a case to decide whether a restrictive practice imposes an unreasonable restraint on competition. <u>Gregory v. Fort Bridger Rendezvous Ass'n</u>, 448 F.3d 1195, 1203 (10th Cir. 2006)(citing <u>Diaz v. Farley</u>, 215 F.3d 1175, 1182 (10th Cir. 2000)). Some types of anticompetitive conduct, however, have been considered in some situations to be "per se" unreasonable because their effects on competition lack any redeeming virtue and so are presumed to be unreasonable and therefore illegal. <u>Id.</u>

    A. <u>Per se analysis</u>.

Count One does not state a plausible Sherman Act violation under per se analysis. The Tenth Circuit has stated that: "A tie-in constitutes a per se section 1 violation if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied

product market." <u>Multistate Legal Studies, Inc. v. Harcourt Brace</u> <u>Jovanovich Legal and Professional Publications, Inc.</u>, 63 F.3d 1540, 1546 (10th Cir. 1995) <u>cert. denied</u>, 516 U.S. 1044 (1996). The Tenth Circuit has also observed, that: "Per se violations are restricted to those restraints that would always or almost always tend to restrict competition and decrease output. This concern is greatest when actual competitors enter agreements because cooperation among would-be competitors will deprive the market place of the independent centers of decisionmaking that competition assumes and demands, and risks anti-competitive effects. Vertical arrangements, on the other hand, do not generally give rise to the same concerns and often have pro-competitive effects." <u>Campfield</u> <u>v. State Farm Mutual Automobile Ins. Co.</u>, 532 F.3d 1111, 1119 (10th Cir. 2008)(interior quotations and citations omitted).

The first amended complaint fails to state a per se tying claim for the following reasons. First, as discussed later in this decision, the court finds that any horizontal conspiracy allegations are insufficiently pled. Second, contracts between an individual defendant and a purchaser of med-surg supplies are vertical arrangements, and therefore less likely to be a per se violation. Third, the alleged market power of each individual defendant is insufficient for the defendant to be held liable in a per se tying case. See <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 26-29 (1984)(30% market share absent other factors is

9

insufficient to establish market power for a per se tying claim);
Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 611-13 (1953)(40% of sales insufficient for per se unlawful tying particularly when that share does not greatly exceed the share of any other competitor). Plaintiff alleges no factors in the first amended complaint from which the court could infer that discovery would produce evidence to support a per se tying claim.

B. Rule of reason analysis

To properly allege a tying claim which satisfies the rule of reason analysis, a plaintiff must allege facts showing that the contract or agreement in question had a substantially adverse effect on competition in general. See Gregory, 448 F.3d at 1205 (quoting Law, 134 F.3d at 1019 for the proposition that plaintiff bears the initial burden of showing that an agreement had a substantially adverse effect on competition); see also, George Haug Co. Inc. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998). While there is much case authority for the proposition that injury to a plaintiff does not suffice to show an adverse effect on competition in general, plaintiff's alleged position as "the only significant specialty distributor of sutures and endo products" (Doc. No. 19, ¶ 50) as well as the alleged target of defendants' tying activity is a distinguishing factor, particularly when it is asserted that plaintiff has "lost a significant number of existing and potential customers" (¶ 8) and (at ¶ 56) that "numerous

hospitals and other acute care providers that would prefer to purchase sutures and endo products from [plaintiff] are prohibited from doing so." See _Apani Southwest, Inc. v. Coca-Cola Enterprises_, 128 F.Supp.2d 988, 997 (N.D.Tex. 2001)(alleged injury to plaintiff may be sufficient to allege substantial injury to competition); see also, _Spanish Broadcasting System of Fla., Inc. v. Clear Channel Communications, Inc._, 376 F.3d 1065, 1072-73 (11th Cir. 2004)(acknowledging that under some circumstances damage to a critical competitor may also damage competition in general). In addition, plaintiff alleges that the tying activity deprives numerous purchasers' access to a more comprehensive product line, superior service and lower distribution fees.

C.   Other arguments

1.   Strict tie-ins versus discounts

Defendants argue that plaintiff cannot proceed upon a tying claim because defendants allow for separate purchases of med-surg supplies and sutures and endo products. As described previously, instead of requiring that med-surg supplies and suture and endo products be purchased together, each defendant is offering discounts on the sale of med-surg supplies if 90% of the purchaser's sutures and endo products needs are purchased from the defendant.   The court disagrees with defendants' argument.   The Tenth Circuit has held that a tying claim was stated when economic penalties (as well as outright prohibition of separate purchases)

11

were used to induce persons to purchase a grave marker from the cemetery providing the grave plot instead of buying the marker separately from a grave marker builder or dealer.  Monument Builders v. American Cemetery Assn., 891 F.2d 1473, 1476 (10th Cir. 1989) cert. denied, 495 U.S. 930 (1990).  Moreover, as the Supreme Court has commented, "the Sherman Act does not prohibit 'tying'; it prohibits 'contract[s] . . . in restraint of trade.'"  Jefferson Parish, 466 U.S. at 21 n. 34.  The question is not so much whether the alleged arrangement is a "tying agreement" as "whether there is a possibility that . . . competition on the merits [has been foreclosed] in a product market distinct from the market for the alleged tying item."  Id. at 21; see also, Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 528 (1983)("[a]n agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market").  So, plaintiff need not allege a strict tie-in arrangement in which a purchaser is required to purchase two separate products together in order to assert a  violation of § 1 of the Sherman Act.  While some purchasers do buy sutures from sources other than defendants, this is not fatal to Count One because it does not foreclose the plausibility of plaintiff's claim that defendants' discounting activity has restrained trade on the merits for a substantial amount of interstate commerce in the market for sutures and endo products.

12

## 2. Insufficient market power

Defendants contend that plaintiff has not asserted that defendants have sufficient market power in the tying product market to plausibly allege the ability to coerce a purchaser to buy sutures and endo products from defendants. As already noted, the first amended complaint states that the alleged tying activity has caused plaintiff to lose a significant number of customers. From this allegation (which must be considered as true) as well as plaintiff's allegations regarding predatory pricing, entry barriers, and parallel pricing behavior by two substantial competitors in the med-surg market, it is plausible to infer that each defendant has sufficient market power in the tying products to coerce buyers to accept the alleged tying arrangement.[3] Contrary to defendants' contention, plaintiff's substantial position in the sutures and endo products market also does not preclude plaintiff from alleging an antitrust injury. See <u>Sterling Merchandising, Inc. v. Nestle, S.A.</u>, 656 F.3d 112, 122 (1st Cir. 2011)(success in the market does not preclude plaintiff from proving damages caused by an antitrust violation); <u>Masimo Corp. v. Tyco Health Care Group</u>, 2006 WL 1236666 *6 (C.D.Cal. 3/22/2006)(jury could find substantial market foreclosure and anticompetitive effects even though

---

[3] Defendant Cardinal has cited <u>Bailey's, Inc. v. Windsor Am., Inc.</u>, 948 F.2d 1018, 1032 (6th Cir. 1991) for the proposition that a defendant whose share of the market is less than that of other competitors lacks the market power to restrain trade in violation of § 1 of the Sherman Act. The market share of the defendant in that case, however, was much less than the alleged market share of defendants Cardinal and O&M in this case.

plaintiff was able to grow revenue and capture new sales in the face of defendant's exclusive dealing discounts).

### 3. Relevant market definition

A proper definition of "relevant market" is critical to determining whether a restraint of trade is unreasonable or anticompetitive, whether a substantial amount commerce has been foreclosed, and whether a level of market power has been leveraged, attempted or achieved in violation of antitrust statutes. Therefore, it is difficult or impossible to determine the plausibility of an antitrust claim if the relevant market is untenably defined.

Defendants contend that Count One and the rest of plaintiff's antitrust claims must be dismissed because plaintiff has improperly confined its definition of the relevant market to domestic acute care providers who purchase med-surg supplies.[4]  Defendants suggest that their market share may be less than alleged by plaintiff if non-acute care providers who purchase med-surg supplies are included.  This is a difficult issue to determine upon a motion to dismiss although it has happened in some cases when the definition appears untenable on its face.  E.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3rd Cir. 1997)(affirming dismissal for failure to plead a valid relevant market including

---

[4] Plaintiff also alleges that each product category within the broader market of med-surg products constitutes a relevant market or submarket.  Doc. No. 19, ¶¶ 25-26.

interchangeable pizza ingredients, supplies, materials and distribution services).

This is not an instance in which the court can determine that plaintiff's relevant market is flawed on its face. As suggested above, many courts recognize that the definition of the relevant market and a defendant's power in that market are issues of fact. E.g., Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001); Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 199 (3d Cir. 1992) cert. denied, 507 U.S. 921 (1993); Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir. 1986) cert. denied, 486 U.S. 1005 (1988); Christou v. Beatport, LLC, 849 F.Supp.2d 1055, 1066 (D.Colo. 2012); Allen v. Dairy Farmers of America, Inc., 748 F.Supp.2d 323, 336-37 (D.Vt. 2010); Lockheed Martin Corp. v. Boeing Co., 314 F.Supp.2d 1198, 1225 (M.D.Fla. 2004). The courts in Allen and Lockheed Martin discuss in some detail the viability of defining a product market on the basis of customer traits. In Allen, a motion to dismiss is denied and in Lockheed Martin, a motion to dismiss is granted. Both courts recognize that a relevant product market may sometimes be limited to a portion of customers based on a distinction in the product sold to those customers. Allen, 748 F.Supp.2d at 336; Lockheed Martin, 314 F.Supp.2d at 1226. The Allen court observed that many cases which decided this question resolved summary judgment motions and that a court should consider such factual issues as "industry

recognition of the market, the commercial realities of, among other things, production, transportation, accessibility of plans, pricing and consumer preferences, as well as 'the actual dynamics of the market.'" Id. (quoting Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 496 (2d Cir. 2004)). In Lockheed Martin, 314 F.Supp.2d at 1228, the court observed that consumer preferences may affect cross-elasticity (i.e., whether demand shifts from goods of one type to goods of a similar type in response to increases in price) which will determine the breadth of the product market.[5]

As plaintiff has noted, in White and White, Inc. v. American Hospital Supply Corp., 540 F.Supp. 951, 988 (W.D.Mich. 1982), hospital customers were a parameter of a relevant market determined by a district court in an antitrust lawsuit where a med-surg supplies distributor was suing a national distributor of hospital supplies. The court made a finding that hospital demand for med-surg products differs from the demand requirements of other consumers because hospitals demand a higher volume of product, a broader product mix and a higher level of vendor service than do other customers; it further found that hospitals were considered a distinct customer class by the med-surg supply business. Id.

---

[5] The type of factual analysis described in Allen and Lockheed Martin occurred in Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc. 875 F.2d 1369, 1374 (9th Cir. 1989) where a plaintiff unsuccessfully argued upon summary judgment that a market should be defined by customers of home center stores that provide one-stop service as opposed to less comprehensive retail outlets. See also, Westman Comm'n Co., 796 F.2d at 1221-22 (discussing markets defined by consumers who demand a "cluster" of goods but not finding such to be the case for restaurant equipment purchasers).

Although the district court's outcome was reversed in part because of an erroneous analysis of the geographic market (see 723 F.2d 495 (6th Cir. 1983)), the district court's opinion confirms that an elaborate factual analysis may be required to determine a proper relevant market in the distribution of med-surg supplies or sutures and endo products.

After due consideration, the court cannot state at this time that plaintiff's conception of the relevant market or submarket is so flawed that it renders plaintiff's claims implausible or impossible to consider.

4.  Antitrust injury

Defendant Cardinal contends that all of plaintiff's antitrust claims must be dismissed because plaintiff has failed to properly allege the type of injury that antitrust laws are designed to remedy.  We reject this contention.  Plaintiff alleges that defendants' tying arrangements reduce the level of competition in the distribution of sutures and endo products; that they limit a customer's choice of sutures and endo products; and that they deprive customers of advantages in delivery costs and procedures. This is sufficient to allege an antitrust injury.  See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1303 (11th Cir. 2010)(tying claim alleging less competition for tied products and fewer choices for consumers adequately expresses an antitrust injury).  Defendant Cardinal argues that plaintiff's allegations of

17

antitrust injury are too general and not supported by facts. We reject this point and refer to the prior Twombly discussion which dismisses any requirement for "detailed factual allegations." See also, Erickson v. Pardus, 551 U.S. 89, 93 (2007)("[s]pecific facts are not necessary"). In sum, plaintiff's allegations of antitrust injury are sufficiently specific and plausible.

IV. COUNTS THREE AND FOUR

Counts Three and Four allege a conspiracy to violate §§ 1 and 2 of the Sherman Act. As mentioned earlier, § 1 prohibits among other agreements, conspiracies in restraint of trade or commerce. Section 2 of the Sherman Act prohibits persons from monopolizing, attempting to monopolize or conspiring to monopolize any part of interstate trade or commerce. 15 U.S.C. § 2. An agreement or conspiracy under federal antitrust laws is said to exist when "there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." West Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 99 (3rd Cir. 2010) cert. denied, 132 S.Ct. 98 (2011). "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two," but allegations of direct evidence, that are adequately detailed, are sufficient alone. Id.

Plaintiff alleges that defendants did the same thing in response to plaintiff's success in selling suture and endo products; namely, defendants tied the sale of suture and endo

18

products to the sale of other products in the med-surg basket. The first amended complaint (Doc. No. 19) contains the following allegations:

> Defendants provide in their contracts that, if an acute care organization wants to purchase distributors' products in the Med-Surg basket excluding sutures and endo, the customer must also purchase sutures and endo products from this distributor; otherwise, Defendants charge the hospital or other acute care organization a penalty in the form of a prohibitive distribution fee applicable to the entire Med-Surg basket. Defendants divide purchase requirements between Med-Surg products excluding sutures and endo, and sutures and endo products. If the acute care provider does not purchase 90% or more of its sutures and endo needs from Defendants, it must pay a penalty on its entire Med-Surg spend. That penalty can range from 1 percent to 5 percent. ¶ 44.

> Defendants also employ the alternative tactic of repackaging distribution penalty programs as purported discount programs. Defendants offer a bundle of Med-Surg products, including sutures and endo products, for a so-called discounted distribution fee and eliminate the discount when sutures and endo are not included in the basket. ¶ 47.

> [T]he allocation of this whole basket "discount" to sutures and endo products brings the price of the Defendants' sutures and endo offerings below cost. ¶ 48.

> This predatory pricing enhances Defendants' market power, raises barriers to entry and impedes the ability of [plaintiff] to compete. ¶ 49.

> These exclusionary practices clearly are directed at [plaintiff]. Sutures and endo are the only product categories in the entire Med-Surg basket subject to Defendants' illegal tying and bundling arrangements. Further, [plaintiff] is the only significant specialty distributor of sutures and endo products. ¶ 50.

> [T]he exclusionary practices directed at [plaintiff] and employed by [defendants] are strikingly similar. ¶ 51.

The Defendants' lock-step implementation of nearly
identical penalty programs defies each distributor's
independent economic interests. One would expect, for
example, in response to [defendant] Cardinal's imposition
of contractual penalties on acute care providers who seek
to purchase from [plaintiff], that [defendant] O&M –
acting independently – would seek these customers'
business by offering Med-Surg products without the
penalty. Instead, [defendant] O&M imposes a similar
regime of contractual penalties and bundling that does
not challenge [defendant] Cardinal. In short,
[defendants] present a united front against acute care
providers' dealing with [plaintiff]. ¶ 52.

There are no legitimate business justifications for
Defendants' anti-competitive practices. Any purported
legitimate business justifications are mere pretexts. ¶
53.

The Supreme Court has stated that when alleging a conspiracy

in violation of antitrust laws, a complaint must contain "enough

factual matter (taken as true) to suggest that an agreement was

made." Twombly, 550 U.S. at 556. The Court continued that:

[L]awful parallel conduct fails to bespeak unlawful
agreement . . . therefore, . . . an allegation of
parallel conduct and a bare assertion of conspiracy will
not suffice. Without more, parallel conduct does not
suggest conspiracy, and a conclusory allegation of
agreement at some unidentified point does not supply
facts adequate to show illegality. Hence, when
allegations of parallel conduct are set out in order to
make a[n] [antitrust] claim, they must be placed in a
context that raises a suggestion of a preceding
agreement, not merely parallel conduct that could just as
well be independent action.

Id. at 556-57. In Twombly, the Court held that alleged competitive

reticence among regional telephone companies was an insufficient

basis from which to infer conspiratorial agreement (as opposed to

20

independent parallel conduct) since the plaintiff did not allege that competition against other regional telephone companies was "potentially any more lucrative than other opportunities being pursued by" the companies during the same period. Id. at 568.

In the case at bar, plaintiff is alleging that the parallel conduct described in the first amended complaint should be construed as circumstantial evidence of a conspiracy because, instead of challenging defendant Cardinal by offering its med-surg products without a penalty for purchasing sutures and endo products from a different distributor, defendant O&M employed a program similar to defendant Cardinal directed against plaintiff's competition in the market for sutures and endo products. Plaintiff, however, does not explain why it would be more lucrative for defendant O&M to challenge defendant Cardinal instead of taking the approach that O&M allegedly has taken. Other courts have observed that "in a highly concentrated market, any single firm's price and output decisions will have a noticeable impact on the market and on its rivals such that when any firm in that market is deciding on a course of action, any rational decision must take into account the anticipated reaction of the other firms." In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300, 321 n.19 (3rd Cir. 2010)(interior citations omitted). Thus, conscious parallelism is not uncommon or unlawful in certain circumstances. Id., citing Twombly, at 553-54. Indeed, each defendant has an

independent incentive to prevail in its competition against plaintiff as well as against other competing companies.

Plaintiff does not allege any circumstances, aside from the alleged action against interest, which supposedly supply a factual context to support an inference that defendants had a prior agreement to engage in parallel conduct. Plaintiff's contention that defendants acted against interest is not sufficient to raise a plausible inference of conspiracy because there is no compelling logic supporting that contention. The fact that a defendant could have chosen a different strategy does not produce an inference that the choice of a strategy similar to that of a fellow competitor is a sign of conspiracy. In the absence of any other contextual support from which to infer a conspiracy, the court agrees with defendants that plaintiff has failed to adequately allege a conspiracy to violate the antitrust laws.

V.   COUNTS TWO AND FOUR

Counts Two and Four of the first amended complaint allege violations of § 2 of the Sherman Act. Plaintiff alleges unlawful monopolization and attempted monopolization in Count Two; plaintiff alleges a conspiracy to monopolize in Count Four. To state a monopolization claim, a plaintiff must allege facts supporting an inference of: "1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident." <u>Full Draw Productions v. Easton Sports, Inc.</u>, 182 F.3d 745, 756 (10th Cir. 1999)(interior quotation omitted). Attempted monopolization requires allegations of 1) a relevant market; 2) a dangerous probability of success in monopolizing the relevant market; 3) specific intent to monopolize; and 4) conduct in furtherance of such an attempt. <u>TV Comm'ns Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1025 (10th Cir.) <u>cert. denied</u>, 506 U.S. 999 (1992).

To allege a conspiracy to monopolize claim, a plaintiff must plead facts which allege: "1) the existence of a combination or conspiracy to monopolize; 2) overt acts done in furtherance of the combination or conspiracy; 3) an effect upon an appreciable amount of interstate commerce; and 4) a specific intent to monopolize." <u>Lantec Inc. v. Novell, Inc.</u>, 306 F.3d 1003, 1028 (10th Cir. 2002)(interior quotations omitted).

Defendants allege that plaintiff's monopolization and attempted monopolization claims are inadequately pleaded, in part, because plaintiffs have not alleged that defendants possess monopoly power or that defendants' actions have produced a dangerous probability of attaining monopoly power. As noted before, plaintiff alleges that defendant O&M has 39% of the acute care market for the distribution of med-surg supplies and for sutures and endo products and that defendant Cardinal has 33% of

those markets.  This means, of course, that other companies share 28% of those markets.

The court agrees with defendants that plaintiff has failed to plead facts which demonstrate a real possibility that discovery would produce proof that defendants possess monopoly power or that defendants' actions have produced a dangerous probability of attaining monopoly power.  The Tenth Circuit held in <u>Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.</u>, 885 F.2d 683, 694 (10th Cir. 1989) that while a 41% market share indicates a firm has "substantial economic power in the market," this "proximity to monopolistic status" was not sufficient under the facts to indicate a capacity to raise the market share to a monopolistic level.  The Tenth Circuit also observed in that case that most lower courts had held that a 70% to 80% market share was necessary to indicate monopoly power.[6]  <u>Id.</u> at 694 n. 18.  The following year (1990), the Tenth Circuit in <u>Reazin v. Blue Cross and Blue Shield of Kansas, Inc.</u>, 899 F.2d 951, 968 (10th Cir.) <u>cert. denied</u>, 497 U.S. 1005 (1990) held that market share percentages may give rise to presumptions, "but will rarely conclusively establish or eliminate

---

[6] This conclusion is supported by more recent reviews of case law.  E.g., <u>In re Pool Products Distribution Market Antitrust Litigation</u>, 2013 WL 1556391 **10-11 (E.D.La. 4/11/2013); <u>Kolon Industries, Inc. v. E.I.DuPont De Nemours and Co.</u>, 2012 WL 1155218 **9-11 (E.D.Va. 4/5/2012); <u>Loren Data Corp. v. GXS, Inc.</u>, 2011 WL 3511003 *7 (D.Md. 8/9/2011)(50% or 60% is insufficient usually, but other relevant factors should be considered); see also, <u>Cohlmia v. St. John Medical Center</u>, 693 F.3d 1269, 1283 (10th Cir. 2012)(citing IIB Areeda & Hovenkamp, <u>Antitrust Law</u> 250 (3d ed. 2006) as stating, "We . . . presume that market shares below 50 or 60 percent do not constitute monopoly power . . . . [and e]ven without an absolute rule, a clear presumption will almost always be decisive.").

market or monopoly power." The court advised that a consideration of entry barriers was relevant to the analysis of market or monopoly power. Id. Such entry barriers could include high capital costs, legal or regulatory requirements, and entrenched buyer preferences. Id. A court may also look at market trends and the number and strength of other competitors. Shoppin' Bag of Pueblo, Inc. v. Dillon Co., 783 F.2d 159, 161-62 (10th Cir. 1986).

In this case, plaintiff's allegations do not support a viable inference of monopolization. There are no allegations of market share or ability to control price and competition which support a reasonable inference that either defendant has monopoly power. The first amended complaint asserts that the alleged tying and discount programs raise barriers to entry and impede plaintiff's ability to compete, and that the alleged below-cost pricing has caused plaintiff to lose "a significant number of existing and potential customers." ¶ 7. Plaintiff has also asserted in opposition to the motions to dismiss that high capital costs are an entry barrier. But, no facts are alleged to support an inference that defendants' programs and practices, which allegedly began in 2008, have produced a dangerous probability of either defendant attaining monopoly power. Moreover, the substantial market share that each defendant possesses is a factor which undermines a claim that either defendant possesses monopoly power or a dangerous potential

to attain such power.  *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F.Supp.2d 569, 580 (S.D.N.Y. 2011).

As discussed earlier, plaintiff's allegations of conspiracy are insufficiently pled.  The court does not believe the first amended complaint sets forth facts from which one can infer a reasonable possibility that defendants conspired to monopolize or conspired to attempt to monopolize the relevant markets in this case.  Accordingly, the court rejects plaintiff's suggestion that the court should consider the aggregate market power of defendants in deciding whether plaintiff has adequately pleaded claims under § 2 of the Sherman Act.  Moreover, it appears that most courts have rejected shared or joint monopoly arguments when analyzing § 2 claims, finding that such claims contradict the basic concept that a monopoly is the domination of a market by a single firm.  E.g., *Terminalift LLC v. International Longshore and Warehouse Union Local 29*, 2013 WL 2154793 ** 3-4 (S.D.Cal. 5/17/2013); *Oxbow Carbon & Minerals LLC v. Union Pacific R. Co.*, ___ F.Supp.2d ___, 2013 WL 673778 *6 (D.D.C. 2013); *RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.*, 661 F.Supp.2d 218, 234-35 (E.D.N.Y. 2009); *Arista Records LLC v. Lime Group LLC*, 532 F.Supp.2d 556, 579-80 (S.D.N.Y. 2007).

For these reasons, Counts Two and Four fail to state a claim.

## VI.  COUNT FIVE

Count Five of the first amended complaint alleges exclusive dealing in violation of § 3 of the Clayton Act against each defendant individually.  This section makes it unlawful:  "for any person engaged in commerce, in the course of such commerce, to . . . make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."  15 U.S.C. § 14.

"To prove a violation under § 3 of the [Clayton] Act, a plaintiff must show the following: 1) that the violator is engaged in interstate commerce and that the alleged unlawful act occurred in the course of such interstate commerce, 2) the violation involved a contract for sale, a sale, or a lease, 3) that the agreement is for goods, wares, merchandise, machinery, supplies or other tangible commodities, 4) that the agreement was conditioned or made on the understanding that the buyer or lessee will not use or deal in the goods of a competitor of the seller or lessor, [and] 5) that the probable effect of the agreement is to substantially lessen competition or create a monopoly."  <u>Apani Southwest</u>, 128

F.Supp.2d at 992; see also, Watkins & Son Pet Supplies v. Iams Co., 107 F.Supp.2d 883, 899 (S.D.Ohio 1999)(listing fewer but similar elements).

Plaintiff asserts that defendants have made sales of med-surg products based on the condition that the purchaser will not deal in plaintiff's sutures and endo products. Plaintiff further asserts that this "exclusive dealing" has foreclosed plaintiff from substantial portions of the markets for the distribution of sutures and endo products and has substantially lessened competition in those markets.

Defendants argue that defendants' discount programs do not constitute exclusive dealing agreements for the purposes of the Clayton Act because the agreements permit purchasers to buy some percentage of sutures and endo products from distributors other than defendants. The Clayton Act, however, is not expressly limited to contracts which completely exclude the purchase of a competitor's goods and courts have construed the Act as applying to contracts that are not 100% exclusive. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 283 (3d Cir. 2012) cert. denied, 133 S.Ct. 2025 (2013).

Defendants also argue that plaintiff has not alleged that the discount programs described in the first amended complaint are actually used by purchasers of sutures and endo products. Although no names are alleged by plaintiff, the court believes one can

reasonably infer from the complaint that the discount programs are used and are the reason why plaintiff has lost customers it otherwise would have had. See <u>Kay v. Bemis</u>, 500 F.3d 1214, 1217 (10th Cir. 2007)(the court may accept reasonable inferences from a complaint's allegations as true). Defendants further claim that the discounts are not coercive. This claim, however, is a factual issue as opposed to a matter of adequate pleading. Defendants also contend that discounts can be pro-competitive. Again, while this <u>may</u> be true, it is part of a rule of reason analysis which in this context is not so straightforward that the court can rule at the pleading stage that plaintiff's exclusive dealing claim is implausible.

Similarly, the court finds that defendants' arguments regarding the level of market foreclosure do not warrant the dismissal of plaintiff's exclusive dealing claim. A number of issues may be relevant to a consideration of whether an exclusive dealing arrangement forecloses a substantial part of the market. For instance, in <u>Tampa Electric Co. v. Nashville Coal Co.</u>, 365 U.S. 320, 329 (1961), the Court suggested it was necessary to "weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that

share of the market might have on effective competition therein." The Court also considered: the duration of the contract; whether there were dominant sellers in the market or a "myriad [of] outlets with substantial sales volume;" if there was an industry-wide practice of exclusive contracts; and if there were pro-competitive or pro-consumer benefits to such contracts. <u>Id.</u> at 334. Some courts have made reference to 30% or 40% as a threshold level by which to screen exclusive dealing claims. E.g., <u>Sterling Merchandising</u>, 656 F.3d at 123-24 (foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent); <u>B & H Medical, LLC v. ABP Admin., Inc.</u>, 526 F.3d 257, 266 (6th Cir. 2008) (same). Even in these cases, the screening was done at the summary judgment level.

Here, plaintiff alleges that defendants are foreclosing from plaintiff's competition a percentage of the market equivalent to each defendant's market share for med-surg supplies, which is 39% for defendant O&M and 33% for defendant Cardinal. This is not an implausible claim and given the number of other factors which may be relevant to a rule of reason analysis, the court shall not decide at the pleading stage that plaintiff has failed to plead adequate foreclosure levels to go forward with Count Five.

VII. COUNTS SIX AND SEVEN – STATE LAW CLAIMS

    A. Kansas Restraint of Trade Act – Count Six

Plaintiff asserts a violation of the Kansas Restraint of Trade Act ("KRTA") in Count Six and makes only a general citation to K.S.A. "50-101 et. seq." Defendant Cardinal contends that this citation to K.S.A. 50-101 et. seq. is inadequate to provide defendant with proper notice of the state law claims plaintiff is making because there are numerous sections to consider. While this argument has some allure, the general rule appears to be that a complaint need not point to the appropriate statute or law in order to raise a claim for relief; a complaint may sufficiently raise a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim. Morris v. Schroder Capital Mgmt. Intern., 445 F.3d 525, 530 n.3 (2d Cir. 2006); Morales-Vallellanes v. Potter, 339 F.3d 9, 15 (1st Cir. 2003); Tolle v. Carroll Touch, Inc., 977 F.2d 1129, 1134 (7th Cir. 1992); Fitzgerald v. Codex Corp., 882 F.2d 586, 589 (1st Cir. 1989). This rule appears contrary to the proposition advanced here by defendant Cardinal. In addition, the apparent similarity in the federal and state antitrust law claims alleged in the first amended complaint should be sufficient to provide defendants adequate notice of plaintiff's state law claims.

Defendant O&M and defendant Cardinal further argue that Count Six should be dismissed because plaintiff only alleges lawful unilateral conduct. The court agrees that plaintiff has not adequately alleged illegal conspiratorial conduct. Plaintiff may

still contend however that, in violation of K.S.A. 50-112, defendants made contracts or agreements "with a view or which tend to prevent full and free competition in the . . . sale of articles imported into [Kansas]." While plaintiff has not adequately alleged a conspiracy to violate antitrust laws, plaintiff does allege contracts which plausibly fall within the language of K.S.A. 50-112 and constitute more than mere unilateral pricing policy. Therefore, we reject defendants' contention that plaintiff has failed to state a claim under the KRTA.

B. Unjust Enrichment – Count Seven

Plaintiff asserts an unjust enrichment claim in Count Seven. The essence of plaintiff's allegations is that plaintiff has had a "reduced presence" in the sutures and endo products markets and that defendants' market share is greater in those markets because of defendants' anti-competitive activities. This does not state a claim for unjust enrichment.

It appears undisputed that in Kansas the elements of an unjust enrichment claim are: 1) a benefit conferred; 2) an appreciation or knowledge of the benefit by the one receiving the benefit; and 3) the acceptance or retention of the benefit under such circumstances as to make it inequitable to retain the benefit without payment of its value. In re Estate of Sauder, 156 P.3d 1204, 1220 (Kan. 2007); see also Bettis v. Hall, 852 F.Supp.2d 1325, 1341 (D.Kan. 2012)(reciting similar elements). Sometimes the first element is

listed as "a benefit conferred upon the defendant by the plaintiff." J.W. Thompson Co. v. Welles Products Corp., 758 P.2d 738, 745 (Kan. 1988); Haz-Mat Response, Inc. v. Certified Waste Services Ltd., 910 P.2d 839, 846-47 (Kan. 1996)(quoting J.W. Thompson Co.); Spires v. Hospital Corp. of America, 289 Fed.Appx. 269, 272-73 (10th Cir. 5/23/2008)(citing Haz-Mat Response, Inc.); Midwest Grain Products, Inc. v. Envirofuels Marketing, Inc., 1998 WL 63077 *5 (10th Cir. 2/17/98)(quoting J.W. Thompson Co.); Freebird, Inc. v. Merit Energy Co., 883 F.Supp.2d 1026, 1038 (D.Kan. 2012)(citing Haz-Mat Response).

It is not plausible to consider plaintiff's reduced market presence as a benefit conferred upon defendants by plaintiff. "Confer" means to bestow, grant, give or contribute. Oxford English Dictionary, OED Online Version June 2013, available at www.oed.com. Plaintiff does not allege that it bestowed, granted or gave business to defendants. Plaintiff alleges that business customers or potential business customers were lured away from purchasing sutures and endo products from plaintiff and attracted to making such purchases from defendants by defendants' tying, bundling or exclusive dealing contracts. While plaintiff's loss of business or "reduced market presence" may have benefited defendants, it was not a benefit conferred by plaintiff. See Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp., 45 F.Supp.2d 1164, 1206-07 (D.Kan. 1999)(profits defendant made by hiring 13 physicians away from

plaintiff clinic were not a benefit conferred by plaintiff); see also, RESTATEMENT (FIRST) OF RESTITUTION § 1 cmt. b (1937)(a person confers a benefit upon another if he gives to the other possession of or interest in something valuable, performs a valuable service, satisfies a debt or duty, or in any way adds to the other's security or advantage or saves the other from expense or loss). Here, plaintiff does not allege that an action by plaintiff benefited defendant. Rather, plaintiff alleges that defendants' actions benefited defendants to plaintiff's disadvantage. This is not sufficient to state an unjust enrichment claim.

VIII. STATUTE OF LIMITATIONS AND LACHES

Defendant Cardinal argues that plaintiff's federal claims should be dismissed by virtue of the statute of limitations and the doctrine of laches. Both defendants argue that plaintiff's state law claims are barred by the statute of limitations. It is undisputed for the purposes of the motion to dismiss that plaintiff's federal damages claims are governed by a four-year statute of limitations (Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1088 (10th Cir. 2006)) and that this time limit is used by some courts as a guideline in considering laches. Aurora Enterprises, Inc. v. National Broadcasting Co., Inc., 688 F.2d 689, 694 (9th Cir. 1982); Rite Aid Corp. v. American Exp. Travel Related Services Co., Inc., 708 F.Supp.2d 257, 272 (E.D.N.Y. 2010); Little Rock Cardiology Clinic, P.A. v. Baptist Health, 573 F.Supp.2d 1125,

34

1151 (E.D.Ark. 2008).  It is also undisputed that plaintiff's state law claims are governed by a three-year statute of limitations. K.S.A. 60-512.

The statute of limitations and laches are affirmative defenses.  <u>Aldrich v. McCulloch Props., Inc.</u>, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)(statute of limitations); <u>Grynberg v. Total S.A.</u>, 538 F.3d 1336, 1341 (10th Cir. 2008)(labeling laches an affirmative defense).  Defendant can raise these defenses in a Rule 12(b) motion when (for the purposes of a limitations defense) the dates alleged in the complaint make clear that the right sued upon has been extinguished or (for the purposes of a laches defense) that the facts alleged in the complaint establish that there has been an unreasonable and prejudicial delay in asserting the claim. See <u>Aldrich</u>, <u>supra</u> (referencing a statute of limitations defense in a 12(b) motion); <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 949 (10th Cir.) <u>cert. denied</u>, 537 U.S. 1066 (2002)(describing burden of proof for laches).  The court should not focus upon whether the allegations in the complaint show compliance with the statute of limitations, but whether the allegations in the complaint show noncompliance.  See <u>Jones v. Bock</u>, 549 U.S. 199, 215 (2007)(complaint need not include facts defeating affirmative defense of administrative exhaustion).

Defendant Cardinal contends that the facts from the complaint demonstrate that plaintiff's federal claims are probably barred,

"[u]nless the challenged conduct occurred between December 5 and December 31, 2012." Doc. No. 24, p. 25. But, defendant Cardinal does not establish that plaintiff's allegations show noncompliance with the statute of limitations or that plaintiff has unreasonably delayed bringing its claims. Therefore, the court shall reject defendant Cardinal's arguments that plaintiff's federal claims are barred under the statute of limitations or laches.

Defendants' argumentation suffers from the same flaw as regards the timeliness of plaintiff's state law claims. The complaint alleges that defendants initiated their alleged illegal bundling or tying activity in 2008. (Doc. No. 19, ¶ 43). Plaintiff filed this action on December 5, 2012. These allegations, accepted as true, do not demonstrate that defendants entered illegal tying, bundling or exclusive dealing contracts only prior to December 5, 2009, that is, more than three years prior to filing the original complaint in this case. See Tricom, Inc. v. Electronic Data Systems Corp., 902 F.Supp. 741, 745 (E.D.Mich. 1995)(each tying contract signed constituted a new and independent antitrust injury).

IX. CONCLUSION

Consistent with the above-stated discussion, the court shall grant in part and deny in part defendants' motions to dismiss, Doc. Nos. 23 and 27. The motions are granted as to Counts Two, Three, Four and Seven and denied as to Counts One, Five and Six. Doc. No.

23 is moot as to Cardinal Health Inc. The motion to dismiss filed as Doc. No. 25 is entirely moot. Plaintiff shall be granted leave to file a second amended complaint by August 30, 2013. The motion to amend the memorandum in support of the motion to dismiss filed by defendant Owen & Minor Distribution, Inc. (Doc. No. 45) is granted. The request for judicial notice (Doc. No. 29) shall be granted. The motion for oral argument (Doc. No. 48) is denied.

**IT IS SO ORDERED.**

Dated this 1st day of August, 2013, at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge