## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUTURE EXPRESS, INC.,

        Plaintiff,

v.

OWENS & MINOR DISTRIBUTION, INC., AND CARDINAL HEALTH 200, LLC,

        Defendants.

Case No. 12-2760-DDC-KGS

## AMENDED MEMORANDUM AND ORDER

NOTICE:  On March 3, 2016, the Court entered a Sealed Memorandum and Order (Doc. 310) ruling on the parties' summary judgment motions.  The Court also entered a Notice of Unsealing and Order (Doc. 312) that advised the parties that the Court intended to unseal the entire Memorandum and Order unless the parties filed a notice identifying the portions of the Memorandum and Order that qualify to remain under seal.  In response to the Court's order, the parties filed a Joint Notice of Portions of Memorandum and Order to Redact (Doc. 318).  The Court has considered the parties' submissions and issues this Amended Memorandum and Order. As identified below, the Court has removed certain references to specific customers and membership associations and confidential business information identified in the sealed version of the Memorandum and Order because the parties have demonstrated that "countervailing interests heavily outweigh the public interests in access."  *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (citation and internal quotation marks omitted).  Moreover, the Court does not find the identity of these entities and the specific confidential business information essential to its analysis.  Instead, the Court references these entities and information generically in this publically-filed Amended Memorandum and Order.  If the specific identities of the entities or confidential business information should become important to the analysis at some later stage of the proceedings, the sealed Memorandum and Order (Doc. 310) contains them.

This case arises under federal and state antitrust laws.  Plaintiff Suture Express, Inc.

("Suture Express") alleges that defendants Owens & Minor Distribution, Inc. ("O&M") and

Cardinal Health 200, LLC ("Cardinal") have violated antitrust laws by tying and bundling the

sale of suture and endomechanical ("endo") distribution to the sale of other medical-surgical

("med-surg") distribution.  This matter comes before the Court on defendants O&M and

Cardinal's Motion for Summary Judgment (Doc. 253) and plaintiff Suture Express' Partial

Motion for Summary Judgment (Doc. 254).  After considering the parties' arguments, the Court

grants defendants' Motion for Summary Judgment and denies Suture Express' Partial Motion for

Summary Judgment.

## I.      Undisputed Facts

The following facts are either stipulated by the parties in the Pretrial Order (Doc. 251), or are

uncontroverted.

### *Med-Surg Product Distribution*

Med-surg products are single-use, disposable products that healthcare providers use on a

regular basis.  Thousands of med-surg products exist.  They fall into about 30 categories that

include, for example, custom surgical kits, packs and trays, IV sets and solutions, wound staples,

gloves, bedpans, hospital gowns, woven and nonwoven goods, needles and syringes, sutures,

endosurgical and endoscopic products, respiratory products, adhesives, bandages, dressings and

sponges, and incontinence products.

Suture Express distributes only two categories of med-surg products to healthcare

providers:  sutures and endo products.  Suture Express also provides distribution services to

health care providers, including clinics, ambulatory surgery centers, and acute care facilities.

O&M and Cardinal are "broadline distributors" of med-surg products, which means that

they distribute a full line of med-surg products in the 30 categories to healthcare providers.  This

includes suture and endo products.  O&M and Cardinal are two of three national broadline

distributors in the United States.  The third national broadline distributor is Medline Industries,

Inc. ("Medline"), which is not a party to this case.  O&M and Cardinal, when measured by sales

volume, are the two largest distributors of med-surg products to acute care providers in the

United States.  Cardinal currently distributes more than 300,000 med-surg products.  O&M distributes more than 220,000 med-surg products.

### Broadline Distributors

National broadline med-surg distributors, like O&M and Cardinal, acquire med-surg products in bulk from the manufacturers of those products.  They store, keep in inventory, and distribute those products to healthcare providers through a network of distribution centers spread across the country.  The distribution centers are large warehouse-like facilities that, typically, are located within several hours' drive from any given customer's hospital.  O&M operates 43 distribution centers nationwide; Cardinal operates 48.

O&M and Cardinal staff each of their local distribution centers with warehouse personnel who pick, pack, and load products onto pallets and then onto trucks, which deliver the products to customers on a regular schedule.  O&M and Cardinal use fleets of trucks to make those deliveries.  Truck delivery is the primary delivery method that O&M, Cardinal, and other broadline distributors use for med-surg distribution.

### Distributors' Relationships With Purchasers

Healthcare providers may contract directly with one or more med-surg distributors.  They typically have a primary distributor who provides the large majority of their med-surg needs.  Some of O&M and Cardinal's contracts define "primary distributor" to mean that the customer purchases a contractually-specified percentage of med-surg (including suture and endo) from the distributor.  Also, healthcare providers sometimes use secondary distributors to fill other product orders for a variety of reasons, including times when the primary distributor cannot provide a requested product.

Healthcare providers also may belong to one or more Group Purchasing Organizations ("GPOs"), Integrated Delivery Networks ("IDNs"), Regional Purchasing Cooperatives ("RPCs"), member alliances, or other buying groups that have consolidated the purchasing power of their members to negotiate contracts with one or more med-surg distributors.  The majority of acute healthcare providers are members of one or more GPOs.  GPO members often purchase med-surg distribution from a distributor under the terms of the GPO's agreement with that distributor.  And GPO agreements often include volume discount tiers.  Acute healthcare providers evaluate, change, and join new GPOs in an effort to obtain more favorable contract terms with med-surg distributors.

RPCs and member alliances are coalitions of GPO members that join together to negotiate contract terms with med-surg distributors.  RPCs, member alliances, or even individual hospitals sometimes negotiate for different terms than those found in GPO distribution contracts accessible to them.  These groups may enter into a "local contract" with a med-surg distributor, which could represent an amendment to a national GPO contract or an entirely different contract.

Alternatively, some hospital systems use a self-distribution strategy.  This means that they purchase products directly from manufacturers and perform distribution functions themselves.  Self-distribution customers still may use outside distributors for services that they choose not to handle themselves.  But some purchasers recognize the disadvantages of purchasing med-surg products directly from a manufacturer instead of using a distributor.  Using a manufacturer instead of a distributor may increase a purchaser's administrative and staff costs because the purchaser must establish separate purchasing relationships with each manufacturer and manage receipt of separate shipments from each manufacturer.  In contrast, a purchaser who

uses a distributor can purchase multiple manufacturers' goods from that one distributor and receive a shipment containing those goods from multiple manufacturers.[1]

Some med-surg distributors testified in their depositions that healthcare providers have consolidated recently, thereby creating larger hospital systems. This has consolidated buying power, and, as some med-surg distributors testified, produced a more competitive marketplace.

### Revenues

Med-surg distributors generate income from two sources: (1) funding paid by manufacturers ("vendor funding"); and (2) "markups," or distribution fees paid by purchasers. Many manufacturers of med-surg products pay distributors various forms of vendor funding, and generally, it is paid as a percentage of the underlying product cost.

Med-surg distributors, including Cardinal, O&M, and Suture Express, acquire products from manufacturers at a standard list price. Then, they charge most customers on a cost-plus basis, which means that they add a negotiated, fixed percentage distribution fee ("cost-plus markup") to the product cost agreed to by the customer and the manufacturer.[2] Sometimes, O&M and Cardinal include the cost of freight in their cost-plus markup. Certain regional distributors, such as Seneca Medical and MMS Inc., LLC, also offer cost-plus markup pricing. As an alternative, some broadline distributors, including Cardinal and O&M, charge some customers a service fee based on the specific distribution services received ("activity-based fee"). The services covered by med-surg distribution contracts differ from customer to customer.

### Suture Express' Entry into Suture and Endo Distribution

Suture Express opened its business in 1998. It developed a business model to respond to the differences between suture and endo distribution and other med-surg distribution. Sutures

---

[1]     This description is a paraphrase of the parties' Stipulated Fact No. 20 (Doc. 251-1 at 5).
[2]     The parties recite these facts in Stipulated Fact No. 27 (Doc. 251-1 at 6).

and endo products account for about 10% of the med-surg supplies distributed in the United States to acute care providers. No acute care providers need just sutures and endo products but no other med-surg products. And no acute care providers need other med-surg products but not sutures and endo products. However, more stock keeping units (SKUs) exist for sutures than any other category of med-surg products. And while suture and endo products are smaller and lighter than most other med-surg products, they have a high-dollar value relative to their size and weight. Because the products are lightweight and small volume—"low cube"—a distributor easily can ship them in a FedEx box to an acute care provider.

Suture Express has one, centralized warehouse located in Lenexa, Kansas. There, it stocks a large variety of suture and endo SKUs, including "slower moving" SKUs. It ships those products from its warehouse across the country via overnight delivery by FedEx (or by courier within the Kansas City metropolitan area). Suture Express imposes no requirements on its customers for order size or frequency. But typically it charges a separate freight fee. This fee is often $7 per day/per location on top of its cost-plus markups. But Suture Express may charge some customers less, more, or not at all for freight. When the $7 per freight fee is added, it increases a customer's actual distribution costs above the cost-plus markup, adding, on average, one quarter of a percent (0.25 %) to the markup.

Suture Express achieves high "fill rates" for its customers. A "fill rate" represents the percentage of times that a distributor can fill a customer's order on a timely basis. For example, if a distributor ships nine of ten items a customer orders, then the fill rate for that particular customer is 90%. Many acute care customers demand high fill rates for suture and endo distribution. Historically, Suture Express has maintained a fill rate higher than 99%, and, in many instances, has higher fill rates than O&M and Cardinal.

### *Market Definitions and Market Share*

Market definitions are an important piece of antitrust analysis.  Here, the parties largely agree on the summary judgment definitions of the relevant geographic and product markets.  They agree that:  (1) the geographic market is national in scope, that is, limited to the United States, and (2) the product market is for distribution of med-surg products to acute care customers (*i.e.*, hospitals).[3]

Industry-wide med-surg (including suture and endo distribution) revenues increased year-over-year during the relevant period, 2007 to 2012.  From 2007 to 2012, O&M's sales of other med-surg products accounted for 32–38% of the total distribution of other med-surg products to acute care customers.  In 2012 (the last year for which data is available), O&M had 38% of those sales.  O&M attributes over half its growth during these five years to acquisitions of two smaller distributors and the addition of two large hospital systems as customers.  The remainder of O&M's growth came from acquiring new customers and organic growth from existing customers.  From 2007 to 2012, O&M's sales accounted for 40–43% of the total sales of distribution of suture and endo products to acute care customers.  In 2012 (the last year for which data is available), O&M had 42% of those sales.

---

[3]    O&M and Cardinal do not dispute Suture Express' Statement of Fact No. 34:  "For purposes of this case, the relevant markets are appropriately limited to distribution of Med-Surg products to acute care customers (*i.e.*, hospitals)."  Doc. 269 at 21 (Suture Express' Memo. in Support of Partial Summary Judgment); Doc. 304 at 2 (stating that Suture Express' Statement of Fact No. 34 is not disputed for purposes of summary judgment).

O&M and Cardinal assert in their summary judgment motion that the relevant market is for distribution *services*, rather than the physical items themselves.  Doc. 266 at 6; Doc. 303 at 6 (sealed corrected version).  Suture Express disputes this statement of fact, arguing that the relevant market is for the distribution of physical items because meg-surg distributors provide the actual products in addition to distribution-related services.  Doc. 280 at 7.  The Court views this statement of fact in the light most favorable to Suture Express, as it must when it considers defendants' motion for summary judgment.  The Court therefore concludes that the relevant market is the distribution of med-surg products.  Moreover, O&M and Cardinal fail to dispute that characterization of the relevant market in their response to Suture Express' motion for partial summary judgment.

From 2007 to 2012, Cardinal's sales accounted for 27–31% of the total distribution of other med-surg products to acute care customers.  In 2012 (the last year for which data is available), Cardinal had 27% of those sales.  From 2007 to 2012, Cardinal's sales accounted for 26–31% of the total distribution of suture and endo products to acute care customers.  In 2012 (the last year for which data is available), Cardinal had 26% of those sales.

Suture Express' market share in the suture and endo distribution market has varied between 8% and 10% from 2007 to 2012.  In 2010, Suture Express' market share was 10% but decreased to 8% by 2012.

### *O&M and Cardinal's Implementation of Bundling Contract Terms*

Between 1998 and about 2008, Suture Express successfully grew its business.  Both O&M and Cardinal engaged in separate, internal communications about the increasing threat that Suture Express, because of its superior fill rates and low pricing, posed to their businesses.  Around the same time, O&M and Cardinal adopted contractual terms that made pricing contingent on a customer's purchase of suture and endo distribution through them.

Cardinal implemented these contractual terms in different ways.  In some contracts, Cardinal imposes markups on med-surg distribution unless the customer purchases 100% of its suture and endo products from Cardinal.  Other Cardinal contracts give Cardinal the right to renegotiate the distribution markup and the payment terms provided in the contract if the customer stops buying its suture and endo products from Cardinal.  Yet other agreements provide for higher markups on med-surg distribution if the customer reserves the right to purchase suture and endo products from other distributors.  And, some agreements make markups on med-surg distribution contingent on the customer purchasing a certain percentage (in some cases, 95%) or a minimum dollar amount (specifically tailored to that customer) of all med-surg products from

Cardinal.  Suture Express' expert, Professor Einer Elhauge, calculated that almost 70% of Cardinal's contracts included at least one of the following contract terms:  (1) an 80%+ med-surg distribution purchase requirement, or (2) a suture and endo distribution volume purchase requirement.

Cardinal also included similar contract terms in standardized agreements that it negotiated with GPOs.  Currently, Cardinal's standardized agreements with the five largest GPOs have contingent pricing terms or impose markups if the customer fails to purchase a certain percentage (in some cases 100%) of suture and endo distribution from Cardinal.  Many of Cardinal's customers have not entered into individually-negotiated contracts.  Instead, they have purchased med-surg distribution from Cardinal under a GPO standardized agreement.

O&M uses similar contract strategies.  O&M includes contractual terms in its customer agreements that allow O&M to increase the price charged for other med-surg distribution if the customer switches suture and endo distribution to another distributor.  For instance, one version of O&M's contracts imposed a markup on other med-surg distribution if the customer purchased suture and endo distribution from a distributor other than O&M.  Other O&M agreements rendered markups on all med-surg distribution contingent on the customer purchasing a high percentage of med-surg distribution from O&M.  Other O&M agreements required the customer to purchase a minimum amount (measured in dollars) of total med-surg distribution.  That minimum amount was tailored to that particular customer so that the customer would violate the contract if it switched all of its suture and endo distribution to another distributor.  And, in other agreements, O&M made markups contingent on customers purchasing the top 10 Healthcare Products Information Services categories (which include suture and endo) from O&M.  Based on his review of O&M contracts, Professor Elhauge opined that almost every agreement included a

term allowing O&M to increase prices on other med-surg distribution if the customer switched its suture and endo distribution to another distributor, such as Suture Express.

O&M also included similar contract terms in standardized agreements that it negotiated with GPOs.  Many O&M customers who did not enter into individually-negotiated contracts purchased med-surg distribution from O&M under a GPO standardized agreement.  O&M's current standardized agreements with the five largest GPOs impose markups if the customer fails to purchase a certain percentage of suture and endo distribution from O&M.

Typically, O&M, Cardinal, and Suture Express' contracts with customers have three to five year terms.  Many of O&M and Cardinal's contracts include provisions allowing the customer to terminate without cause after giving notice of six months or less.  Although customers may have the ability to change distributors under their contracts, customers have described the process as a time consuming one and not insignificant.  Those customers also recognize the overhead costs and investment required to switch distributors.  Despite the complexity of switching distributors, about one-half of Cardinal's acute care customers continue to do business with Cardinal within three or four years of initiating the relationship.  The same is true for O&M.

### Effect of O&M and Cardinal's Contract Terms as Analyzed by Plaintiff's Expert

Suture Express' expert, Professor Elhauge, analyzed the contract terms for 102 of O&M and Cardinal's customers.  He created this pool of sample contracts by identifying Cardinal's 50 largest customers and O&M's 52 largest customers.  Together, these 102 customers account for 3,271 separate acute care facilities.  The 50 Cardinal customers account for 53% of Cardinal's med-surg sales.  And the 52 O&M customers account for 47% of O&M's med-surg sales.  After reviewing these 102 contracts, Professor Elhauge concluded that between 2006 and 2013, O&M

made about 98% of its suture and endo sales and Cardinal made about 71% of its suture and endo

sales under a contract containing one of the contractual terms described above—that is, one that

makes pricing contingent on the purchase of suture and endo distribution through them.

Professor Elhauge also analyzed cost data produced by Cardinal to calculate the

minimum markup that an equally efficient suture and endo distributor would have to charge to

remain in the market.  Professor Elhauge then used data about the contingent pricing terms in

Cardinal's contracts to determine how often Cardinal's incremental suture and endo markups fell

below the minimum markups.  To put it another way, Professor Elhauge examined how often the

contract terms produced sales of suture and endo distribution products below cost.  For Cardinal,

he concluded that customers with contracts containing the bundling provision paid an

incremental price lower than the minimum markup 67% of the time.  For O&M customers[4] with

such contracts, Professor Elhauge opined that the resulting incremental price was lower than the

minimum markup 85% of the time.

Professor Elhauge also applied an economic test to determine whether bundled discounts

have the same economic effect as a tying arrangement.  Applying that test, Professor Elhauge

used sales data from Suture Express, Cardinal, and O&M to calculate whether purchases of

Suture Express' suture and endo distribution by customers who purchased other med-surg

distribution from O&M and Cardinal (*i.e.*, customers who "broke the bundle") are less than 10%

of the sum of those purchases plus purchases of defendants' suture and endo distribution by

---

[4]     O&M did not produce cost data sufficient for Professor Elhauge to perform a similar calculation
for its markups.  So, Professor Elhauge relied on Cardinal's cost data to perform the analysis for O&M.

customers who accepted the bundle.[5]  Professor Elhauge determined that this ratio ranged from 3% to 7%, depending on the year.

Professor Elhauge also examined Suture Express' performance among defendants' customers who had entered into contracts containing the bundling terms and compared them to customers who were not bound by contracts containing the bundling terms.  Professor Elhauge determined that Suture Express' market share among customers who had entered into contracts with bundling terms ranged from 2% to 6% between 2006 and 2013, while its market share for customers not bound by the contractual bundling terms ranged from 13% to 41% for the same time period.  From his conclusions, Suture Express' market share among customers not subject to the bundling terms (depending on the year) was four to 15 times greater than its share among customers who were subject to bundling terms.

### Practical Effects of the Bundling Terms and Market Structure

O&M and Cardinal have acknowledged that the bundling terms successfully prevented Suture Express from selling suture and endo distribution to many of their customers.  In a 2010 document, O&M noted that it has had some success defending against Suture Express by bundling pricing for suture and endo with other med-surg products.  In another document, O&M recognized that customers subject to bundling will face higher prices if they choose to purchase suture and endo distribution from Suture Express.  Cardinal identified "contract obligations" as a reason that one of its customers did not switch its business to Suture Express.  Cardinal also described a situation when a customer agreed to stop purchasing suture and endo from Suture Express and move the business to Cardinal after Cardinal informed the customer of a "compliance issue."  The Court understands Cardinal's reference to this "compliance issue" to

---

[5]      *See* Doc. 262-1 at 148 (Elhauge report at ¶ 154) (explaining that Professor Elhauge used this formula because it is "a prominent economic test" used to determine if a bundled discount has the same economic effect as tying (citing X Areeda, Elhauge, & Hovenkamp, *Antitrust Law* ¶ 1758b (1996))).

mean that the customer was not complying with the bundling terms in its contract that required the customer to purchase suture and endo from Cardinal to obtain certain pricing on other med-surg distribution.  Cardinal noted other situations when it had retained customers' suture and endo distribution purchases because of contractual requirements that effectively prevented the customers from purchasing suture and endo distribution from other sources (including Suture Express).

Many customers have informed Suture Express that they understand that the bundling terms in defendants' contracts prevent them from purchasing suture and endo distribution from Suture Express.  Some customers stated that they could not purchase suture and endo distribution from Suture Express because their contracts with defendants effectively prevented them from doing so.  Other customers moved their business away from Suture Express after signing contracts with defendants containing the bundling terms.  And some customers informed Suture Express that any savings they realized by moving their business to Suture Express was offset by the costs they incurred under their contracts' bundling requirement.  But, the bundling provisions notwithstanding, some customers subject to such contractual terms continued to purchase suture and endo distribution from Suture Express.  For example, one Suture Express customer[6] paid increased prices on its med-surg distribution purchased from Cardinal because it failed to abide by the suture and endo commitment requirement in its contract with Cardinal after it purchased suture and endo distribution from Suture Express.

Also, customers testified under subpoena about their decisions and how they made them when entering into contracts with O&M, Cardinal, and other distributors that contain bundling

---

[6]     The sealed version of this Memorandum and Order (Doc. 310) identifies this customer specifically.

terms.  For example, a hospital membership association[7] entered into a contract with Cardinal in January 2008.  Cardinal was the only distributor awarded a contract by this membership association at that time.  Of the membership association's 34 members, no more than 22 of them entered into the Cardinal contract.  In December 2011, Medline beat Cardinal, O&M, and Suture Express to win a sole-source contract with this membership association.

One hospital, who is a member of this association and thus had the option to sign the membership association's med-surg distribution contracts, contracted with Cardinal until April 2012, when it switched to Medline as its primary distributor.  In 2006, this hospital declined to move business to Suture Express from Cardinal because the move would produce minimal savings over its existing Cardinal contract.  This existing contract called for an increase in the cost plus markup for med-surg distribution if the hospital failed to meet the 90% suture and endo purchase requirement.

A second hospital who is a member of this association also had the option to enter into the membership association med-surg distribution contracts or contract locally with a different distributor.  This hospital signed the membership association contract with Cardinal for med-surg distribution services until 2012, when it moved its business to Medline.  The hospital did not move its business to Suture Express because it made fiscal sense to purchase suture and endo through Medline based on the pricing structure of Medline's contract.

A third hospital[8] is an equity member of a GPO and thus had committed to use a med-surg distributor authorized by the GPO.  In 2008, this hospital had the choice of four authorized

---

[7]  The sealed version of this Memorandum and Order (Doc. 310) identifies this membership association specifically and the specific hospitals who are members of this association as described the following paragraphs.

[8]  The sealed version of this Memorandum and Order (Doc. 310) specifically identifies this hospital and the six additional hospitals described in the following six paragraphs.

med-surg distributors—O&M, Cardinal, Medline, or Suture Express.  The hospital switched from Cardinal to O&M in 2008, after having switched from O&M to Cardinal in 2007.  The hospital declined to move its suture and endo distribution to Suture Express because it wanted to consolidate services, and it recognized that moving the business would increase its costs under its existing contract with O&M.

A fourth hospital chose to contract with O&M instead of Cardinal, Medline, and Professional Hospital Supply (a regional distributor).  The hospital was subject to bundling terms under its O&M contract, which it considered when making the decision not to move business to Suture Express.  But that was not the "overriding reason" for the decision.  Instead, this hospital decided to keep its business with O&M because of the benefits of having a local distributor.

A fifth hospital purchased suture and endo distribution from Suture Express and other med-surg from Medline until 2010, when it switched its med-surg distribution to O&M and was subject to a bundling term.  In 2012, the hospital switched from O&M to Medline as its distributor for med-surg products, including suture and endo.  When it made the switch, the hospital considered contract proposals from O&M, Cardinal, Medline, and Seneca (a regional distributor).

A sixth hospital understood that it had many options for contracting with med-surg distributors through its GPO.  It even had switched GPOs to receive better contracting opportunities.  In 2009, the hospital signed a contract with O&M through a regional purchasing group within its GPO.  Before entering that contract, the hospital purchased suture and endo distribution from Suture Express.  After signing the contract with O&M, the hospital moved its suture and endo business to O&M because the contract required it to do so or incur increased

markups.  The contract also provided that the hospital could move suture and endo distribution

back to Suture Express if O&M failed to comply with a 99% fill rate requirement.

A seventh hospital chose to contract with Cardinal in 2009, as its primary med-surg

distributor, over Medline and O&M.  The hospital considered purchasing suture and endo

distribution from Suture Express but chose not to do so for efficiency reasons, and because it

wanted to work with one single distribution channel.  While the hospital's contract with Cardinal

required it to purchase suture and endo distribution through Cardinal, the hospital testified that

the bundling contractual terms were not necessarily a factor in its decision to keep its suture and

endo distribution with Cardinal instead of Suture Express.

An eighth hospital implemented an expense reduction plan in 2009 or 2010, part of which

involved reevaluating its med-surg distribution contract with Cardinal.  The hospital solicited

RFPs, and Cardinal, O&M, Medline, and Claflin (a regional distributor) responded.  The hospital

did not send an RFP to Suture Express because it decided to seek bids only from broadline

distributors.  The hospital awarded the contract to Cardinal because of its lower markup, better

payment terms, and other considerations.  The hospital purchased suture and endo from Suture

Express before it entered the new agreement with Cardinal in 2010, but stopped doing so because

it wanted to achieve the financial benefits of its Cardinal contract.  The Cardinal contract

included a bundling provision that required the hospital to repay part of Cardinal's discount if the

hospital failed to meet its suture and endo commitment.

A ninth hospital changed distributors from Medline and Suture Express to O&M in 2011.

The hospital told Suture Express that it was moving its business to O&M in an effort to

consolidate purchases, minimize inventory, and realize savings.  The hospital's contract with

O&M contained a bundling term that required it to purchase a certain volume of suture and endo from O&M, or incur price markups.

### *Broadline Distributors' Distribution of Suture and Endo and Value-Added Services*

Broadline distributors, like O&M and Cardinal, provide economies of scale. This means that per-unit costs are lower when they distribute high volumes of med-surg products. Some common costs exist when O&M and Cardinal distribute suture and endo products and other med-surg products together by truck. As described above, suture and endo products account for about 10% of an acute care provider's total spending on med-surg products. Suture and endo products are smaller and lighter than most other med-surg products, and have high-dollar value relative to their size and weight. They also are more expensive than most other med-surg products, yielding higher revenue for distribution services priced on a cost-plus basis. In contrast, med-surg products that are bulky or heavy are more expensive to deliver, and they contribute relatively less revenue for the amount of space they consume on a distribution truck.

A broadline distributor's trucks make regular deliveries of med-surg products to its customers regardless whether the customers have ordered suture and endo through it. The distributor can add suture and endo products to the customer's existing delivery without adding meaningful cost to that delivery because the same truck and driver, using virtually the same amount of fuel, will deliver the customer's med-surg products regardless of whether the load contains suture and endo products.

But O&M and Cardinal also recognize that some customers prefer more frequent deliveries of suture and endo products than other med-surg products. To that end, O&M and Cardinal have established distribution practices specific to suture and endo products. Cardinal has the National Suture Center, a separate, centralized distribution facility for suture and endo

distribution.  Cardinal set up this facility to improve customer service and reduce eroding sales to Suture Express.  O&M operates a centralized facility that resupplies its local facilities and from which certain customers can order suture and endo products directly.

Broadline distributors, including O&M and Cardinal, also offer special services,[9] such as inventory management that can help customers save money.  But, in many cases, customers pay additional fees for these special services.  Some broadline distributors, including O&M and Cardinal, offer logical- or low-unit-of-measure ("LUM") programs.  Other broadline distributors, including O&M and Cardinal, offer just-in-time ("JIT") inventory replenishment programs that may require additional deliveries to customers.  O&M and Cardinal also offer wound closure inventory management programs; they permit the distributor to work directly with the purchasing customer to manage their suture and endo inventory.  Cardinal's Wound Closure Management Services program enables Cardinal to make recommendations to customers about the appropriate size, storage, and stocking locations for suture and endo inventory.  Less than 1% of Cardinal's customers use this program.  O&M's program—PANDAC—involves on-site cost containment and inventory management services for suture and endo and certain other med-surg products.  About 20% of O&M's suture and endo customers use PANDAC.  Some broadline distributors also provide same-day delivery to customers if they operate within specified driving distance of the nearest distribution center.  However, requests for same-day deliveries are rare.  Same-day deliveries also may cost more, and a distributor is able to fulfill a same-day request only if it already has the product in stock at its local distribution center.

### *Competition Among National and Regional Distributors*

O&M and Cardinal have won and lost customers from and to one another.  As already discussed, O&M and Cardinal also compete against a third national broadline distributor,

---

[9]      Suture Express also offers similar services.

Medline.  Medline has grown its business in recent years.  In early 2014, it acquired Professional

Hospital Supply ("PHS"), a regional distributor located primarily in the western United States.

Medline's med-surg product distribution to acute and non-acute providers has grown from less

than $2 billion in sales in 2008 to over $5 billion in sales in 2014.  These numbers exclude

growth derived from Medline's acquisition of PHS.  For suture and endo distribution only,

Medline distributed about $35 million to both acute and non-acute providers in 2008.  By 2014,

Medline's suture and endo distribution to both acute and non-acute providers increased to about

$220 million (not including PHS suture and endo distribution figures).  Medline has won

customers from O&M and Cardinal.  Medline also has negotiated contracts with GPOs and

regional buying groups.  Suture Express also has won and lost contracts against Medline.

 The three national broadline distributors also sometimes compete with regional med-surg

distributors for business.  Suture Express also has lost and won contracts against certain regional

distributors.  For example, Seneca Medical ("Seneca") is a regional distributor that distributes

90,000 different products from 1,500 different manufacturers.  Seneca operates in 12 states out

of six distribution centers.  It has a fleet of more than 80 trucks and 30 account managers in the

field.  Since 2007, Seneca has opened three additional distribution centers.  A Seneca

representative estimated that in the last five or six years, Seneca has grown by 50%.  The Seneca

representative also estimated that Seneca's market share has grown to 50% (and as high as 75%

market share in some geographic areas it serves), and that Seneca has a 15% to 16% share

overall in the 12-state region that it serves.  Seneca has won customers from O&M and Cardinal.

Between January 2011 and May 2014, Seneca won several major health systems customers

competing against Cardinal, O&M, and Medline.

MMS Inc., LLC ("MMS") is another regional full-line distributor.  It has distribution centers in eight states and Guam.  MMS provides same day service by distributing to its acute care customers located within a six hour drive of its distribution centers.  The Claflin Company ("Claflin") is a regional distributor of med-surg supplies located in Providence, Rhode Island.  It serves the New England region, and it has grown in the last 30 years by purchasing other distributors.  In 2009, Claflin beat both O&M and Cardinal to win an estimated $25 million med-surg distribution contract with a certain hospital.[10]  Before that, Cardinal had served as the distributor for that hospital for five years.

Before Medline acquired it in 2014, PHS operated as a regional acute care distributor.  It had eight distribution centers in six states.  Buffalo Hospital Supply is another distributor of med-surg products.  It currently serves over 500 healthcare organizations, and it competes with O&M and Cardinal for business.  DeKroyft-Metz & Co., Inc. ("DeKroyft") is another regional distributor based in Peoria, Illinois.  It operates one distribution center that serves three states.  Kreisers Inc. ("Kreisers") is a regional med-surg distributor located in Sioux Falls, South Dakota.  It operates six distribution centers.  Midland Medical Supply is a regional med-surg distributor located in Lincoln, Nebraska, with a customer base of nearly 600 clients that includes hospitals, clinics, doctor's offices, surgery centers, long term care homes, and medical and industrial laboratories.  American Medical Depot is another regional med-surg distributor with two corporate offices—one in Florida and the other in Pennsylvania.  It carries 350,000 products from over 2,000 suppliers.

In 2007, O&M bought the acute care business of McKesson Medical-Surgical ("McKesson").  McKesson operates a med-surg business unit that supplies med-surg products to physicians' offices, home care agencies, long-term care facilities, and surgery centers.  It carries

---

[10]     The sealed version of this Memorandum and Order (Doc. 310) identifies this hospital specifically.

more than 200,000 med-surg products which it distributes from a network housed in more than 45 different locations.  Although O&M now operates McKesson's acute care business, McKesson is not subject to a non-compete agreement that prevents it from reentering the acute-care market.

Also, Henry Schein Medical is a broadline distributor of med-surg products to primary care physicians and specialists, group practices, physician-owned labs, and ambulatory surgery centers.  In 2006, it sold its hospital supply (which is the relevant market here).  But all the parties in this case recognize Henry Schein Medical as a competitor in the non-acute and ambulatory care markets.

### *Competition from Manufacturers*

As described above, some hospital systems use a self-distribution strategy.  That is, they purchase products directly from manufacturers and perform distribution functions themselves.  With self-distribution, an IDN or collective of hospitals uses its own distribution center or centers to distribute products to member hospitals.  But self-distribution customers still may rely on outside distributors for services that they choose not to handle themselves.

O&M has lost at least two customers to self-distribution.  Suture Express likewise identifies direct distribution from suture and endo manufacturers Johnson & Johnson (Ethicon) and Covidien as competition in the market.  Ethicon and Covidien provide direct purchasing services to customers, and, in recent years, have offered changes in their pricing structure for customers making direct purchases.

### *Pricing in Distribution Contracts*

Many factors may influence the distribution pricing that a distributor and acute care customer agree to in a contract.  As already mentioned, GPOs tend to negotiate contracts with

one or more med-surg distributors on behalf of their members.  For several GPOs, the RFP and negotiation process is handled by GPO member advisory councils.  Usually, this process starts with a GPO issuing an RFP, and then med-surg distributors respond.  The RFP describes various contract terms and asks the distributors if they are willing to agree to those terms.  The contract terms in the RFP are a starting point for negotiation.

Some RFPs from GPOs specifically have requested contract terms containing product category commitments from customers.  But GPOs earn administrative fees in proportion to the total volume of med-surg distribution that passes through the distributors.  For that reason, GPOs have an incentive to include volume commitments in med-surg distribution contracts.

Some, but not all, of the national and regional med-surg distributors include volume and product commitments in their customer contracts.  A customer who purchases higher volumes from a distributor has greater leverage to obtain lower prices.  Suture Express also includes volume commitments in its contracts.  These contractual terms offer more favorable pricing in exchange for purchasing larger quantities of products.  But such terms do not make pricing contingent on the purchase of another type of product, similar to the bundling provisions used by O&M and Cardinal.

Other national and regional broadline distributors have included in their contracts terms similar to the terms used by O&M and Cardinal, where pricing depends on the customer's commitment to purchase a certain volume of suture and endo distribution.  Medline includes in its agreements a price increase by one half point if a customer stops purchasing suture and endo distribution from Medline.  The majority of Seneca's local agreements also include a percentage or other commitment to obtain suture and endo products and custom procedure trays from Seneca.  Two distributors, MMS and Seneca, testified that they include suture and endo

commitment terms in their contracts because the product category is important to their profitability and pricing.

Some of O&M and Cardinal's contracts contain a cost-plus markup fee for med-surg distribution that represents one blended rate for all med-surg product categories. Other of their contracts contain more than one cost-plus markup fee, with markup fees that may differ for certain specific product categories. Suture and endo products are two product categories that, sometimes, have a different distribution markup than the one that applies to med-surg product markups.

Suture Express' expert, Professor Elhauge, performed an analysis that concluded that defendants' markup to acute care facilities for other med-surg products has been over 50% higher than the distribution markup charged to acute care facilities for suture and endo products. But, when customers contracted with defendants on a "blended" rate for both types of distribution, defendants sometimes based the rate on the product mix, and charged lower rates when customers bought more suture and endo products.

### Profits

On average, O&M and Cardinal's markups for the distribution of med-surg products were lower in 2013 than they were in 2008. Markups also have declined for regional distributors Seneca and MMS. And, on average, O&M and Cardinal's markups for the distribution of suture and endo products were lower in 2013 than they were in 2008. Professor Elhauge and Suture Express' former CEO concede that Suture Express restrains the prices that O&M and Cardinal can charge for suture and endo distribution services. Suture Express also acknowledges that competition has pushed the markups for suture and endo products down.

O&M and Cardinal's profit margins have declined since 2008.  Cardinal's operating margins for distribution-only activity have decreased by about 80% from 2008 to the end of 2011.  O&M's operating margins for med-surg distribution also have decreased by about 17% between 2008 and 2013.  O&M and Cardinal's distribution services margins also declined during this period.  Cardinal's distribution services margin (which is roughly seven to eight times greater than its operating margin) decreased by about 75% between 2008 and 2013.  But O&M's distribution services margin (which is about 10 to 11 times greater than its operating margin) only decreased by about 8% from 2008 to 2013.[11]  Suture Express' distribution services margin is higher than either O&M or Cardinal's med-surg distribution services margins.

### Barriers to Entry in the Market

A business seeking to enter the med-surg distribution market would incur large investment costs associated with that effort, including costs for building or leasing one or more distribution center(s) and leasing or purchasing delivery trucks.  For example, O&M has distribution centers located throughout the country.  Each distribution center distributes med-surg products within a geographic area consisting of one to three states.  Cardinal also has located distribution centers across the country in close proximity to heavily populated areas.

The process for switching broadline distributors requires time and expense on the customer's part.  One customer has described it as a complex and detailed process, especially if the customer operates more than one facility.  The process of switching involves an assessment of current inventories and order histories of the different types of med-surg products with the

---

[11]    The sealed version of this Memorandum and Order contains specific data for defendants' profit margins described in the above paragraph.  Defendant O&M argued, persuasively, that revealing of this specific data could place it at a competitive disadvantage in the marketplace.  The Court thus expresses this data in broader terms in the Amended Memorandum and Order.  If that data should become relevant to issues in later proceedings, the sealed version of this Memorandum and Order recites this data specifically.

incumbent distributor, ensuring availability of the current products with the new distributor, determining pricing structures, loading and coordinating computer systems with the new distributor, and coordinating placement of orders and deliveries with the new distributor.  But, as shown by examples described above, acute care customers often switch distributors for various reasons, including more favorable contract terms.

### Challenges to Suture Express' Business

Since its inception, Suture Express has never distributed the full range of med-surg products.  Thus, most of the med-surg product categories purchased by hospitals are not available from Suture Express.  Suture Express also does not offer same-day service outside of the area near its warehouse in Kansas.

From 2006 to 2008, Suture Express successfully gained suture and endo business from Medline customers.  But this success declined after Medline improved its service in suture and endo distribution, offered discounted pricing, and included bundling terms in its contracts.  Since 2010, Medline has experienced significant growth in its suture and endo distribution to both acute and non-acute providers, more than doubling the amount of its sales in this market.

In mid-2010, a certain hospital[12] notified Suture Express that, effective January 2011, it would move its business to O&M.  This hospital was Suture Express' largest revenue-producing customer between 2006 and 2010.  The hospital accounted for about 20% of Suture Express' net sales in 2009 and 2010.  The loss of this customer had a negative effect on Suture Express' revenues and profits.

## II.    Summary Judgment Standard

The standard for deciding summary judgment is well-known.  Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material

---

[12]      The sealed version of this Memorandum and Order (Doc. 310) identifies this hospital specifically.

fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995).  When it applies this standard, the Court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co*., 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the

court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Here, plaintiff and defendants both have filed motions for summary judgment. When the parties file cross-motions for summary judgment, the legal standard does not change. Each movant bears the burden of establishing that no genuine issue of material fact exists and it is entitled to judgment as a matter of law under its summary judgment theory. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). The Court must treat cross motions for summary judgment separately—"the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). However, where the cross motions overlap, the Court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted). Also, the Court may assume that it need not consider evidence beyond that cited by the parties. *Atl. Richfield Co.*, 226 F.3d at 1148 (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)). Nevertheless, the Court must deny summary judgment if disputes remain about material facts. *Id.* (quoting *James Barlow*, 132 F.3d at 1319).

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).  And, summary judgment has "particular importance in the area of antitrust law, because it helps to avoid wasteful trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (citation, internal quotation marks, and alterations omitted); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010) (stating that "[t]he entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces." (citation omitted)).  Indeed, the Supreme Court has recognized that "[s]ummary judgments have a place in the antitrust field" because "[s]ome of the law in this area is so well developed that [when] the gist of the case turns on documentary evidence, the rule at times can be divined without a trial." *White Motor Co. v. United States*, 372 U.S. 253, 259 (1963); *see also SEC v. Geyser Minerals Corp.*, 452 F.2d 876, 881 (10th Cir. 1971) (explaining that "even in antitrust litigation, if the pertinent area of law is well developed and the case turns on documentary evidence, disposition by summary judgment may be appropriate" (citing *White Motor Corp.*, 372 U.S. at 259)).

## III.     Analysis

Suture Express has filed a Partial Motion for Summary Judgment (Doc. 254) asking the Court to find that O&M and Cardinal's bundling actions are an illegal tying practice that violates:  (1) Section 1 of the Sherman Antitrust Act; (2) Section 3 of the Clayton Act; and (3) the Kansas Restraint of Trade Act ("KRTA"), K.S.A. § 50-101 *et seq.*  Defendants have filed a

Motion for Summary Judgment (Doc. 253), seeking summary judgment against all three legal theories invoked by Suture Express' claims.  The Court exercises its discretion to address the parties' cross-motions together.

### A.  Sherman Act § 1

Suture Express asserts that defendants' bundling practices constitute an illegal tying arrangement that violates section 1 of the Sherman Act.  A tying arrangement exists when a seller conditions its sale of a product (the "tying" product) on the purchase of a second product (the "tied" product).  *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006).  The Supreme Court has explained that "'the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'"  *Id.* (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).  But, even in concentrated markets, tying arrangements "may serve procompetitive purposes, such as quality control, production and sales efficiencies, and facilitation of indirect price competition."  *Town Sound & Customer Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992); *see also Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2007) (explaining tying in the form of bundled discounts "generally benefit[s] buyers because the discounts allow the buyer to get more for less" and that tying can produce "savings to the seller because it usually costs a firm less to sell multiple products to one customer at the same time than it does to sell the products individually").

Here, Suture Express claims that defendants have conditioned the sale of other med-surg distribution (the "tying" product) on the purchase of suture and endo distribution (the "tied" product).  Each defendant imposed a tying arrangement, according to Suture Express, by

offering a bundled discount that makes it uneconomic for customers to contract for suture and endo distribution separate and apart from other med-surg distribution. Suture Express characterizes the bundled discount as a "penalty" that defendants impose on customers who choose to purchase suture and endo distribution elsewhere. And, Suture Express contends, this bundling arrangement amounts to an unreasonable restraint on trade in violation of the Sherman Act § 1.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Notwithstanding its words, § 1 does not prohibit every restraint of trade, but only "unreasonable restraints of trade." *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir.), *cert denied*, 525 U.S. 822 (1998) (internal quotation marks and citation omitted). Courts employ two different tests to determine whether a defendant's conduct unreasonably restrains trade. *Id.* They are: (1) the per se rule, and (2) the rule of reason. *Id.* (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994)).

The elements of a tying violation are: "(1) two separate products or services are involved; (2) the sale or agreement to sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997) (citations omitted); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992); *Jefferson Par.*, 466 U.S. at 12–18, *abrogated on other grounds by Ill. Tool Works, Inc.*, 547 U.S. at 31; *Multistate Legal Studies,*

*Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'n, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995) (reciting the elements of a "per se violation").

The per se rule "condemns practices that 'are entirely void of redeeming competitive rationales.'" *Id.* (quoting *SCFC ILC, Inc.*, 36 F.3d at 963). When presented with a practice that is illegal per se, the court "need not examine the practice's impact on the market or the procompetitive justifications for the practice advanced by a defendant before finding a violation of antitrust law." *Id.* Some courts have recognized, however, that the "per se" rule in tying cases is not "like other, truly per se rules in antitrust law" because it requires an "inquiry into [the] tying product market structure (which is frequently costly and time-consuming) . . . but if the defendant is found to have market power there, the plaintiff is, in theory, relieved of proving actual harm to competition and of rebutting justifications for the tie-in." *Town Sound & Customer Tops, Inc.*, 959 F.2d at 477; *see also Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 593–94 (7th Cir. 2008) (explaining that despite several Supreme Court decisions applying the rule of reason test to vertical restraints, the Supreme Court has not discarded the "per se" tying rule and, instead, it has modified the rule by requiring that the seller hold market power in the tying product); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 n.2 (1st Cir. 1993) (stating that "[t]ying is sometimes also described as a per se offense but, since some element of power must be shown and defenses are effectively available, 'quasi' per se might be a better label." (citing *Eastman Kodak Co.*, 504 U.S. 451)).

Absent per se liability, a plaintiff still may prevail on a tying claim if the challenged practice unreasonably restrains competition. *See Jefferson Par.*, 466 U.S. at 29; *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 500 (1969) ("A plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects

31

of the practices involved, that the general standards of the Sherman Act have been violated.").

When making this determination, courts use a rule of reason test that "requires an analysis of the

restraint's effect on competition." *Law*, 134 F.3d at 1016–17 (citing *Nat'l Soc'y of Prof'l Eng'rs*

*v. United States*, 435 U.S. 679, 695 (1978)).   A court first must determine "whether the

challenged restraint has a substantially adverse effect on competition." *Id.* at 1017 (citing *SCFC*

*ILC, Inc.*, 36 F.3d at 965).  If so, "[t]he inquiry then shifts to an evaluation of whether the

procompetitive virtues of the alleged wrongful conduct justifies the otherwise anticompetitive

impacts." *Id.* (citing *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993)).

To determine whether the challenged practice imposes an unreasonable restraint on trade,

the Court must examine "a variety of actual market factors." *Reazin v. Blue Cross & Blue Shield*

*of Kan., Inc.*, 899 F.2d 951, 960 (10th Cir. 1990) (citation and internal quotation marks omitted).

Under this analysis, plaintiff bears the burden of showing an "adverse effect on competition." *Id.*

(citation and internal quotation marks omitted).  Importantly, the challenged restraint must inflict

an adverse impact on competition, not just on an individual competitor or the plaintiff's business.

*Id.* (citing *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986),

*cert. denied*, 486 U.S. 1005 (1988); *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d

1168, 1172 (9th Cir. 1988)).

When Judge Rogers decided defendants' motion to dismiss, he ruled that the Complaint

failed to state a plausible Sherman Act violation under a per se analysis.  Doc. 50 at 8–10.  But,

Judge Rogers held that Suture Express' tying claim properly stated a claim under the rule of

reason analysis.  *Id.* at 10–11.  In its summary judgment motion, Suture Express recites the

elements of a tying violation (Doc. 268 at 67), and asserts that the summary judgment facts

demonstrate each of these elements under a rule of reason analysis, thereby warranting summary

judgment in its favor. *See* Doc. 268 at 66–80. Suture Express also argues that the bundling

provisions have affected competition adversely and no procompetitive justifications exist for the

practice. Conversely, defendants argue in their summary judgment motion that the undisputed

facts, even when viewed in Suture Express' favor, fail to establish the elements of a tying claim.

And, defendants assert, even if Suture Express could establish the elements of a tying claim

under a rule of reason analysis, the summary judgment facts present no anticompetitive effects

from defendants' bundling but instead demonstrate pro-competitive and valid business reasons

for the bundling practices. Thus, analyzing Suture Express' claim under a rule of reason

analysis, defendants contend they are entitled to summary judgment.

The Court addresses each of these arguments below and concludes that the summary

judgment facts, even when viewed in the light most favorable to Suture Express, present no basis

for a reasonable jury to find the existence of an illegal tying arrangement violating § 1 of the

Sherman Act. Thus, Cardinal and O&M are entitled to summary judgment against Suture

Express' Sherman Act § 1 claim.

### 1. Elements of a Tying Arrangement

Suture Express asserts that the undisputed summary judgment facts establish all four

elements of an illegal tying arrangement in violation of § 1. As stated, those four elements

require proof of: "(1) two separate products or services are involved; (2) the sale or agreement to

sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient

economic power in the tying product market to enable it to restrain trade in the tied product

market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected."

*Sports Racing Servs., Inc.*, 131 F.3d at 886 (citations omitted). Suture Express contends that the

summary judgment facts entitle it to summary judgment on the issue of liability on its Sherman Act claim.

In contrast, defendants O&M and Cardinal assert that Suture Express cannot establish all four elements.  They argue that certain disputed facts exist on some elements, and they thus preclude summary judgment for Suture Express.  More specifically, O&M and Cardinal argue that any disputed facts germane to the first element of a tying claim—whether two separate products are involved—preclude summary judgment for Suture Express.  But those disputes do not matter, defendants say, to the legal theory advanced by their summary judgment motion. Defendants assert that no triable issue of material fact exists about the second and third elements of the Sherman Act claim.

The Court examines the second and third elements below.  In subpart a, the Court considers the second element of a tying claim—whether the agreement to sell med-surg distribution is conditioned on purchasing suture and endo distribution.  As explained in that section, the Court concludes that factual issues preclude a summary judgment finding for either party on this element.  In subpart b, the Court concludes that the summary judgment facts preclude the possibility that Suture Express can establish the third element of a tying claim, *i.e.*, that O&M and Cardinal have sufficient market power in the tying product to permit them to restrain trade in the tied product market.  This conclusion leads the Court to grant summary judgment for defendants against Suture Express' §1 tying claim.  Likewise, it negates Suture Express' motion for summary judgment.

### a. The Court Cannot Decide on Summary Judgment whether Defendants Condition the Sale of Med-Surg Distribution on the Purchase of Suture and Endo Distribution.

In its discretion, the Court begins with Suture Express' summary judgment motion, addressing the conditioning element of a tying claim. In this analysis, the Court views the evidence in the light most favorable to defendants, and concludes that these summary judgment facts present triable issues about the conditioning element of a tying claim.

### i. Suture Express' Summary Judgment Arguments on the Conditioning Element

Suture Express asserts that defendants have conditioned the sale of other med-surg distribution on the sale of suture and endo distribution. Suture Express does not assert that the bundling discounts actually prohibit customers from purchasing the two types of distribution separately. Instead, Suture Express contends that the economic penalties imposed by defendants' bundling contracts coerce customers into purchasing both kinds of distribution services from them. *See Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kan.*, 891 F.2d 1473, 1476, 1483 (10th Cir. 1989) (holding that plaintiff had stated a tying claim against defendants who had imposed "prohibitively expensive" surcharges on purchasers of cemetery plots who bought grave markers separately instead of purchasing them from the cemetery).

Suture Express relies on two different tests to prove that defendants' bundling practices have an illegal, coercive effect: (1) the buyer behavior test, which focuses on the percentage of buyers of the tied product that take the bundle; and (2) the discount attribution test which examines, after allocation of the alleged discounts to the tied product, whether the incremental price of the tied product is below its costs.

The buyer behavior test, examines "whether nearly all or a very high percentage of buyers purchased the [bundle] from the defendant rather than purchasing [the tying product]

from defendant and [the tied product] from a rival." X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1758a (3d ed. 2011). Suture Express' expert, Professor Elhauge, performed the buyer behavior test two different ways.

First, he examined Suture Express' performance among defendants' customers who had entered into contracts containing the bundling terms and compared it to Suture Express' performance with customers who were not bound by bundling terms. From that data, plaintiff's expert determined that Suture Express' market share among customers who had entered into contracts with bundling terms ranged from 2% to 6%. Second, Professor Elhauge performed a similar buyer behavior test by using sales data from Suture Express, Cardinal, and O&M to calculate whether purchases of Suture Express' suture and endo distribution by customers who purchased other med-surg distribution from O&M and Cardinal (*i.e.*, customers who "broke the bundle") was less than 10% of the sum of those purchases plus purchases of defendants' suture and endo distribution by customers who accepted the bundle. Professor Elhauge determined that this ratio ranged between 3% and 7%, depending on the year.

Defendants respond that Professor Elhauge performed the buyer behavior tests incorrectly, using only Suture Express' sales data as the rival tied product. Indeed, Areeda and Hovenkamp suggest a presumption of non-tying if "a sufficiently large number of customers are observed who purchase the secondary product *from someone other than defendant*." X Areeda & Hovenkamp ¶ 1758a (emphasis added). Here, Professor Elhauge only examined the percentage of customers who broke the bundle by purchasing the tied product (suture and endo distribution) from Suture Express—not the percentage of *all* purchases of the tied product from any rival med-surg distributor. Suture Express counters defendants' attack by explaining that Professor Elhauge used all the data available to him to make his calculations, but this data did

not include data from non-party med-surg distributors.  But, even if he had, Professor Elhauge

asserts that the data would not favor defendants because the other broadline distributors also use

bundling contracts and any suture and endo sales made by other broadline distributors under their

bundling contracts would increase the denominator in the ratio, thereby producing an even

smaller percentage than the 3% to 7% that he calculated from just the parties' data (and, thus, the

Court infers, establishing even stronger evidence of coercion).  Professor Elhauge also opines

that, if a customer orders other med-surg from defendants but not suture and endo, then the

customer likely orders suture and endo from Suture Express; and not from another broadline

distributor because Suture Express offers lower markups than any other distributors in the

market.  Defendants launch yet another line of attack on Professor Elhauge's analysis, asserting

that neither of these buyer behavior tests is dispositive.  Therefore, defendants say, Suture

Express cannot show it is entitled to summary judgment based solely on these tests.

Areeda and Hovenkamp explain that the results of the buyer behavior test can play a

useful—but not dispositive—role.  That is, the test may suggest an illegal tying arrangement, or

even create presumptions or inferences for and against illegal tying under certain circumstances.

X Areeda & Hovenkamp ¶ 1758a.  But the commentators never endorse the test as a dispositive

one, capable of deciding the entire question.  *Id.*

The Court concludes that defendants' criticisms of Professor Elhauge's analysis under the

buyer behavior test present fact issues that preclude Suture Express from establishing coercion

on summary judgment.  While these tests might persuade a reasonable jury to conclude that

coercion exists, a reasonable jury also could conclude otherwise—*i.e.*, that consumer choices and

preferences drive the results, not coercion from defendants' bundling provisions.  Based on this

record, the undisputed facts fail to establish that defendants' contracts have a coercive effect.

This leaves Professor Elhauge's analysis under the discount attribution test.  He used this test to analyze cost data produced by Cardinal to determine how often the contract terms brought the suture and endo distribution charges below cost.  He concluded that among Cardinal customers with contracts containing the bundling provision, the resulting incremental price was lower than the minimum markup 67% of the time.  He also opined that among O&M customers[13] with such contracts, the resulting incremental price was lower than the minimum markup 85% of the time.

Other courts have applied the discount attribution test to tying or bundled discount cases to assess the likelihood that coercion exists.  *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 275 (6th Cir. 2015) (applying the discount attribution standard and finding a likelihood that plaintiff could prove coercion because the record suggested that defendant was selling the product below its incremental cost); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2007) (adopting a discount attribution standard that examined whether "the resulting price of the competitive product or products is below the defendant's incremental cost to produce them," and, if it is, "the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2.").

Defendants contend that Suture Express cannot use the discount attribution test to prove coercion here, and they make two principal arguments.  First, defendants argue that the discount attribution test applies only to monopolization claims under Sherman Act § 2, and that no court ever has applied the test to non-monopolists, as are defendants in this case.  In *Collins Inkjet Corp.*, the Sixth Circuit applied the discount attribution test when plaintiff asserted a § 1 Sherman Act claim because it found no reason to treat economically identical behavior

---

[13]     Because O&M did not produce cost data sufficient for Professor Elhauge to perform a similar calculation for its markups, he used Cardinal's cost data to perform the analysis for O&M.

differently under §§ 1 and 2 when both sections prohibit anticompetitive conduct.  781 F.3d at

267.  But, in that case, defendant had a 100% monopolistic share of the market.  *Id.* at 281.

Defendants contend that no court ever has applied the discount attribution test to a non-

monopolist.  The Court's research reveals the same.  This absence of authority makes sense

because the test examines whether defendant is selling "the competitive (or tied) [product at a]

price below cost," which may exclude a rival who sells only the tied product.  *Id.* at 274.  But, in

a market without a monopolist, a seller of a full range of products has no incentive to exclude the

rival who sells only the tied product because other full range sellers competing in the market still

can defeat any effort to raise prices.  Here, defendants are not monopolists.  And so, even if

defendants excluded Suture Express, other med-surg distributors in the market (such as Medline)

can prevent defendants from raising prices.  In a market without a monopolist, customers have

the option to move their business from defendants to other med-surg distributors (such as

Medline) if they are unsatisfied with defendants' prices.

When discussing the "formulation for cost-based tests for determining when a bundled

discount is 'exclusionary' in the sense that it keeps rivals out of the market," the commentators

have described a scenario similar to the one presented here:

> In order to have antitrust significance a bundle must not merely keep one rival out
> of the market; it must exclude all of them.  That is to say, a firm's aggregate
> discount of product A, B, and C might very well exclude a rival who produces
> only B and C, but not A.  However, if there are other rivals in the market who also
> make the full range of A, B, and C, then the practice is not exclusionary, although
> it may limit the range of effective competition to those firms capable of
> competing across the full range of goods.

Herbert Hovenkamp & Eric Hovenkamp, *Complex Bundled Discounts and Antitrust Policy*, 57

BUFF. L. REV. 1227, 1231 (July 2009).  As applied here, defendants' bundling of suture and endo

distribution does not exclude *all* rivals.  For instance, defendants' bundling arrangements have

not excluded Medline, a third national broadline distributor who offers similar bundling provisions.  Likewise, defendants have not excluded Seneca and MMS, regional broadline distributors who also offer bundling, from competing in the relevant market.  The summary judgment facts thus fail to show that defendants' bundling practices have excluded *all* rivals, and the discount attribution test cannot serve as a strong indicator of coercion because defendants are not monopolists.

Second, defendants attack Professor Elhauge's analysis by asserting that he used an improper measure of costs and an unrepresentative sample size.  These criticisms create fact issues that preclude Suture Express from prevailing on the coercion element of a tying claim and thus preclude summary judgment in its favor.  Also, like the buyer behavior test, the discount attribution test may suggest evidence of coercion, but it is not a dispositive test that warrants summary judgment for Suture Express.  *See* Hovenkamp & Hovenkamp, 57 BUFF. L. REV. at 1255 (explaining that the discount attribution test "produces very severe false positives and should be regarded as nothing more than a starting point for analysis").  In short, the results of Professor Elhauge's discount attribution test cannot establish coercion at the summary judgment stage.

Finally, Suture Express relies on anecdotal statements by its customers to establish coercion.  Suture Express cites comments from defendants' customers giving their understanding of the bundling terms in defendants' contracts, *i.e.*, that they prevented the customer from purchasing suture and endo distribution from Suture Express.  Some customers informed Suture Express that their contracts prohibited the purchases while other customers explained that any savings that they may realize from purchasing suture and endo distribution from Suture Express was offset by the costs incurred under their contracts with defendants.  Defendants respond that

evidence of customers adhering to their contract terms is not coercion.  If that were true, defendants argue, the antitrust laws would prohibit all contracts restraining a customer's ability to do business with another.  But that is not the law.  *See*, *e.g.*, *NCAA v. Bd. of Regents*, 468 U.S. 85, 98 (1984) (explaining that "every contract is a restraint of trade, and as we have repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade").

Viewing this evidence in the light most favorable to defendants, as the Court must when it considers Suture Express' summary judgment motion, the Court concludes that the summary judgment facts present genuine issues precluding Suture Express from establishing the second element of a tying claim—that defendants have conditioned the sale of other med-surg distribution on the sale of suture and endo distribution.  Because Suture Express cannot prove at least one element of a tying claim on summary judgment, the Court denies Suture Express' motion for partial summary judgment.

### ii.   Defendants' Summary Judgment Arguments on the Conditioning Element

The Court now turns to defendants' summary judgment arguments on this same element. Defendants contend that the Court must grant summary judgment against Suture Express' § 1 tying claim because the summary judgment facts present no triable issues about the conditioning element of that claim.  Specifically, defendants argue that no evidence of coercion exists because med-surg distributors compete vigorously for contracts before a customer enters into a med-surg distribution contract.  And, defendants assert, customers are not coerced into entering those contracts.  Instead, defendants claim that the evidence simply shows that customers freely decide to enter contracts and then adhere to the contract terms they have chosen.  Also, defendants argue that the contracts allow customers to terminate them, generally with six months' notice, and defendants have a history of lax enforcement of the bundling terms.

The summary judgment record contains conflicting evidence about this last point—defendants' enforcement of their contracts.  A jury could examine defendants' evidence and conclude that no coercion exists.  But a reasonable jury also could find that the results of Professor Elhauge's tests, notwithstanding defendants' criticism of them, prove coercion.  Thus, the Court finds that disputed factual issues preclude it from deciding on summary judgment whether defendants condition the purchase of other med-surg distribution on the purchase of suture and endo distribution.

Because the summary judgment facts present a genuine issue of fact on the second element of a tying claim—that is, whether defendants have conditioned the sale of other med-surg distribution on the sale of suture and endo distribution—the Court turns now to defendants' other summary judgment theory.  As the next section explains, the summary judgment facts present no genuine issues about a separate element of Suture Express' tying claim—market power.

### b.  Defendants Lack Economic Power in Tying Market.

The Supreme Court requires that "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."  *Ill. Tool Works*, 547 U.S. at 46.  But "[t]he standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product."  *Fortner Enters.*, 394 U.S. at 502.  Instead, "economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market."  *Id.* at 502–03 (citations omitted).  "'Even absent a showing of market dominance, the crucial economic power may be inferred from the

tying product's desirability to consumers or from uniqueness in its attributes.'"  *Id.* at 503

(quoting *United States v. Loew's Inc.*, 371 U.S. 38, 45 (1962)).

A plaintiff can demonstrate that market power exists by adducing evidence of either

"power to control prices" or "the power to exclude competition."  *Westman Comm'n Co. v.*

*Hobart Int'l, Inc.*, 796 F.2d 1216, 1225 n.3 (10th Cir. 1986); *see also Fortner Enters., Inc. v.*

*U.S. Steel Corp.*, 394 U.S. 495, 503 (1969) ("Market power is usually stated to be the ability of a

single seller to raise price and restrict output.").  The power to control prices and the power to

exclude competition "may, in turn, depend on various market characteristics, including the

existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in

the market, and market trends."  *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951,

967 (10th Cir. 1990) (citing *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159, 162 (10th

Cir. 1986)); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (explaining

that "[s]ince the purpose of the inquiries into market definition and market power is to determine

whether an arrangement has the potential for genuine adverse effects on competition, 'proof of

actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into

market power, which is but a 'surrogate for detrimental effects'" (quoting 7 P. Areeda, *Antitrust*

*Law* ¶ 1511, p. 429 (1986)).

> **i.  Suture Express' Summary Judgment Arguments on the Market Power Element**

Again, the Court begins by addressing Suture Express' summary judgment arguments.  In

so doing, the Court views the evidence in the light most favorable to defendants, the non-moving

parties on Suture Express' summary judgment motion.

Suture Express argues that the summary judgment facts establish that defendants possess

power in the market for other med-surg distribution.  To support this claim, Suture Express

points to defendants' large market share in other med-surg products, the substantial barriers to entering this market, the imposition of the bundling terms in a large percentage of defendants' contracts, the infrequency of customers "breaking" the bundle, and Suture Express' sales losses to defendants because of the bundling provisions.

*First*, Suture Express asserts that defendants comprise the large majority of nationwide broadline distribution of other med-surg products. From 2007 to 2012, O&M's share of the market ranged from 32% to 38%, and Cardinal's share ranged from 27% to 31%. Suture Express cites several cases in which courts have determined that lesser market shares establish market power. But defendants correctly explain that those cases involved different market conditions than those presented here. *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239–40 (2d Cir. 2003) (finding market power existed when one defendant had 47% market share and the other defendant had 26% market share in a highly concentrated market where customers could not refuse to do business with defendants, even when subject to significant price increases, because of customer preference); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (finding market power when a retailer, with 20% of the national wholesale market and up to 49% in some local wholesale markets, successfully had reduced output from manufacturers thereby insulating it from having to lower prices); *Eiberger v. Sony Corp. of Am.*, 622 F.2d 1068, 1080–81 (2d Cir. 1980) (explaining that defendant had a "strong market position" because it had established 12% market share within just four years of entering the market and defendant was the fastest growing company among four other competitors who accounted for 96% of the market); *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 188–91 (E.D.N.Y. 2015) (concluding that defendant's 26.4% market share of a highly concentrated market with significant barriers to entry alone was not likely sufficient to prove market power without "the amplifying effect of

44

cardholder insistence" on paying with an American Express card); *Johnson v. Blue Cross/Blue Shield of New Mexico*, 677 F. Supp. 1112, 1119–20 (D.N.M. 1987) (concluding that genuine issues precluded summary judgment for defendant on market power because defendant's market share of 25% to 30% was "artificially depress[ed]" and entering companies were unable to capture any significant portion of the market).

Importantly, while defendants' market share is relevant to determining market power, it "alone is insufficient to establish market power." *Reazin*, 899 F.2d at 967 (citation and internal quotation marks omitted). Thus, the Court cannot conclude that O&M and Cardinal have sufficient market power based on their market shares alone.

*Second*, the barriers to entry into the market fail to establish market power. "Entry barriers are particular characteristics of a market which impede entry by new firms into that market." *Reazin*, 899 F.2d at 968 (citations omitted). Barriers to entry "may include high capital costs or regulatory or legal requirements such as patents or licenses." *Id.* Suture Express argues that the barriers to entry here are substantial because national broadline distribution requires a network of local distribution facilities and sufficient infrastructure that is expensive to build. It also requires hospital customers to support the operation. But, the summary judgment facts show that competitors in this med-surg market are growing their businesses as they compete against O&M, Cardinal, and Suture Express for acute care customers. For example, Medline has grown its business significantly from 2008 to 2014. It has won customers from O&M, Cardinal, and Suture Express, and it has successfully negotiated contracts with GPOs and regional buying groups. Also, regional distributors are competing successfully in this market, winning contracts from national broadline distributors. For example, regional distributor Seneca has grown its business by 50% in the last five or six years, and it has opened three new distribution centers

since 2007.  As these competitors have expanded in the market, O&M and Cardinal's market shares have declined or remained relatively flat.  These facts fail to establish that barriers to entry exist in the market.

Suture Express also argues that a customer's cost to switch med-surg distribution precludes competitors from entering the market.  But, the summary judgment facts establish just the opposite.  While some customers describe the process of switching distributors as an involved one requiring an investment of time and overhead, the record is filled with examples of customers who, in fact, have switched distributors on a regular basis.  Indeed, O&M and Cardinal retain only about half of all acute care customers after three or four years of beginning to do business with them.

*Third*, that defendants have managed to secure the bundling terms in a large number of defendants' contracts fails to establish market power.  Suture Express' expert reviewed 102 of defendants' customer contracts and concluded that, between 2006 and 2013, O&M made about 98% of its suture and endo sales and Cardinal made about 71% of its suture and endo sales under contracts containing a bundling provision.  But the mere existence of these terms in customer contracts cannot create an inference of market power.  *See Tele Atlas N.V. v. NAVTEQ Corp.*, No. C-05-01673 RMW, 2008 WL 4809441, at *16 (N.D. Cal. Oct. 28, 2008) (explaining that "[t]o permit the mere existence of a tying arrangement to satisfy the plaintiffs' burden of production on market power is to permit every tying case to proceed to a jury, even where the defendant lacks a shred of market power.  This is bad policy, as '[m]any tying arrangements, even those involving patents and requirements ties, are fully consistent with a free, competitive market.'" (quoting *Ill. Tool Works*, 547 U.S. at 45)).

The summary judgment facts also establish that other competitors in the market, including national distributor Medline and regional distributors Seneca and MMS, use similar bundling terms for suture and endo distribution in their customer contracts.  And Suture Express does not contend that these firms have market power.  The undisputed facts reveal a market where customers have a range of choices before deciding which contracts to enter.  They can contract through a GPO or regional buying group, or they can contract directly with a med-surg distributor.  Customers make the choice to enter into contracts containing bundling terms, both with defendants and other competitive rivals.  The existence of these terms in defendants' contracts does not raise an inference of market power.

Also, competitive rivals offer similar bundling terms, which demonstrates that defendants' bundling is not a barrier to entry.  As the Seventh Circuit has explained, "[i]f rivals may design and offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power."  *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672 (7th Cir. 1985).  Here, other med-surg distributors, including Medline, Seneca, and MMS, offer contractual terms similar to the ones used by defendants.  Thus, defendants' use of bundling terms is not unique among competitors in the market, and this practice fails to establish market power.

*Fourth*, Suture Express asserts that defendants' bundling terms are predatory because they fail the discount attribution test.  But, as described above, the Court cannot find on summary judgment that defendants fail this test because fact issues preclude such a finding.  The Court also refuses to find that the fact issues attendant to this test demonstrate market power.  Suture Express cites no legal authority for that conclusion.  And, as noted above, no court has applied the discount attribution test to a non-monopolist.  Defendants are not monopolists, and they

would not benefit from excluding a rival who produces less than a full range of products because other broadline distributors exist to compete against defendants and prevent them from raising prices.

*Fifth*, because defendants' customers "break the bundle" infrequently, Suture Express contends this establishes O&M and Cardinal's market power. This fact, it contends, shows an indirect detrimental effect on competition, thereby demonstrating market power. However, as already explained, customers have many alternatives in this market before deciding to enter contracts. That customers make business decisions to enter into contracts and then adhere to their terms does not support a finding of market power.

*Sixth,* Suture Express asserts that its loss of sales to defendants because of the bundling provisions shows market power. Suture Express' expert concluded that Suture Express' market share among "unrestrained customers" (*i.e*., those not parties to contracts containing the bundling terms) was four to 15 times greater than its share among customers who were subject to bundling terms, depending on the year. But, like other arguments Suture Express makes, this fact reveals nothing more than customers adhering to their contracts' terms after they have made the decisions to enter into them. Suture Express cites no authority for the proposition that this fact demonstrates market power.

*Seventh*, Suture Express argues that defendants' intent in implementing the bundling terms was to leverage its market power and protect its business from Suture Express. *See* Doc. 268 at 78 (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("knowledge of intent may help the court to interpret facts and to predict consequences"); *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988) (explaining the intent of defendants may be relevant to the effect on competition)). Several of defendants' internal documents and

48

communications acknowledge that using bundling terms successfully has prevented Suture Express from selling suture and endo distribution to their customers.  But, as the Ninth Circuit recognized in *Hahn*, intent is not dispositive.  868 F.2d at 1026.  And, the Tenth Circuit has held that "intent to harm a rival, protect and maximize profits, or 'do all the business [ ] they can,' is neither actionable nor sanctioned by the antitrust laws."  *SCFC ILC, Inc.*, 36 F.3d at 969 (quoting *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1339 (7th Cir. 1986)).  The Court cannot find market power from defendants' intent to protect its suture and endo business from Suture Express' rival business model.

The Court concludes that none of Suture Express' arguments establish that defendants have sufficient market power to entitle Suture Express to summary judgment.  Thus, the Court cannot grant summary judgment for Suture Express on this element of their § 1 tying claim.

### ii.    Defendants' Summary Judgment Arguments on the Market Power Element

The Court now turns to defendants' summary judgment arguments on the market power element.  In this analysis, of course, the Court views the facts in the light most favorable to Suture Express, the non-moving party.  And, the Court concludes that the undisputed facts, when viewed in Suture Express' favor, present no triable issues about defendants' power to exclude competition or control prices.  *See Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1225 n.3 (10th Cir. 1986) (explaining that an antitrust plaintiff may demonstrate market power with evidence of either power to control prices or the power to exclude competition).  Thus, the summary judgment facts preclude Suture Express from establishing market power, and the Court must grant summary judgment for defendants.

As described above, the summary judgment facts describe a market rife with competitive rivals who are growing and expanding their business while Cardinal and O&M's market shares

49

have declined or remained relatively flat.  Indeed, O&M and Cardinal compete vigorously against one another, winning and losing customers back and forth.  They also compete with a third national broadline distributor, Medline, who has grown its business significantly in recent years.  The record also includes undisputed examples of growth among regional distributors who compete against national broadline distributors, including defendants, for acute care business.  And, at least two competitors in the non-acute care business, McKesson and Henry Schein Medical, potentially could enter the acute care markets and compete against defendants using their existing national distribution networks for non-acute care distribution.  The parties also face competition from manufacturers who sell directly to hospital systems that have implemented a self-distribution strategy.  All of this evidence demonstrates that defendants lack the power to exclude competition.

Also, the existence of a competitive rival that offers similar bundling—Medline— forecloses defendants' ability to exclude competition here.  As Hovenkamp & Hovenkamp explain, "if bundle-to-bundle discount competition can occur in a market, then a particular firm's bundled discount cannot be exclusionary unless its overall price is below its costs.  Otherwise an equally efficient firm exists that would be able to match the discounted price and earn a profit."[14] Herbert Hovenkamp & Eric Hovenkamp, *Complex Bundled Discounts and Antitrust Policy*, 57 BUFF. L. REV. 1227, 1231 (July 2009).  *Cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 915 (9th Cir. 2007) (concluding that defendant possessed "substantial market power" when it was the exclusive provider of tertiary services in the market).   Here, Medline uses similar bundling provisions, is growing its business, and competing with O&M and Cardinal.  These undisputed facts prevent Suture Express from demonstrating any triable issues about defendants' ability to exclude competition.

---

[14]        Suture Express does not allege that defendants' overall price is below its costs.

The record also lacks evidence of defendants' ability to control prices. Instead, the summary judgment facts show that O&M and Cardinal's markups for the distribution of med-surg products were lower, on average, in 2013 than they were in 2008. Their markups for suture and endo distribution also were, on average, lower in 2013 than they were in 2008. Regional distributors Seneca and MMS also experienced declines in markups, which they attributed to competitive pressures from customers and other distributors. And, as Suture Express concedes, competition has lowered markups for suture and endo products.

Also, O&M and Cardinal's profit margins have declined since 2008. Cardinal's operating margins for distribution-only activity have decreased by about 80% from 2008 to 2011. O&M's operating margins for med-surg distribution also have decreased by about 17% between 2008 and 2013. Suture Express contends that these figures are misleading because they calculate the ratio using a figure that includes the value of the product distributed, thereby understating the margins. Suture Express asserts that the more appropriate figure to examine is the distribution services margin. But both O&M and Cardinal's distribution services margins also declined during this time period. The margin for Cardinal's distribution services (which is roughly seven to eight times greater than its operating margins) decreased by about 75% between 2008 and 2013; and O&M's margin (which is about 10 to 11 times greater than its operating margin) decreased by about 8% between 2008 and 2013.[15] This decline in markups and margins shows that defendants lack the ability to control prices.

The summary judgment record also establishes that acute care customers are consolidating, thereby forming larger and larger hospital systems. While Suture Express argues that no causal relationship exists between customers' consolidation and lowered prices in the

---

[15]     The sealed version of this Memorandum and Order contains specific data for defendants' profit margins described in the above paragraph. *See supra* n.11.

market, several med-surg distributors, including Suture Express' CFO, testified that consolidation has increased customers' buying power and created a very competitive marketplace.  The evidence of customer consolidation in a competitive market with declining profits also demonstrates that defendants lack the power to control prices.

Under these facts, no reasonable jury could conclude that defendants have the power to exclude competition or control price.  Instead, the undisputed facts demonstrate a market where O&M and Cardinal compete vigorously against Medline, certain regional distributors, and each other.  And, after three or four years, O&M and Cardinal can retain only about half of their acute care customers.  These facts preclude any triable dispute about defendants' market power.  *See In re Wireless Tele. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 471 (S.D.N.Y. 2005) (granting summary judgment for defendants because plaintiff failed to present evidence raising a question of fact that any one of the defendants had sufficient market power to force a tie when "defendants compete against each other in terms of service and price" and "the high churn rate is striking evidence of their respective lack of control over the market and the impediments each of them faces to any effort to control price").

Because the summary judgment facts fail to present a triable issue about market power—one of the required elements for proving a tying claim—Suture Express' Sherman Act § 1 claim fails as a matter of law.  Consequently, the Court must grant summary judgment for defendants.

### 2. The Summary Judgment Facts Fail to Establish Harm to Competition or an Antitrust Injury.

Defendants argue that they also are entitled to summary judgment against Suture Express' Sherman Act § 1 claims for another, independent reason—Suture Express cannot establish an antitrust injury.  The Court agrees.

A plaintiff asserting an antitrust claim must establish an antitrust injury, as the Sherman Act defines this term. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006)). "'The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm' or individual." *Id.* (quoting *Tal*, 453 F.3d at 1258). Therefore, the antitrust laws require a plaintiff to demonstrate "'an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Tal*, 453 F.3d at 1253).

Here, Suture Express argues that it has demonstrated an antitrust injury because defendants' bundling terms have prevented customers from purchasing suture and endo distribution from it. As a result, Suture Express contends, customers are denied Suture Express' superior service and higher fill rates and, in some cases, lower prices. Suture Express asserts that, but for defendants' conduct, it would have won more customers and experienced greater growth. At oral argument on the summary judgment motions, Suture Express emphasized that it offers a superior product—"a better mousetrap." That is, Suture Express contends that its overnight delivery of suture and endo products by air is a more efficient distribution method. And, Suture asserts that customers should have access to it.

But the antitrust laws are not designed to protect competitors like Suture Express; instead, those laws were enacted to promote competition so that market participants could decide who had "a better mousetrap." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (stating that the "antitrust laws . . . were enacted for the protection of competition not competitors" (citation and internal quotation marks omitted)); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 960 (10th Cir. 1990) (explaining that a challenged practice

must adversely impact competition, not just an individual competitor or plaintiff's business).

Thus, Suture Express must show harm to competition, not just harm to Suture Express. *See*

*Cohlmia*, 693 F.3d at 1281 ("'An antitrust plaintiff must prove that challenged conduct affected

the prices, quantity or quality of goods or services, not just his own welfare.'" (quoting *Mathews*

*v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)).

The Supreme Court has described raised prices and reduced output as the "hallmarks of

anticompetitive behavior." *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984). Neither one exists

here. The summary judgment facts, when viewed in Suture Express' favor, fail to demonstrate

raised prices. Instead, as described above, the facts show declining markups for many

competitors in the market—including both defendants, certain regional distributors, and Suture

Express. The facts also show that defendants experienced declining margins. The record also

contains evidence from med-surg distributors, including Suture Express' CFO, about competitive

pressures in the marketplace that have produced pricing decreases.

The record also lacks admissible evidence of reduced output. Instead, rival national and

regional competitors are growing and expanding their businesses. And, even Suture Express'

expert calculated that industry-wide med-surg (including suture and endo distribution) revenues

increased year-over-year during the relevant period. These summary judgment facts prevent a

reasonable jury from inferring harm to competition, even when viewed in the light most

favorable to Suture Express.

Suture Express argues that the Court should not examine the harm to competition by

examining historical prices or output in the market. Instead, Suture Express asserts that it has

demonstrated anticompetitive harm through its expert's analysis which shows that prices are

higher than they would be but for the defendants' contracts containing bundling terms. And,

Suture Express contends, customers paid these higher prices while suffering lower fill rates. Professor Elhauge estimates that customers paid higher prices, amounting to $36 million from 2007 to 2012.  To calculate this figure, Professor Elhauge compared the average of defendants' markups on suture and endo distribution overall to Suture Express' markups overall.  Defendants argue that by limiting the analysis to these firms, Suture Express fails to show that market-wide prices were higher and quality was lower than it would have been absent defendants' bundling. *See Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) (explaining that an antitrust violation requires a showing "of an actual adverse effect on competition market-wide").

The Court agrees.  The difference in price for suture and endo distribution between these three competitors fails to show that competition is harmed across the market.  As one court has explained, "[i]f a plaintiff could generate a jury question on injury to competition simply by asserting that his less expensive or superior product was excluded from the market, the distinction between injury to a competitor and injury to competition would be lost." *Brookins v. Int'l Motor Contest Ass'n*, No. CIV. C96-134 MJM, 1998 WL 937242, at *4 (N.D. Iowa July 15, 1998).  It is "[f]or that reason, the courts have held that the mere fact that a certain supplier is prevented from participating in the market does not of itself show an actual adverse effect." *Id.* (citation omitted).

Defendants challenge Professor Elhauge's analysis for another reason, asserting that it fails to account for the fact that acute care customers also require distribution of other med-surg products.  Professor Elhauge concedes that the theory of anticompetitive harm depends on the harm in the tied market not being offset by a consumer surplus benefit in the tying market. While Suture Express contends that customers would have paid less for suture and endo

distribution but for defendants' bundling, the analysis fails to show that prices for other med-surg distribution would not increase if defendants omitted the contractual bundling terms and thereby lost the benefit of efficiencies created by the bundle. *See, e.g.*, *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 492 (3d Cir. 1992) (pointing out the flaw in plaintiff's logic that defendant would not raise the price of the tying product if the challenged tie-in was prohibited; instead, in a competitive market where defendant lacked supranormal profits, defendant would have to raise the price of the tying product "and consumers would be no better off than before").

Professor Elhauge's analysis does not present a genuine issue that the challenged practice harmed competition in the overall market. *See It's My Party, Inc. v. Live Nation, Inc.*, __ F.3d __, 2016 WL 426085, at *5 (4th Cir. 2016) (affirming summary judgment against plaintiff's antitrust claims and holding that the district court was not required "to accept uncritically" an expert's opinion "that coincidentally fit plaintiff's precise circumstances" because "[n]o party can expect to gerrymander its way to an antitrust victory without due regard for market realities."). Thus, Suture Express cannot withstand summary judgment because the facts, even when viewed in Suture Express' favor, fail to show a harm to competition. And without it, Suture Express cannot establish an antitrust injury.

### 3. Defendants Have Established Procompetitive Justifications for the Contractual Bundling.

Defendants also argue that, even if Suture Express could make a showing that the challenged action has an adverse effect on competition under the rule of reason approach described above, defendants' pricing terms provide customers with procompetitive benefits that are greater than any alleged anticompetitive harm. *See Law*, 134 F.3d at 1017 (explaining that if the challenged conduct results in an adverse effect on competition, then "[t]he inquiry . . . shifts

to an evaluation of whether the procompetitive virtues of the alleged wrongful conduct justifies the otherwise anticompetitive impacts." (citation omitted)); *see also NCAA v. Bd. of Regents*, 468 U.S. 85, 104 n.26 (1984) (explaining that the Supreme Court recognizes that "tying may have procompetitive justifications that make it inappropriate to condemn without considerable market analysis" (citing *Jefferson Par.*, 466 U.S. at 11–12)); *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 788–90 (1st Cir. 1988) (Breyer, J.) (concluding that a tying arrangement was lawful under a rule of reason analysis because of an "absence of serious anticompetitive impact" and "evidence of justification").

Because the Court has determined that Suture Express has failed to present a triable tying claim when it cannot establish market power or anticompetitive harm, the Court could stop short of this argument and decline to address it.  But given the case's breadth and complexity and to facilitate a full review on appeal, the Court elects to address this argument.  *See, e.g., United States v. Microsoft*, 253 F.3d 34, 94–95 (D.C. Cir. 2001) (remanding case to the district court to consider the procompetitive justifications of a tying arrangement under a rule of reason analysis). And, for the reasons explained below, the Court agrees with defendants.

Defendants argue that the contracts' bundling terms benefit customers because it is more efficient to distribute suture and endo products with other med-surg products, and defendants can pass the savings from those efficiencies on to customers.  Indeed, as Areeda and Hovenkamp explain, "tying doctrine and antitrust policy do not condemn the defendant who [sells packaged products and] merely passes on [the] cost savings [from the package] because this "improve[s] customer welfare immediately, tend[s] to increase sales and profits and thereby encourage[s] cost-cutting innovations, and would occur in perfectly competitive markets."  X Areeda & Hovenkamp ¶ 1758d1.

Defendants recognize these efficiencies because:  (1) sutures and endo products are light weight and take up little space, and therefore little incremental cost results from adding suture and endo to an existing distribution of other med-surg products; (2) suture and endo products are more expensive than other med-surg products, and thus yield higher revenues for distribution services marked up on a percentage basis of the product's cost; (3) suture and endo manufacturers fund distribution of their products on a higher basis than funding provided by other med-surg vendors; and (4) suture and endo products constitute a high volume of customers' med-surg product needs in comparison to the other categories of med-surg products.

Customers who purchase other med-surg distribution from defendants will receive those products from defendants by truck regardless of whether they also purchase suture and endo products.  By adding suture and endo products to the truck with the other med-surg products, defendants realize efficiencies.  They also can allocate the costs for the truck delivery that it must incur already while generating more revenue dollars.  This, in turn, allows defendants to charge a lower mark-up on other med-surg products than they otherwise would charge for delivery of only the lowered-priced and higher-cost med-surg products.

Suture Express argues that the summary judgment record fails to demonstrate these efficiencies.  It contends that the efficiencies do not exist if a customer wants more frequent deliveries of suture and endo than other med surg products.  It also asserts that distribution of suture and endo by truck creates additional, significant costs that do not exist when delivering suture and endo by air.  But defendants respond.  To establish competitive benefits, defendants say, they need not prove that their distribution model by truck is more efficient than Suture Express' model.  Instead, defendants must demonstrate that their distribution of suture and endo and other med-surg together produces savings compared to what they would incur if they

distributed them separately.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th

Cir. 2007) (explaining that bundling discounts "generally benefit buyers" and may produce

"savings to the seller because it usually costs a firm less to sell multiple products to one customer

at the same time than it does to sell the products individually"); *see also It's My Party, Inc. v.

Live Nation, Inc.*, __ F.3d __, 2016 WL 426085, at *10 (4th Cir. 2016) (describing defendant's

bundling as a "one-stop shop" and stating that "[i]n such a case, the practice of 'bundling

obviously saves distribution and consumer transaction costs . . . [and] can also capitalize on

certain economies of scope.'" (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C.

Cir. 2001)).

The summary judgment facts, when viewed in Suture Express' favor, show that

defendants realize savings by adding suture and endo distribution to other med surg distribution,

thereby producing a procompetitive benefit.  Defendants use the same inputs to distribute suture

and endo that they employ for other med-surg distribution.  They rely on the same warehouses,

trucks, and personnel to distribute thousands of types of med-surg products (including suture and

endo).  And, they experience economies of scope when they can distribute multiple products at

the same time.  As described above, defendants incur very little incremental cost to add suture

and endo distribution to a customer's existing delivery of other med-surg products.  But, when

they deliver them together, defendants generate substantially more revenue because suture and

endo are more expensive products and produce higher funding from vendors.[16]  When that

occurs, defendants can charge lower prices for distribution of the products together.  The joint

distribution of both kinds of products together produces efficiencies and thus a procompetitive

benefit.

---

[16]     It is undisputed that vendor funding generally is paid as a percentage of the underlying product
cost.  Thus, the more expensive the product, the more vendor funding it generates.

In contrast, if a customer does not purchase suture and endo from defendants, then they must charge higher markups on the other med-surg products to cover the costs incurred for that delivery. The removal of suture and endo from the order does not eliminate much cost but results in substantially less revenue. But, defendants still incur the same costs for delivery without the suture and endo, and thus the increased pricing on other med-surg products bears those costs.

Suture Express also asserts that, even if defendants realize efficiencies from their bundling, they offer no evidence to demonstrate that they have passed any cost savings from the bundle on to customers. But the bundling terms, themselves, demonstrate such savings. When customers purchase suture and endo distribution along with other med-surg distribution, they realize savings in the form of lower markups for other med surg distribution than they otherwise would pay if they purchased other med-surg distribution without the bundle.

Trying to neutralize the undisputed facts, Suture Express contends that the bundled pricing terms do not reflect discounted savings to customers but instead allow defendants to impose penalties on customers who chose to buy suture and endo from another distributor. If that were true, defendants must increase prices artificially before discounting them. The record contains no admissible evidence of that practice. Also, no evidence suggests that prices are higher than they would be but for defendants' bundling terms. And, even if they were, the market here includes competitors (like Medline) who can prevent defendants from inflating prices artificially.

Suture Express also argues that defendants cannot realize efficiencies or justify anticompetitive conduct by claiming that any anticompetitive effects in one market (suture and endo distribution) are offset by the benefits to competition in another (other med surg

distribution).  Suture Express asserts that *Eastman Kodak Co. v Image Tech. Servs., Inc.*[17]

rejected a firm's use of a tie to take profits from one market to cover their investment in another

market.  But the material facts here are different.  No evidence suggests that defendants are

taking profits from suture and endo distribution to invest in other med-surg distribution.  Instead,

the summary judgment facts show that defendants realize efficiencies from selling both types of

distribution *together*.  Thus, if customers purchase both types of distribution together thereby

producing the efficiency, defendants can offer them lower prices for other med-surg distribution.

Providing additional support for these recognized efficiencies, other broadline

distributors offer similar bundling provisions.  This reinforces the undisputed facts about the

bundle's efficiency.  Here, the summary judgment record establishes that rival distributors who

lack market power, including Medline, Seneca, and MMS, use similar bundling provisions.

They require the same types of suture and endo commitments from customers in exchange for

lower pricing on other med-surg products.  As one court has observed, "firms without market

power will bundle two goods only when the cost savings from joint sale outweigh the value

consumers place on separate choice."  *United States v. Microsoft Corp.*, 253 F.3d 34, 88 (D.C.

Cir. 2001).  Some distributors also testified that when a customer orders a certain product mix

that allows the distributor to realize economics of scale, and the distributor is able to reflect those

efficiencies through lower pricing to the customer.

Suture Express also testified that it offers discounted prices to customers who commit to

purchase a certain volume of product.  These types of commitments differ from defendants'

bundling arrangements because they do not involve tying two products together, but nevertheless

they are premised on similar efficiencies.  Indeed, Suture Express' CFO testified that Suture

Express offers discounted prices for volume commitments because different cost components

---

[17]        504 U.S. 451, 485 (1992).

exist when a customer brings all of its suture and endo business to Suture Express instead of "cherrypick[ing]" certain products for distribution.  Doc. 303-3 at 5.  Suture Express' CFO also agreed that the customer should pay a different price under the two different scenarios because of the "very different" cost components involved.  *Id.*

As the case law cited above recognizes, bundling allows a seller to save on costs and capitalize on economies of scope.  Because of efficiencies like these, "cost-justified bundled discounts [are] essential to the efficient operation of markets, even though such discounts may exclude an equally efficient rival."  X Areeda & Hovenkamp ¶ 1758d1.  Areeda and Hovenkamp describe how a seller realizes efficiencies through a bundled discount in the following example:

> Consider this illustration:  to drive a truck from Chicago to St. Louis costs $100, no matter how full the truck is.  The buyer needs half a load of beans and half a load of corn and shipping them separately would cost $100 per shipment, but shipping them together costs $100 total.  So the seller offers a discount of $60 if the buyer purchases both corn and beans and accepts them in a single shipment, effectively "tying" the corn and bean purchases via the discount.  In this case the buyer profits by $60 over what separate sales from separate sellers would produce.  The seller is $40 ahead after taking a $60 price cut but avoiding a $100 truck trip, and the rest of society is better off because unneeded truck trips consume resources.  Nevertheless, the policy injures a rival who sells beans but not corn, even if that seller is an equally efficient bean producer and has tucking costs that are no higher.

X Areeda & Hovenkamp ¶ 1758d1.  Suture Express asserts that this example does not apply here, where the comparison is distribution by truck to distribution by air.  It argues that joint distribution by truck does not offer a procompetitive benefit to the market when Suture Express can distribute suture and endo more efficiently by air.  But, as stated above, defendants need not prove that their model is more efficient than Suture Express' business model.  Instead, the procompetitive benefit realized in the market at issue here is the lower pricing offered to customers on other med-surg distribution.  Suture Express cannot match the bundle offered by

defendants, but that is because of a decision it and it alone has made:  to limit its business model to suture and endo distribution.

In essence, Suture Express is asking the Court to insert itself into the market and decide which business model customers should choose when they purchase suture and endo distribution. The Court declines.  The Court's involvement in this type of discussion could very well "lead to an environment of commercial parochialism."  *It's My Party, Inc.*, 2016 WL 426085, at *13. Actually, it could produce harm to competition.  Suture Express wants the Court to enjoin defendants from offering the bundled terms to customers.  But this order, if the Court were to issue it, would not stop other market participants like Medline, Seneca, and MMS from offering similar bundling terms—as they do already.  The Court cannot issue an order that restrains defendants from bundling but leaves their competitors free to use them to their benefit (and to defendants' harm).  Under these facts, it is most appropriate to let the market's customers decide which business model offers the most efficient distribution of their med-surg needs.  *See id.* (concluding that plaintiff could not employ the antitrust laws for "anticompetitive ends" and stating that it was "sending this tussle between two rivals back to the marketplace from whence it came").

Suture Express also argues that defendants cannot demonstrate procompetitive justifications for their bundling because this practice fails the "less restrictive alternative test." Under this test, an antitrust plaintiff may rebut a claim that a tie is procompetitive "by showing that the claimed function is not legitimate in principle, is served poorly by the restraint, or is adequately attainable by substantially less restrictive means."  IX Areeda & Hovenkamp ¶ 1729a; *see also Law*, 34 F.3d at 1019 (stating that "[i]f the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not

reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner"). Here, Suture Express argues, if bundling produces efficiencies, then the less restrictive approach to implementing that efficiency is for defendants to lower the price of suture and endo distribution. Defendants did not take that approach, but instead altered the price for distribution of other med-surg products. Thus, Suture Express contends, defendants fail the less restrictive alternative test.

Defendants respond that the less restrictive alternative advanced by Suture Express fails to realize the efficiencies described above when defendants are able to distribute both suture and endo and other med-surg together. If defendants discounted only the suture and endo distribution, they would fail to cover the costs incurred for delivery to a customer who purchased only suture and endo distribution but not other med-surg. Defendants also could not match the bundled prices to customers who purchased both suture and endo and other med-surg, thereby producing the described efficiencies and cost savings.

Defendants also reject Suture Express' suggestion that they should reverse the bundle. That is, Suture Express asserts that the less restrictive alternative is for defendants to offer lower pricing on suture and endo distribution in exchange for loyalty in purchasing other med-surg products. This proposal again fails to recognize the efficiencies of distributing the products together, which reduces the *overall* costs of distribution and not simply the cost of one subset of products. Also, defendants assert that customers do not select a broadline distributor based on one category of med-surg products. Instead, customers select broadline distributors based on their ability to distribute across the broader line of med-surg distribution. Thus, defendants would not offer a bundle premised on a discount of one category of med-surg products in exchange for purchase of other-med surg because customers already go to the distributor to

purchase their other med-surg needs.  The undisputed facts, viewed in Suture Express' favor, do not establish that defendants could achieve the procompetitive benefits of defendants' bundling through a less restrictive alternative.

The Court finds that the summary judgment facts demonstrate procompetitive benefits of bundling, and they justify any anticompetitive effect.  Thus, Suture Express cannot survive summary judgment under a rule of reason analysis on its Sherman Act § 1 claim.

## B.  Clayton Act § 3

Suture Express also asserts that defendants' contractual terms violate § 3 of the Clayton Act.  Section 3 of the Clayton Act prohibits "any person engaged in commerce, in the course of such commerce, to . . . make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."  15 U.S.C. § 14.

Defendants seek summary judgment against this Clayton Act claim because, defendants argue, the Clayton Act applies only to the sale of "goods, wares, merchandise, machinery, supplies, or other commodities."  15 U.S.C. § 14.  And, it does not apply to services.  *See Hudson Valley Asbestos Corp. v. Tougher Heating and Plumbing Co.*, 510 F.2d 1140, 1145 (2d Cir. 1975) (explaining that "[i]t is, of course, well settled that section 3 [of the Clayton Act] does not apply to sales of services").  Here, defendants argue, the relevant market is distribution *services*, not the products themselves.  Thus, defendants contend the Court must grant summary judgment against Suture Express' Clayton Act claim.

As explained above, the Court has determined that the undisputed facts establish that the relevant product market here is distribution of med-surg products to acute care customers, not distribution services as defendants assert.  *See supra* n.3.  And Suture Express cites several cases in which courts have held that the Clayton Act applies to distribution agreements for physical goods.  *See*, *e.g.*, *W. Power Sports, Inc. v. Polaris Indus. Partners L.P.*, 951 F.2d 365, 1991 WL 266523, at *3 (9th Cir. Dec. 11, 1991)  (unpublished table opinion) (reversing district court's grant of summary judgment on a Clayton Act § 3 claim and holding that the statute applied to distribution agreements requiring distributors to purchase a certain amount of snowmobiles from the manufacturer); *see also Chelson v. Oregonian Publ'g Co.*, 715 F.2d 1368, 1369 (9th Cir. 1983) (holding that the Clayton Act applied to an agreement between a newspaper publishing company and its retail distributors that prohibited the distributors from distributing advertising inserts for another company because the agreement provided that that distributors would purchase goods and resell them); *see also* X Areeda & Hovenkamp ¶ 1752f2 (explaining that the Clayton Act applies even when "services [are] embodied in corporeal goods" and "[w]hen the item sold is a physical product from which buyers derive value, it should be considered a commodity").

Defendants distinguish these cases because they involve the traditional purchase and resale of goods but do not discuss prices that customers pay for distribution services, as customers of med-surg distribution pay in this case.  Indeed, Suture Express' expert opined that the relevant product market here is the market for distribution services, not the physical items themselves.  He also based his analysis on that market definition.  Though defendants seem to have the better end of this argument, the Court concludes that it need not decide this issue to determine the viability of the Clayton Act claim.  Even assuming that the Clayton Act applies to

the med-surg distribution at issue here, Suture Express' claim fails for the same reasons described above in the context of the Sherman Act.

Suture Express asserts that the economic effect of defendants' bundling terms makes them exclusive contracts that violate § 3.  Thus, Suture Express' claim under the Clayton Act mirrors its tying claim under § 1 of the Sherman Act.  And, "the standard for adjudicating tying [under Sherman Act § 1 and Clayton Act § 3] are now recognized to be the same."  *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008) (citing *Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 874 (11th Cir. 1998); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 495–96 (3d Cir. 1992) (en banc); *Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290, 1298–99 (10th Cir. 1989)); *see also* IX Areeda & Hovenkamp ¶ 1719b (explaining that although the words of Sherman Act § 1 and Clayton Act § 3 "differ, the two statutes apply a single substantive standard").  Thus, for the same reasons explained in the analysis for Suture Express' Sherman Act claim, defendants are entitled to summary judgment against Suture Express' tying claim under § 3 of the Clayton Act.[18]

## C.  Kansas Restraint of Trade Act

Finally, Suture Express and defendants both move for summary judgment on Suture Express' claim under the Kansas Restraint of Trade Act.  The KRTA "is broad in scope" but case law under the Act is "largely undeveloped" and "the bulk of [the Act's] provisions have not been meaningfully interpreted by Kansas courts."  *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1068 (Kan. 2012) (citing *Bergstrom v. Noah*, 974 P.2d 520, 530 (Kan. 1999)).  The Kansas Supreme Court has noted that the KRTA and federal antitrust laws share some similarities, but "they are not, in fact, the same."  *Id.* (citing *Bergstrom*, 974 P.2d at 531).

---

[18]    And, for the same reasons explained above when discussing the Sherman Act claim, the Court denies Suture Express' summary judgment motion on its Clayton Act claim.

Federal antitrust law may supplement the remedies available under this Kansas law, but it does not displace the substantive antitrust provisions of the KRTA. *Id.* Therefore, "[w]hile . . . cases [interpreting federal antitrust statutes] may be persuasive authority for any state court interpreting [Kansas'] antitrust laws, such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws." *Bergstrom*, 974 P.2d at 531.

K.S.A. § 50-112 prohibits all agreements or contracts "made with a view or which tend to prevent full and free competition in the . . . sale of articles imported into [Kansas]" and those "designed or which tend to advance, reduce or control the price . . . of any such products or articles." In *O'Brien*, the Kansas Supreme Court held that K.S.A. § 50-112, in its form on the date of that opinion,[19] omitted any mention of reasonableness, or a rule of reason. 277 P.3d at 1079. The Kansas Supreme Court thus held that the statute "leaves no room" for applying a rule of reason approach, and held that "reasonableness does not set the antitrust violation standard in Kansas . . . ." *Id.* at 1083. Given this holding, the Court cannot simply apply its federal analysis to decide whether the KRTA claim survives summary judgment.

Instead, the Court begins its analysis of the KRTA claim with the requirement of antitrust injury. While this requirement originates in "federal antitrust jurisprudence,"[20] it undoubtedly plays an important role under the KRTA. As the Kansas Supreme Court explained in *O'Brien,* the antitrust injury requirement "equates to the Kansas concept of causation, or the 'requirement that a plaintiff's theory of damages … correspond[s] to an economic effect that the statute …

---

[19]     The Kansas legislature enacted "substantial changes" to the KRTA after the Kansas Supreme Court's opinion in *O'Brien*. *Smith v. Phillip Morris Cos.*, 335 P.3d 644, 652 (Kan. Ct. App. 2014). The amendments to the KRTA went into effect on April 18, 2013, but generally do not apply retroactively to cases already pending at the amendments' effective date. *Id.* (citing K.S.A. § 50-164 (Supp. 2013)) (further citation omitted). Because this case was filed before the 2013 effective date of the KRTA amendments, the current version of the KRTA does not apply to this case.

[20] *O'Brien*, 277 P.3d at 1075 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

invoked as the basis for liability aims to prevent.'"   277 P.3d at 1075 (quoting Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 698 (2003) (first ellipsis in original)).   *O'Brien* illustrates how Kansas law applies this requirement, whether one thinks of it as antitrust injury or damages causation.

In *O'Brien*, a class of retail consumers who had purchased a particular brand of fashion accessories and luggage from retail stores sued the products' manufacturer.   This class claimed that the manufacturer had violated the KRTA by adopting a pricing policy "suggesting" retailers should sell its products at "keystone," which was "twice wholesale plus a small amount that varie[d] by product."   *Id.* at 1068.   The manufacturer also shipped its products to retailers tagged with a "manufacturer's suggested retail price (MSRP)."   *Id.*   And while the manufacturer characterized its policy merely as "suggested pricing," *id.*, the summary judgment facts established that:

- the manufacturer required its retailers to initial and sign an acknowledgment that violating the pricing policy was "grounds for dismissal" from selling the products at retail;

- while never "systematic[ally]" or "comprehensive[ly]" monitoring compliance with this pricing policy, the manufacturer "occasionally enforced" it by refusing to deal with retailers who sold its products at discounted prices; and

- the pricing policy had *increased* the price that the plaintiff class of retail buyers had paid to purchase the products.

*Id.* at 1068–70.

These summary judgment facts sufficed, the Kansas Supreme Court held, to permit a reasonable jury to find that the plaintiff class "actually [had] paid prices for [the manufacturer's goods that were] *inflated* by its pricing combinations or arrangements with retailers."   *Id.* at 1078 (emphasis added).   The Kansas court deemed these facts sufficient to avoid summary judgment because the KRTA requires a plaintiff seeking to recover under this act to "come forward with

69

evidence that [the plaintiff] has been injured or damaged by" conduct that the KRTA renders illegal. *Id.* at 1077. But *O'Brien* also held that not just any kind of injury will do. A KRTA plaintiff also must seek to recover for "an economic effect that the [KRTA] aims to prevent." *Id.* at 1075. The Kansas court concluded that the manufacturer's policy had caused retail customers to pay an inflated price, and this was sufficient to support a finding that the claimed damages met both aspects of the KRTA's requirement for antitrust injury/damage causation. *Id.* at 1078. The Kansas Supreme Court thus reversed the trial court's decision granting summary judgment. *Id.*

Close attention to *O'Brien*'s rationale focuses the analysis on the very facts that make summary judgment appropriate here. The summary judgment facts in this case establish a market where both defendants, many regional broadline competitors, and even Suture Express are experiencing *declining* prices and *declining* markups. *See supra* Part III.A.2. Such declines, though bad news for defendants, Suture Express, and other participants in the distribution market, actually are good news for acute care providers who purchase distribution from them. These declining prices also are good news for patients who pay the bills issued by those acute care providers.[21]

Offering discounts to customers does not inflate prices—the condition that *O'Brien* held to satisfy the requirement that the claimed harm must be one that the KRTA "aims to prevent." To the contrary, price discounts give customers who choose to subscribe to them the chance to purchase at *deflated* prices. This kind of market condition provides no basis for a reasonable jury to find the kind of "economic effect" that the KRTA "aims to prevent." 277 P.3d at 1075. In short, the summary judgment facts preclude the possibility that Suture Express can satisfy the

---

[21]    Also, the summary judgment record contains no admissible evidence of reduced output. Rival national and regional competitors are growing the distribution market. Even Suture Express' expert calculates that industry-wide revenue figures for med-surg distribution had increased, not decreased, during the relevant period. *See supra* Part III.A.2.

KRTA's requirement of antitrust injury/damages causation.  This makes summary judgment appropriate.

In addition, the summary judgment facts fail to show that defendants' contracts were "made with a view," "designed to," or "tend to" prevent full and free competition, as the KRTA requires.  *O'Brien* explained that "it is enough [for a plaintiff] to show that the arrangement is 'designed to' or 'tends to' control prices . . . a plaintiff does not have to show that the arrangement actually succeeds in increasing prices."  277 P.3d at 1075.  Also, "the phrase 'designed to' contemplates a subjective standard [while] 'tend to' contemplates an objective standard, one that requires examination of the defendant's behavior to discern whether it would reasonably be expected to produce a particular result, regardless of the defendant's intention."  *Id.* at 1075–76.  Suture Express cites various documents where defendants discussed, separately, their use of bundling contract terms to defend against Suture Express taking defendants' suture and endo distribution business.  But no reasonable jury could find that these communications show that the contracts were designed to prevent full and free competition.  To the contrary, a reasonable jury only could find that these communications reveal competitors engaged in the activity that the KRTA seeks to promote—trying to meet and counter the effects of competition that Suture Express' innovative business model brought to the market.  If the Court were to view these communications sufficient for a jury to find conduct intended to prevent full and free competition, every attempt by one competitor to gain business from a rival would require a trial under Kansas' antitrust laws.  The Court does not understand the Kansas Supreme Court's interpretation of the KRTA to require such a result.

Even under the broadest permissible view of the KRTA and viewing all evidence in the light most favorable to Suture Express, the summary judgment record lacks evidence that

defendants' contracts were designed to or tend to harm competition.  To the contrary, Suture Express cannot demonstrate harm to competition sufficient to survive summary judgment on its KRTA claim.

And, for the same reasons, the Court denies Suture Express' summary judgment motion on its KRTA claim because it cannot establish harm to competition, especially when the Court views the evidence in the light most favorable to defendants, as it must when considering Suture Express' summary judgment motion.

## IV.     Conclusion

This case exposes the rough-and-tumble business of competition in the American marketplace.  In 1998, Suture Express launched an innovative business model designed to capture the most lucrative channel of med-surg distribution.  It worked.  By 2010, Suture Express had managed to capture a 10% share of that lucrative market segment, suture and endo distribution.  Defendants and other broadline distributors didn't like losing that market share to Suture Express, so they did what motived competitors do.  They fought back with their own pricing innovation—pricing designed to recapture those lost suture and endo customers.  Their innovation worked as well, and it cost Suture Express some of the customers it originally had taken from broadline distributors, including defendants.

The next move in this competitive saga belongs to the market's participants—Suture Express, defendants, other distributors, acute care providers, and other innovators who, as Suture Express once did, can come up with a new idea that customers may fancy.  But the Court can find nothing in our antitrust laws that assigns a role, on these summary judgment facts, to the courts.  Therefore, the Court grants summary judgment for defendants on all three claims asserted by Suture Express.

**IT IS THEREFORE ORDERED THAT** defendants Owens & Minor Distribution, Inc. and Cardinal Health 200, LLC's Motion for Summary Judgment (Doc. 253) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff's Partial Motion for Summary Judgment (Doc. 254) is denied.

**IT IS SO ORDERED.**

**Dated this 7th day of April, 2016, at Topeka, Kansas**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**